James E. Cecchi
Caroline F. Bartlett
Lindsey Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Paul M. Weiss
Julie D. Miller
COMPLEX LITIGATION GROUP, LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
(847) 433-4500

*Attorneys for Plaintiff*

Joseph P. Guglielmo
SCOTT + SCOTT LLP
500 5th Avenue, 40th Floor
New York, NY  10110
(212) 223-6444

Stephen A. Weiss
Jonathan Shub
Scott A. George
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
(212) 584-0700

Joe R. Whatley, Jr.
Patrick J. Sheehan
WHATLEY KALLAS
380 Madison Avenue, 23rd Floor
New York, New York 10017

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LYDIA FABEND, ROSEMARIE MURPHY, KIMBERLY DAVIS  and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>L'OREAL USA, INC., LANCÔME, INC., LANCÔME LUXURY PRODUCTS, LLC,<br><br>Defendants. | Civil Action No.12-3571(WJM) (MF)<br><br><br>**AMENDED COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiffs, by their attorneys, on behalf of themselves and all others similarly situated, make the following allegations pursuant to the investigation of their

counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      The search for the elusive waters of the "Fountain of Youth" has tempted those seeking to restore youth and beauty for ages.   Indeed, as the story goes, in 1513, the great explorer Juan Ponce De Leon searched high and low for the "Fountain of Youth" – only to find Florida instead.   In the 1800s, "snake oil" salesmen infamously ranged the West selling tonics that claimed to cure every ill, including signs of aging.   Today, the search for a youth potion continues and, like modern-day snake oil salesmen, L'Oreal USA, Inc., through its Luxury Division brand, Lancôme, Lancôme, Inc., and Lancôme Luxury Products, LLC (collectively "Defendants")[1] prey on consumers' fundamental fear of aging and their eternal hope that products exist that can eliminate the signs of aging and effectively turn back time.

2.      In fact, L'Oreal profits handsomely by its false and misleading claims that Lancôme's wrinkle cream products, including those from the Luxury Collections Visionnaire, Genifique, High Resolution, Renergie, and Absolue Precious

---

[1]      As the precise corporate structure of Defendants is unclear at the time of filing, Plaintiffs reserve the right to add additional Defendants should it become necessary as discovery progresses.   In addition, because the products themselves reference Lancôme Luxury Products, LLC, while the advertisements and websites do not, the use herein of one of the Defendants shall not be deemed to exclude any other.   The Defendants have made it impossible for a consumer to determine which entity in fact produces, distributes and sells the various Luxury Wrinkle Creams.

Cells (collectively "Luxury Wrinkle Creams") have age-negating effects on human skin. For example, among other things, Lancôme specifically promises that:

- Visionnaire is the "1st skincare [product] capable of fundamentally re-creating more beautiful skin . . . it acts biologically on the 12 key targets of aging";

- Genifique Youth Activating Concentrate "boosts the activity of genes and stimulates the production of youth proteins";

- High Resolution "helps boost the synthesis of the three natural skin fillers – collagen, hyaluronic acide, and elastin"; High Resolution Night Refill 3X™ "has triple antiwrinkle power that refills wrinkles in one hour";

- Renergie's "[l]ifting and contouring properties combine to firm and reshape the face . . . Skin Truth: skin cells need to communicate with each other constantly. This communication is key to maintaining the support structure that keeps skin looking youthful. This cutting-edge formula features the unique GF-Volumetry™ complex, shown to help support cellular communication"; the product will "lift the eyes; erase wrinkles and fine lines"; and "[v]isibly lift, firm and reshape facial contours, see the facial angle visibly improved by 8 degrees."; and

- Absolue's Pro-Xylane™, "a patented scientific innovation – has been shown to improve the condition around the stem cells and stimulate cell regeneration to reconstruct skin to a denser quality."; "it's proven: within 6 days skin recovers the epidermis of a young skin."

3.    Unfortunately, these efficacy claims (and others detailed below) are false, deceptive and misleading.

4.    As explained more fully herein, Lancôme has made, and continues to make, deceptive and misleading claims and promises to consumers about the efficacy of its Luxury Wrinkle Creams in a pervasive, nation-wide marketing scheme that confuses and misleads consumers about the true nature of the

products.   In reality, the Luxury Wrinkle Cream products do not live up to the claims made by Lancôme.

5.     Lancôme knows this, yet designs its marketing and advertising campaign to include indicia of scientific research for the sole purpose of misleading and deceiving consumers.   As a result, Lancôme's marketing pitch is the same as that of the quintessential snake-oil salesman – Lancôme dupes consumers with false and misleading promises of results it knows it cannot deliver, and does so with one goal in mind – reaping enormous profits.

6.     Indeed, the only reason a consumer would purchase the high-priced Luxury Wrinkle Creams sold by Lancôme instead of much lower-priced moisturizers, which are readily available, is to obtain the unique results that Lancôme promises.   Upon information and belief, other lower-priced brands manufactured and distributed by L'Oreal contain substantially the same ingredients as those touted by Lancôme – the only difference being the false and misleading promises made by Lancôme to deceive consumers into paying significantly more for the higher priced Luxury Wrinkle Creams.

7.     A direct effect of this pervasive and deceptive marketing campaign is that consumers across the country, including Plaintiffs and the proposed Class, relied upon Lancôme's false and misleading misrepresentations and purchased skin-care products for exorbitant prices that do not, and cannot, provide the results promised.

8.    Lancôme's false and misleading statements about the efficacy of a particular product are equally applicable to each of the products within that specific collection.  For example, for each of the Genifique products (serum, cream serum, eye cream, and night cream) ("Genifique Products") Lancôme specifically promises that its unique formula will "boost the activity of genes and stimulate the production of youth proteins" resulting in "visibly younger skin in 7 days."  According to Lancôme, these claims are based upon the purported discovery of a formula shown in "in-vitro tests on genes" to "boost genes' activity."  Because each of the Genifique Products contains essentially the same formula, and because Lancôme repeats the same promises for each product, the misleading claims touting the supposed benefits are equally applicable to all of the Genifique Products.   The same holds true for the Renergie, High Resolution, and Absolue collections.  (The Visionnaire collection currently has only one product.)

9.    In addition, Lancôme markets and sells certain collections together, falsely and misleadingly promising even greater results when the products are used in combination.  For example, Lancôme markets Visionnaire and Genifique together as "super serums" because they are "perfect partners for younger looking skin":



10.    Similarly, on its website Lancôme has a section titled "Discover Your Perfect Skincare" in which it asks consumers a series of questions about certain specific skin problems they are looking to address, such as "fight wrinkles" or "lift and firm."

11.    After the consumer answers a series of questions, Lancôme provides a page titled "Skin Profile & Recommendations" where it recommends products aimed at correcting the specific concerns identified by the consumer.  As is also the case at department stores, Lancôme cross-sells products from all of the Collections and recommends that the consumer purchase more than one of the Luxury Wrinkle Creams:



12.     Lancôme's marketing campaign for each of the Luxury Wrinkle Creams follows the same deceptive pattern and practice – Lancôme makes specific efficacy promises based on purported scientific research and new discoveries that deceive and mislead consumers into believing that the Luxury Wrinkle Cream they are purchasing will provide the promised and unique results.  Such promises are deceptive and misleading.

13.     Lancôme's Luxury Wrinkle Creams, and those of its competitors, are sold in a different manner than less expensive wrinkle creams or moisturizers, which affects the manner in which Plaintiffs and the Class are exposed to the false and deceptive claims.  While lower-priced consumer products are available on the shelves of drug stores and supermarkets, the Luxury Wrinkle Creams are sold mainly though counters at high-end department stores.  Sales persons who are specifically trained by Lancôme to sell its Luxury Wrinkle Creams routinely occupy

the counters, where Lancôme also provides consumers access to product displays and sales brochures. Accordingly, instead of making a side-by-side comparison of product packaging on store shelves, consumers of the Luxury Wrinkle Creams decide to purchase these products almost exclusively by virtue of marketing campaigns that reach consumers before they enter the retail outlets (i.e., print media advertisements, television commercials or internet marketing) or through the counter sales and advertising.

14.    Regardless of where Plaintiffs and the Class purchased the Luxury Wrinkle Cream products (*i.e.*, on-line directly from Lancôme, in a department store at the Lancôme counter, or from other third-party retailers like Sephora), they were exposed to Lancôme's pervasive deceptive and misleading advertising messages and material omissions regarding the efficacy promises of the Luxury Wrinkle Cream collections. Indeed, no reasonable consumer would accidentally purchase a $100 jar of wrinkle cream without some "knowledge" of what the product claims to do.

15.    Plaintiffs seek relief in this action individually and as a class action on behalf of all purchasers in the United States of at least one of the Luxury Wrinkle Creams ("the Class") at any time from the date of product launch for each of the Luxury Wrinkle Creams to the present (the "Class Period") for unjust enrichment, breach of express warranty, violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 58:8-1, *et seq.*; violations of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*, and the California False Advertising Law,

Cal. Bus. & Prof. Code § 17500, *et seq.*, violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, and for violation of the Consumer Fraud Laws of the various states. Pending completion of discovery, Plaintiffs may seek leave to amend the Class definitions.

16.    Plaintiff Fabend seeks relief individually and on behalf of a subclass of residents of her home state of California.

17.    Plaintiff Murphy seeks relief individually and on behalf of a subclass of residents of her home state of New Jersey.

18.    Plaintiff Davis seeks relief individually and on behalf of a subclass of residents of her home state of Illinois.

## THE PARTIES

19.    Plaintiff Lydia Fabend is a citizen of the State of California, residing in Marin County. Plaintiff Fabend purchased Lancôme's High Resolution Refill 3X Triple Action Anti-Wrinkle Cream with SPF 15 and Renergie Lift Volumetry Volumetric Lifting and Reshaping Cream from Macy's department store in Union Square, San Francisco, California, during the Class Period for personal use. As set forth in greater detail below, in or about late 2010 or early 2011, Plaintiff Fabend saw, read, and received Lancôme's material misrepresentations as described more fully herein, including Lancôme's many false and misleading product claims, and relied on those material mis-statements in making her decision to purchase Lancôme's Luxury Wrinkle Creams. Plaintiff Fabend would not have purchased

Lancôme's High Resolution and Renergie products had Lancôme not made such false and deceptive claims and instead disclosed the true nature of its products.

20.     Plaintiff Rosemarie Murphy is a citizen of the State of New Jersey, residing in Bergen County. In or about 2010, during the Class Period, Plaintiff Murphy purchased Absolue Precious Cells and Genifique in a Bloomingdale's department store in Hackensack, New Jersey, for personal use.  Plaintiff Murphy saw, read and received Lancôme's material false and misleading misrepresentations as described more fully herein, and relied on those material mis-statements in making her decision to purchase Lancôme's Luxury Wrinkle Creams.  Plaintiff Murphy would not have purchased Lancôme's Absolue Precious Cells and Genifique products had Lancôme not made such false, misleading and deceptive claims and instead disclosed the true nature of its products.

21.     Plaintiff Kimberly Davis is a citizen of the state of Illinois.  In or about January 2012, during the Class Period, Plaintiff Davis purchased High Resolution Eye Cream at a Macy's department store in Vernon Hills, Illinois for personal use. Plaintiff Davis was concerned about wrinkles on her face and decided to purchase the High Resolution product in reliance upon the representations made by Lancôme regarding effective wrinkle reduction.  Plaintiff Davis relied on efficacy promises as described more fully herein and would not have purchased the High Resolution product had Lancôme not made such efficacy promises and instead disclosed the true nature of the product.

22.    Defendant L'Oreal U.S.A., Inc., is a Delaware corporation with its principal place of business in Berkeley Heights, New Jersey.    L'Oreal has manufacturing facilities in Clark, NJ, Franklin, NJ and Piscataway, NJ.    L'Oreal has distribution facilities in Cranbury, NJ, Dayton, NJ and South Brunswick, NJ. L'Oreal also has research facilities in Clark, NJ and a consumer evaluation center in Berkeley Heights, NJ.

23.    Defendant Lancôme, Inc. is a Delaware corporation.

24.    Defendant Lancôme Luxury Products, LLC is a limited liability corporation.

### JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)  because there are more than 100 class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

26.    Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because Defendants reside in this District and a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District.    Defendants distributed, advertised and sold the Luxury Wrinkle Creams, which are the subject of the present complaint, in this District.

### GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**Lancôme's Misleading Efficacy Claims**

27.    A central theme of Lancôme's deceptive marketing campaign, which permeates throughout its print, television, in-store and web-based advertisements and product displays and sales brochures, is that its products, and the results promised by Lancôme, are supported by vigorous scientific research and resulting discoveries.  As described in more detail below, Lancôme's marketing campaign highlights the purported years of scientific research, the number of patents, "studies", lab research, and in-vitro testing that, according to Lancôme, supports the promised results.

28.    In fact, while such science-based claims provide Lancôme with an increased level of credibility among unsuspecting consumers, and therefore increased sales, the purported scientific research is simply part and parcel of Lancôme's deceptive and misleading advertising campaign.

29.    Despite Lancôme's admission in its Code of Business Ethics (2007) that "[o]verselling our products by making inflated or exaggerated claims for them is dishonest," Lancôme turns a blind eye to its own ethical standards for increased profits.

30.    One of the reasons Lancôme saturates its marketing campaigns with misleading scientific references is that it knows that such repeated and pervasive references to scientific terms and data makes it more likely that consumers will believe that its products are approved by the FDA, when in fact they are not. Lancôme knows that consumers who believe that the Luxury Wrinkle Cream products have received FDA approval are more likely to believe Lancôme's false

efficacy promises and therefore more likely to purchase the high priced Luxury Wrinkle Creams.

31.    By promising specific results, Lancôme's advertising transcends the realm of mere puffery and becomes actionable as deceptive, misleading or fraudulent.

32.    By way of example, Lancôme misleads consumers by claiming that many of its promised results are supported by "in-vitro testing," which Lancôme knows sounds scientifically reliable to the average consumer.

33.    In fact, "in-vitro" is Latin for "in glass" and it means that the results are based on lab testing rather than "in vivo" testing on people.  In other words, "in-vitro" results are based on ingredient testing on skin cells in a test tube or petri dish, which means that the ingredients' ability to penetrate to the deeper levels of the skin cannot be assessed.  In most instances, "in-vitro" results do not translate to human skin.  Lancôme is well aware of this reality yet continues to convey to consumers that "in-vitro" results support its efficacy claims.

34.    One example of an ingredient with great "in-vitro" results that does not translate to skin benefits is the family of peptides. In "in-vitro" tests, peptides have been shown to boost collagen production, reverse skin damage, lighten discoloration and much more.  While Lancôme touts these "in-vitro" results in its marketing, it fails to disclose what it knows is the truth:  Most peptide molecules are too large to penetrate the skin, which means they cannot possibly deliver the in-lab results in real life.   And, even if the peptide is one that can possibly penetrate

to deeper layers of the skin, the degree of penetration is significantly less in actual use by consumers than the "in-vitro" test results provide.  Lancôme is aware of this flaw in in-vitro testing, yet does not disclose it to consumers.   Accordingly, Lancôme's use of "in-vitro" tests as a marketing ploy is misleading to consumers.

35.    Moreover, to the extent that the Luxury Wrinkle Creams provide any of the promised results, such results are merely temporary.  Lancôme knows this, yet fails to disclose it to consumers, leaving Plaintiffs and the Class with the belief that the promised age-negating benefits will be permanent.

**Lancôme's Misleading and Deceptive References to Scientifically Sounding Data**

36.    Lancôme's product marketing strategy also includes references to nonsensical "clinical" studies or trials and consumer "tests."   Lancôme knows, because according to its product brochures for the Luxury Wrinkle Creams it also conducts psychological research, that average consumers are swayed by such indicia of scientific credibility and Lancôme takes full advantage of this to profit on consumers' gullibility.

37.    By way of example, Lancôme makes the following product claims, among others, on its respective product marketing materials:

- Genifique:

    o "Clinical study on skin proteins associated with young skin – France";

    o  "Based on consumer evaluations in a clinical study, which also consists of expert evaluations."

- Renergie:

- o "Based on results from consumer test of 50 women aged from 45 to 65 years old – France."

- Absolue:

  - o "Based on results from a consumer test on women with UV-damaged skin";

  - o "Reduction in crow's feet and laugh lines in a 4-week clinical evaluation on UV-damaged skin."

- Visionnaire:

  - o "Self-assessment of the total of all consumers tested at 4 and 6 weeks."

  - o "Clinical study"

- High Resolution:

  - o "In-vitro testing on rice peptides and alfalfa extract shows production of new collagen within 48 hours"

38.    Such references to scientific-sounding studies or "tests" are themselves deceptive and misleading (regardless whether the studies or tests exist).

39.    Upon information and belief, flaws in Lancôme's studies and tests include, but are not limited to (1) studies with too few participants to yield results that are scientifically or statistically significant such that Lancôme could reasonably believe that the results would translate to consumers, and (2) tests where participants are cherry picked and/or where results are selectively determined such that Lancôme is able to manipulate the results to support the purported benefits of the Luxury Wrinkle Creams for use in its advertising materials.

40.    Regardless of whether the actual "clinical" studies or "tests" referenced by Lancôme produced the claimed results, the references to such "clinical" studies or "tests" as being indicative of results for consumers in actual use is deceptive and misleading.

**Lancôme's Misleading Use of Footnotes and Asterisks**

41.    Another way that Lancôme misleads consumers is by its pervasive use of footnotes or asterisks throughout its marketing materials for all five Collections to deceptively disclaim the promised results of a particular product.

42.    For example, in its High Resolution product brochure Lancôme states that High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream "Visibly refills wrinkles and crow's feet* and helps re-plump skin for renewed smoothness."  However, in microscopically small print at the bottom of the brochure, Lancôme incoherently attempts to qualify the foregoing wrinkle claim stating, "*Visibly refill [sic] the appearance of wrinkles." Lancôme provides no explanation as to how High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream purports to refill *the appearance* of wrinkles, instead of the wrinkle itself, as is claimed in much larger, legible typeface.   In fact, while the use of the "appearance of wrinkle" language in the disclaimer is an attempt remedy the deceptive nature of the primary marketing message, the attempt fails because the type is illegible and also because it conveys a conflicting and misleading message. Consumers are therefore left with the false impression that High Resolution will actually refill their wrinkles and crow's feet.

**Lancôme Misleadingly Advertises that its Products are Protected by Patents**

43.    Another aspect of the deceptive and misleading advertising scheme employed by Lancôme to market its Luxury Wrinkle Creams is its claims that some of the products are patented.

44.    For example, in its brochure for Genifique, Lancôme claims: "The Innovation - 10 Years of Research - 7 International Patents."

45.    The message conveyed to consumers is that Lancôme's extensive 10-years of research has led to the development of some new and unique ingredient that Lancôme has patented, and that this ingredient is what makes Genifique distinct; that is, what enables it to boost the activity of genes.  However, it is impossible for the consumer to know exactly what is patented since there is no patent information or patent number(s) anywhere on the product or the product's packaging.  In fact, upon information and belief, no U.S. patents exist for Genifique.

46.    Moreover, even Lancôme is unsure of the number of "international patents" it possesses for Genifique.  In the May 2012 issue of Glamour magazine, a Lancôme advertisement for Genifique claims that it is internationally patented.  An asterisk refers to very small print which states "patented in the EU, France, Japan, Russia, and Mexico. US patent pending."  According to this advertisement, there are only 5, not 7, "international" patents for Genifique.  Of course, no one can tell what the patents are actually for since there are no numbers identifying them.

47.    Lancôme convinces consumers that Genifique warrants its high price tag through misleading claims that its unique ingredient is protected by patents

17

and therefore not available in any other product.  But, upon information and belief, none of the ingredients in Genifique are unique.  All of the ingredients in Genifique are present in other cosmetic products.

48.    Lancôme makes similar unfounded statements with respect to Visionnaire [LR 2412 4%] Advanced Skin Corrector, claiming that "[LR 2412] is such a visionary molecule that it is now protected by 20 International Patents!" Lancôme further claims in the question and answer section on its website:

Question:    "Why did it take so long to develop [LR 2412]?"

Answer:    These 12 years represent the sum of the time it took to create 20 compounds, all of which belong to the jasmonate family, and to carry out formulation trials to test their stability, safety and performance. The final result of this long development process is a single molecule that is now protected by 20 International patents.

49.    Contrary to these claims, the package insert for Visionnaire, which consumers receive only after purchasing the product, states only that a patent is "pending" and conveniently omits Lancôme's claim of having "20 International Patents!"

50.    Once again, Lancôme's claims of patent protection are intended to deceive consumers and cause them to purchase what they believe is a unique product providing unique results.

51.    The use of the word "patent" by Lancôme in its advertising materials is not only deceptive and misleading to the consumer, but also constitutes false marketing under U.S. patent law.  According to 35 U.S.C. § 292(a):

(a)    Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, or imported by the person into the United States, the name or any imitation of the name of the patentee, the patent number, or the words "patent," "patentee," or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; or **Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article the word "patent" or any word or number importing the same is patented, for the purpose of deceiving the public**; or Whoever marks upon, or affixes to, or uses in advertising in connection with any article the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public - Shall be fined not more than $500 for every such offense. (Emphasis added)

52.    In sum, touting that its research and scientific innovation has led to the patenting of its products is simply part and parcel of Lancôme's deceptive and misleading scheme to convince consumers that the Luxury Wrinkle Creams provide unique age-negating benefits and are therefore worth their price tag.

**Lancôme's Pervasive and Misleading National Marketing Campaign**

53.    Lancôme's pervasive false and misleading national marketing campaign includes the dissemination of deceptive advertising through a variety of mediums including, but not limited to, internet, television and print media, as well as in-person product presentations and demonstrations by Lancôme-trained beauty consultants and sales people.    Some of the same deceptive and misleading statements are also printed on the product boxes.

### Internet Marketing

54.     Lancôme's internet marketing includes, among other things, video presentations, statistical data, and question and answer information on its own website, Lancôme-usa.com.  In addition, Lancôme's products and advertisements appear on numerous third-party websites including, but not limited to, Sephora.com,  Macys.com,  Amazon.com,  Neimanmarcus.com,  Nordstrom.com, facebook.com, and hsn.com.  Many of its commercials and promotional videos are also readily accessible on youtube.com.  Each of these sources provides consumers access 24 hours a day, 7 days a week, to Lancôme's deceptive advertising.

### Print Media and Sales Brochures

55.     Lancôme also heavily markets its Luxury Wrinkle Creams in print media, including the placing of advertisements in such widely circulated magazines as Glamour, Cosmopolitan, Vogue, Elle, Marie Claire, and Allure, among others. Lancôme specifically targets print advertising of the Luxury Wrinkle Creams in magazines with readership in the 25-to-60 age bracket.

56.     The specific dates and places of each of Lancôme's advertisements are in the possession of Defendants.

57.     In or about late 2010 to early 2011, in reliance upon information provided by Lancôme in magazine advertisements, including Glamour magazine, among others, Plaintiff Fabend purchased Lancôme's High Resolution and Renergie products.

58.    In addition, Lancôme provides product sales brochures and product displays for distribution and viewing at, among other places, malls and department stores, which provide much of the same information available online, as well as which direct customers to visit Lancôme.com for more product information.[2]  The following are sample sales brochures, which were made available at, among other places, the Lancôme counter at the Nordstrom department store in Short Hills, New Jersey:



---

[2]    When consumers in the United States visit Lancôme.com, they are automatically re-directed to Lancôme-usa.com.











59.    Plaintiff Fabend saw, read and relied on product efficacy statements in making her decision to purchase the High Resolution and Renergie products in or about late 2010 and early 2011 at the Union Square San Francisco Macy's department store.  The efficacy statements relied on by Plaintiff Fabend included, for example, the purported, "scientific" benefits based upon discoveries, "clinical" data and "in-vitro" tests.  In addition, Plaintiff Fabend viewed before and after photos of a woman's jaw and neckline purporting to have been "reshaped" and "visibly improved by 8 degrees" after using Lancôme's  Renergie Lift Volumetry product.

60.    These false and misleading statements received by Plaintiff Fabend in or about late 2010 and early 2011 at the Union Square San Francisco Macy's department store were material and influenced her decision to purchase Lancôme products.

61.    Despite consistent use, Plaintiff Fabend did not experience any of the promised results from the Lancôme Wrinkle Cream Products.

62.    Similarly, Plaintiff Murphy saw, read and relied upon the false and misleading statements contained in Lancôme's Genifique and Absolue Precious Cells sales brochures and product displays at Bloomingdale's department store in Hackensack, New Jersey in or about 2010 (Absolue Precious Cells purchases) and 2011-2012 (Genifique purchases).

63.    Plaintiff Murphy was induced to purchase Absolue Precious Cells as a result of Lancôme's material false and misleading product statements.   Despite consistent use, Plaintiff Murphy did not experience any of the promised results from using Absolue Precious Cells.

64.    Likewise, Plaintiff Murphy was induced to purchase Genifique as a result of Lancome's material false and misleading printed product statements. Despite consistent use, Plaintiff Murphy did not experience any of the promised results from using Genifique.

65.    Plaintiff Davis saw, read, and relied upon the false and misleading statements contained in Lancôme's High Resolution sales brochure and product display at Macy's department store in Vernon Hills, Illinois.

**In-Store Sales People**

66.    Upon information and belief, Lancôme also provides a training program and disseminates uniform information to sales persons regarding the Luxury Wrinkle Creams at locations where its products are sold.   These sales

persons are trained by Lancôme to parrot and reinforce the same purported benefits of using the Luxury Wrinkle Creams as well as the pseudo-scientific data supporting such promised results as contained in Lancôme's other forms of advertising.

### Use of Celebrity Spokespeople

67.    Lancôme makes further use of print, television and internet advertising, wherein Lancôme touts the benefits of its skin-care products using celebrity spokespersons who claim to exemplify the results of the products.

68.    What Lancôme fails to disclose is that the images of the celebrities it uses are airbrushed, digitized, embellished, "Photo-shopped" or otherwise altered and, therefore, contrary to the claims made by Lancôme, cannot and do not illustrate the effectiveness of its products.  In sum, the images used by Lancôme to sell its Luxury Wrinkle Creams have nothing to do with the effectiveness of the products themselves.

69.    Most recently, the National Advertising Division in the United States has taken a stance against the use of Photoshop in cosmetics advertising, noting that "[a]dvertising self regulatory authorities recognize the need to avoid photoshopping in cosmetics advertisements where there is a clear exaggeration of potential product benefits."

70.    Despite this warning, and the increased scrutiny regarding the use of photo-shopped images in the marketing of skin care products, upon information and belief, Lancôme continues to use altered images in its cosmetic advertising,

including this highly embellished image of actress Kate Winslet as compared to her

photo below.  (available at http://www.imdb.com/media/rm2159774208/nm0000701).





71.    Such deceptive use of celebrity spokespersons only further illustrates

the lengths to which Lancôme will go to trick its consumers to make a profit.

**Lancôme's Claims Regarding Product Efficacy Are Not Mere Puffery**

72.    Lancôme's specific claims of efficacy cannot be defended as mere puffery.    Similarly, Lancôme's claims of scientifically backed research and discoveries go beyond any mere sales puffery by claiming first that certain specific discoveries enable the Luxury Wrinkle Creams to provide the unique benefits and then by providing specific "proven results" affirmations and promises of those benefits.    Indeed, such specific scientific references are an integral part of its marketing campaign, as L'Oreal admits in its 2011 annual report: "close interaction between science and marketing . . .  is a key advantage to L'Oreal's innovation approach."

73.    Lancôme relies on such a "close interaction" because it knows that consumers are more likely to believe its empty promises, and therefore more likely to purchase its products, when the indicia of scientific discovery and study are present.    Lancôme even has a term for the exaggerated use of science in its advertising and marketing campaign:  "hyperscience."

74.    Even if one or more of Defendants' claims is literally true, when viewed in their totality, the promises made by Defendants regarding the efficacy of the Luxury Wrinkle Creams are nevertheless misleading to the average consumer and are therefore actionable regardless of their literal truthfulness.

**Other Challenges to Lancôme's Misleading Advertising**

75.    In December 2010, the Swedish Market Court found that Lancôme's claims that its High Resolution products (one of the Collections at issue here) could

smooth out wrinkles by up to 70% were unsubstantiated and not supported by scientific evidence. The court ruled that Lancôme's advertisements were thus misleading. The court imposed a conditional fine of 1 million krona, and also ordered L'Oreal to pay the ombudsman's legal fees. Lancôme was banned from making a number of claims about its creams, including that they "repair wrinkles from within," "reduce wrinkles up to 40 percent," or use "pictures that mislead customers about the effects of the product in future adverts."[3]

76.     Despite these admonitions by the Swedish court, Lancôme continues to deceive and confuse consumers in the United States by repeating similar false, misleading, and deceptive claims domestically.[4]

77.     In addition, both L'Oreal and Lancôme have recently had advertisements banned in the U.K. for containing deceptive images, which were found to have misled consumers regarding the efficacy of their products. Specifically, an advertisement by L'Oreal for its Revitalift wrinkle cream was banned because it "misleadingly exaggerated the performance of the product in relation to the claims." Also, an advertisement featuring Julia Roberts wearing Lancôme's Teint Miracle foundation was banned because her skin appeared "categorically flawless."

---

[3]     Available at: http://www.cosmeticsdesign-europe.com/Market-Trends/Ads-branded-misleading-as-L-Oreal-s-lumbered-with-conditional-fine.

[4]     *See* http://thelook.today.msnbc.msn.com/_news/2012/02/01/10288992-loreal-ad-banned-for-making-rachel-weisz-look-misleadingly-smooth?lite;http://www.styleite.com/beauty/julia-roberts-christy-turlington-ads-banned-photoshop/#0

78.    Whether over the Internet, television, in print or through personal contact with sales people, each of these forms of advertising perpetuates the same general deceptive scheme that Lancôme's products have age-negating effects on human skin.  In fact, the Luxury Wrinkle Creams do not have such effects.

**Product Cycles**

79.    To perpetuate its deceptive and misleading scheme, Lancôme has a short product cycle, releasing new products every few years based upon some new "research" or purported "scientific discovery."  Lancôme does so in order to falsely tout its new products via a re-imagined marketing campaign in order to keep driving sales and profits that would otherwise stagnate once consumers used the products and realized that they do not perform as promised.  This scheme is evidenced by the fact that Lancôme discontinues sales and production of its older products once new products are introduced to the market, despite the fact that the claims made on the discontinued products are seemingly amazing scientific breakthroughs.

80.    For example, Lancôme discontinued its Secret de Vie[5] product, for which it made the following promises:

- It started in the Lancôme Laboratories with the urge to achieve "skin rebirth." Then came an awesome discovery: Sucre Vital™, a magical nutrient that fuels life in a hostile undersea world. Recreated by Lancôme scientists, this fuel and five other life-sustaining ingredients form Extrait de Vie™, a powerful concentrate that provides the skin with virtually everything it needs to thrive.

---

[5]    The French name "Secret de Vie" translates into "Secret of Life" in English.

- Enriched with Extrait Extréme, two phenomenal marine extracts from extreme environments the boiling California undersea and the glacial Arctic Ocean this rare complex prolongs the life of skin cells.

- A unique concentrate of six ingredients that delivers intense restorative action to six major cell types for instant, visible, exceptional results.

- Intense nighttime regenerating action your skin experiences the transformation of "cellular rebirth."

81.     Lancôme discontinued this purported "awesome discovery" that "prolongs the life of skin cells" from the market despite its promised efficacy.

82.     Lancôme's removal of purportedly effective products, like Secret de Vie, from the market demonstrates that Lancôme's promised benefits are illusory and nothing more than clever marketing.

83.     Upon information and belief, the Secret de Vie line of products was replaced by the Absolue Collection.

**Comparison to Lower Cost Products**

84.     L'Oreal USA, Inc. also sells products under other brand names, often for significantly lower prices.  Some of these lower priced products provide similar results to those of the Luxury Wrinkle Creams; others are almost identical.  For example, L'Oreal USA's "L'Oreal Paris" brand sells a product called L'Oreal Youth Code Serum Intense that is substantially identical to Lancôme's Genifique: Youth Activating Concentrate.  The following chart compares these products:

| Product | Genifique<br>Youth Activating Concentrate | L'Oreal Paris<br>Youth Code Serum Intense |
|---|---|---|
| Ingredients | • Aqua/ Water/Eau | • Aqua/Water |

| | |
|---|---|
| <ul><li>Bifida Ferment Lysate</li><li>Glycerin</li><li>Alcohol Denat.</li><li>Dimethicone</li><li>Hydroxyethylpiperazine Ethane Sulfonic Acid</li><li>Sodium Hyaluronate</li><li>Phenoxyethanol</li><li>Adenosine</li><li>PEG-20 Methyl Glucose Sesquistearate</li><li>==PEG-60 Hydrogenated Castor Oil==</li><li>Salicyloyl Phytosphingosine</li><li>Ammonium Polyacryldimethyltauramide/Ammonium Polyacryloyldimethyl Taurate</li><li>Limonene</li><li>Xanthan Gum</li><li>Caprylyl Glycol</li><li>Disodium EDTA</li><li>Octyldodecanol</li><li>Citric Acid</li><li>==Citronellol==</li><li>Parfum/Fragrance</li></ul> | <ul><li>Bifida Ferment Lysate</li><li>Glycerin</li><li>Alcohol Denat.</li><li>Dimenthicone</li><li>Hydroxyethylpiperazine Ethane Sulfonic Acid</li><li>Peg-20 Methyl Glucose Sesquisterate</li><li>Sodium Hyaluronate</li><li>Salicyloyl Phytosphingosine</li><li>Palmitoyl Oligopeptide</li><li>Palmitoyl Tetrapeptide-7</li><li>Adenosine</li><li>Ammonium Polyacryldimethyltauramide,</li><li>Disodium Edta</li><li>Caprylyl Glycol</li><li>Citric Acid</li><li>Xanthan Gum</li><li>N-Hydroxysuccinimide</li><li>Chrysin</li><li>Octyldodecanol</li><li>Sodium Benzoate</li><li>Phenoxyethanol</li><li>Limonene</li><li>Parfum</li></ul> |

| | | |
|---|---|---|
| Claims | • 10 years of research<br><br>• More than 4000 genes analyzed<br><br>• More than 1300 proteins studied<br><br>• Tonicity and elasticity significantly improved<br><br>• Boosts the activity of genes<br><br>• Stimulates the production of youth proteins<br><br>• A true skincare innovation with 7 worldwide patents pending,<br><br>• Visibly younger skin in just 7 days.<br><br>• Skin looks as if lit from within – breathtaking radiant.<br><br>• Its youthful quality returns: cushiony soft and velvety to the touch. Drop by drop, skin is vibrant with youth, its tone becomes astonishingly even, its texture dramatically refined. | • 10 Years of Gene Research.<br><br>• See smoother, youthfully luminous and rested skin emerge.<br><br>• L'Oreal scientists unlock the code of skin's youth by discovering a specific set of genes that are responsible for skin's natural power of regeneration.<br><br>• With L'Oreal's breakthrough GenActiv Technology TM, this 10x more concentrated daily activating serum has the power to instantly hydrate and transform skin to be smoother, youthfully luminous and rested skin emerge.<br><br>• Dramatic Results:<br><br>o Immediately, skin is transformed to be silky smooth, deeply hydrated<br><br>o 1 Week, Facial features look rested and your face radiates from within<br><br>o 4 Weeks, Helps liberate your face from signs of fatigue. Skin is revived and appears visible younger. |
| Cost | $80.00 for 1 fluid ounce | $24.99 for 1 fluid ounce |

85.    As demonstrated by the above comparison of the efficacy claims made by L'Oreal for both products, the efficacy claims are driven by the target market and not by the actual results that the substantially identical products will provide. That is, the claims for L'Oreal's Youth Code Serum Intense, which, at $24.99 for 1 fluid ounce is a much lower-priced product, are directed at working middle-class women, and therefore L'Oreal focuses on liberating the skin from looking "fatigued," "reviving" the skin, and making it look more "rested."  Conversely, L'Oreal's claims for Genifique Youth Activating Concentrate, which, at $80.00 for 1 fluid ounce, is a high-priced product focus on science (*i.e.*, genes analyzed,  performance, patents) and promises of "youth" proteins and younger skin.

86.    Despite the different efficacy claims and the price disparity, the only ingredients in Genifique but not in the less expensive Youth Code are PEG-60 Hydrogenated Castor Oil and Citronellol, none of which are new or unique such that they provide any special benefits.  PEG-60 Hydrogenated Castor Oil is a fragrance ingredient, cleansing agent or solubilizing agent found in more than 60 cosmetic products.  Citronellol is a colorless oily liquid with a floral smell suggestive of rose commonly used in cosmetics and personal care products.

87.    Accordingly, none of the ingredients that are found in Genifique but not found in the less expensive Youth Code justifies the price discrepancy.

**The Specific Luxury Wrinkle Cream Claims made by Lancôme**

88.    Lancôme makes specific promises regarding the efficacy of the Luxury Wrinkle Creams as further detailed below.

## VISIONNAIRE ADVANCE SKIN CORRECTOR

89.    Visionnaire [LR 2412 4%] Advanced Skin Corrector ("Visionnaire") was launched in September 2011.

90.    Visionnaire is sold for $84 for 1.0 fl. oz, and $105 for 1.7 fl oz.

91.    Lancôme's misleading advertising campaign for Visionnaire is designed to highlight the dramatic (and fanciful) results that can be achieved by using Visionnaire.

92.    The following advertising and marketing claims about Visionnaire are deceptive or misleading:

a.    LR 2412 is a molecule designed to propel through skin layers. On its path, it triggers a cascading series of *micro-transformations\* and acts biologically on the 12 key targets of aging\**. LR 2412 is a small molecule. It is also amphiphilic, which means it is able to merge naturally with both aqueous and lipid structures in the skin. As soon as it is applied, LR 2412 therefore merges with surface lipids without impairing skin's barrier function. It is such a visionary molecule that it is now protected by 20 International Patents!
*\*Based on in-vitro testing*

b.    Capable of fundamentally re-creating more beautiful skin.

c.    One out of two women tempted by a cosmetic procedure decided to postpone it. \*\*\*
        \*\*\* After 4 weeks of consumer use. Consumer evaluation of women aged 35 to 49 years tempted by hyaluronic acid, laser or chemical peeling. Results not equal to a medical procedure.

d.    In 4 weeks, wrinkles\*, pores\*, and uneveness are visibly corrected.
        \*clinical study

e.    Fine lines look reduced: 76%
Pores seem less visible: 84%
Skin seems smoothed out: 87%

Overall skin appearance is improved: 86%

f.    LR 2412 visibly rejuvenates your skin.

g.    Much more than a wrinkle-corrector, our 1st skincare capable of fundamentally re-creating more beautiful skin. The first skincare with LR 2412, a molecule designed to propel through skin layers.

h.    When plants are damaged, they produce a 'signal molecule.' This activates the healing of the damaged tissues and also serves to make them more resistant. Within plants, it is this 'signal molecule' that triggers the action of repair and defense mechanisms. The challenge of our Research was to mimic its ability in a compound that it's in affinity with human skin. Our Research created and studied around 20 derivatives of this substance. Out of these studies, the molecule LR 2412 was born.

93.    Lancôme deceives and misleads consumers by claiming that the promised results of Visionnaire are based on "clinical studies" and "in-vitro testing." Such references to purported supporting data is part and parcel of Lancôme's false and misleading marketing campaign because Lancôme presents the data in a deceptive and misleading manner such that consumers are likely to give it more credibility than it deserves. Further, Lancôme knows the promised results – as trumpeted to consumers via Lancôme's purportedly science-based marketing gimmicks – cannot be attained.

94.    Lancôme repeatedly claims specific results for Visionnaire that are based on what amounts to a mere survey of consumers who received free product from Lancôme as part of the "study."

95.    In addition, Lancôme's descriptions of the tests and/or studies it relies on are deceptive and misleading because they overstate or mischaracterize the circumstances of tests or studies themselves.

96.    For example, while one of Lancôme's tests for Visionnaire is described as being conducted on a "total of 800 women" (Lancôme-usa.com), none of the purported efficacy results are based on this test.  Rather, for the efficacy results, Lancôme refers at one point to an undefined and un-described "clinical study" and at another point to a seemingly different and incoherent description of a "self-assessment of the total of all consumers tested at 4 and 6 weeks."  These tests appear to be different from the test on "800 women" yet deceivingly purport to reflect the results of "all women tested."

97.    Lancôme's references on the "proven results" portion of its website are similarly deceptive and misleading.  Here, Lancôme touts that consumers who used Visionnaire reported that "fine lines looked reduced 76%."  Lancôme does not disclose whether "all the consumers tested" reported a 76% reduction in the look of fine lines or whether 76% of the consumers tested reported some reduction in the look of fine lines, regardless of how minimal the "look" of the reduction.  Lancôme intentionally creates such confusion in order to deceptively bolster the results of its consumer testing because the interpretations of this "result" can be dramatically different – a 76% reduction in the look of fine lines across all those who were tested vs. 76% of those who were tested saw a minimal reduction in the look of fine lines.

98.     Moreover, Lancôme's patent claims for Visionnaire are not consistent from one advertisement to another.  For example, Lancôme's website claims that Visionnaire is the result of 12 years of research and 20 international patents.[6] Lancôme's package insert for Visionnaire indicates, however, that patents are pending but makes no mention of having any patents, much less 20 International patents.    And, inexplicably, L'Oreal's 2011 financial report targeting investors[7] claims that Visionnaire is protected by 17, not 20, patents. ("With Visionnaire, Lancôme has stepped into the future of cosmetics. As well as offering the performance and technological innovation of LR 2412, protected by 17 patents, Visionnaire stands out thanks to its innovative communication, with its five advertising visuals which focus on women of different ethnic origins.  The launch was backed up by a futuristic film that combines visions of hyperscience, hyperluxury and a very Lancôme kind of femininity.").

99.     Finally, Lancôme claims on other advertising material, that Visionnaire is the result of 10 years of research and only 17 patents.

---

[6]     "These 12 years represent the sum of the time it took to create 20 compounds, all of which belong to the jasmonate family, and to carry out formulation trials to test their stability, safety and performance. The final result of this long development process is a single molecule that is now protected by 20 International patents."  "These 20 International Patents, as well as the presentation of LR2412 at the World Congress of Dermatology in Seoul, South Korea, this spring, aid in validating our scientific discovery." (available at http://www.lancome-usa.com/visionnaire-minisite-ask-a-beauty-advisor/visionnaire_ask-a-beauty-advisor,default,pg.html).

[7]     http://www.loreal-finance.com/_docs/us/2011-annual-report/LOREAL_Rapport-Activite-2011.pdf



100.    Lancôme further claims the Visionnaire has the ability to boost cell renewal and accelerate the ability of the skin to heal itself.

101.    Lancôme's website contains a video purporting to "explore the science of LR 2412." This one minute and twenty second video includes a dramatization of Visionnaire penetrating in the skin and contains claims and promises that it will recreate more beautiful skin.









102.    And another of Lancôme's websites has a different video presentation, which makes similar efficacy promises:













103.    Making such specific efficacy promises based upon "scientific" data and discovery demonstrates that Lancôme's claims are *not* mere puffery.  Indeed, if Visionnaire actually "penetrated through skin layers," "act[ed] on all layers of the skin," "repair[ed]" fine lines and wrinkles, and "correct[ed] pores," it would trigger regulation by the FDA as a drug.

**<u>GENIFIQUE</u>**

104.    The Genifique collection ("Genifique") was launched in 2009.    The Youth Activating Concentrate costs $80 for 1 oz. and the Genifique Eye Youth Activating Eye Concentrate costs $60 for 0.5 oz.  The Genifique Eye Light-Pearl Eye Illuminating Youth Activating Concentrate costs $68.00 for 0.67 oz.    The Youth

---

[8] Note the almost invisible reference in this video (bottom right corner) to "19 women" as Lancôme attempts to disclaim the much more visible (and misleading) efficacy statement that the product is "Active on 100% of Women."

Activating Cream Serum costs $84. for 1 oz.  The Genifique Repair Youth Activating Night Cream costs $98 for 1.7 oz.

105.  Plaintiff Murphy purchased the Genifique Youth Activating Concentrate 1 oz. size for $80 at the Lancôme counter at the Bloomingdale's department store in Hackensack, New Jersey in May 2012.  She also purchased the Genifique Eye Youth Activating Concentrate 0.50 oz. size for $60 at the Lancôme counter at the Bloomingdale's department store in Hackensack, New Jersey approximately a year earlier. As stated herein, Plaintiff Murphy purchased the Genifique products based on Lancôme's false and misleading efficacy statements. The statements received by Plaintiff Murphy in or about 2011-2012 were material and influenced her decision to purchase Lancôme products.

106.  Despite using the products consistently Plaintiff Murphy did not experience the results promised by Lancôme.

107.  Lancôme misleadingly claims that Genifique is:

a. Our first skincare that boosts the activity of genes[1] and stimulates the production of youth proteins[2]. A true skincare innovation with 7 worldwide patents pending, Génifique is the foundation of every woman's skincare at any age or for any skin concern.
[1]*In-vitro test on genes.* [2]*Clinical study on skin proteins associated with young skin – France.*

b. Result: Visibly younger skin in just 7 days.  Skin looks as if lit from within – breathtaking radiant. Its youthful quality returns: cushiony soft and velvety to the touch. Drop by drop, skin is vibrant with youth, its tone becomes astonishingly even, its texture dramatically refined.

108.   Lancôme's advertisements further promise that using Genifique will provide visibly younger looking skin in just 7 days by reactivating and/or reviving youth (proteins) in the genes:





109.   In reality, Lancôme knows or should know that using Genifique will not boost the activity of genes in humans, despite its reference to an "in-vitro test on genes."

110.   Moreover, the nonsensical reference to the "clinical study on skin proteins associated with young skin – France" provides no information that would

allow a consumer to assess the reliability of the purported clinical study. Accordingly, the reference to this study does nothing to cure the false, misleading, and deceptive statements made by Lancôme, and instead contributes to the deception and consumer confusion.

111.   Lancôme also created and distributed several marketing videos further disseminating its claim that Genifique reactivates youth proteins based on the "science of genomics." The videos, one of which is entitled "The Science Behind Lancôme Genifique," were available on Lancôme-usa.com and are currently available on youtube.com (http://www.youtube.com/watch?v=puQkKTEcRr4&feature= related). The videos are inundated with purported scientific data, discoveries, studies and statistics showing how Genifique allegedly boosts the activity of genes:













112.   In reality, such claims are misleading and deceptive because nothing in Genifique is the result of a scientific discovery that can increase youth proteins in human skin such that it would repair or reverse the signs of aging.   Instead, Lancôme's reference to scientific-sounding information is part and parcel of Lancôme's deceptive, misleading scheme to convince consumers that Genifique provides unique age-negating benefits that it does not, and cannot, provide.

113.   Indeed, if Genifique did actually activate "youth genes" or stimulate the production of "youth proteins" in the skin, it would trigger regulation by the FDA.

### **HIGH RESOLUTION**

114.   The High Resolution collection was launched by Lancôme in 2009. The cost of the High Resolution Refill 3x Triple Action Renewal Anti-Wrinkle Night Cream is $93.00 for 2.6 oz.   The High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream is $60 for 0.5 oz.   The High Resolution Refill-3X™ Triple Action Renewal Anti-Wrinkle Cream SPF 15 Sunscreen is $78 for 1.7 oz.   The High Resolution Collaser-5x (tm) Intense Collagen Anti-Wrinkle Serum sold for $72.00 for 1 oz, but is no longer available online.

115.   Plaintiff Fabend purchased Lancôme's High Resolution Refill 3X Triple Action Anti-Wrinkle Cream with SPF 15 for approximately $80.00 on or about late 2010 or early 2011 from the Lancôme counter at the Union Square Macy's department store in San Francisco, California.   Plaintiff Fabend relied upon and was induced to purchase the High Resolution product based upon Lancôme's false

and misleading efficacy statements.  The statements received by Plaintiff Fabend in or about late 2010 and early 2011 were material and influenced her decision to purchase Lancôme products.  Indeed, Lancôme's false and misleading promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Fabend and the Class members.

116.   Despite using the products consistently, Plaintiff Fabend did not experience the results promised by Lancôme.

117.   Plaintiff Davis purchased Lancôme's High Resolution product for approximately $60 in or about January 2012 from the Lancôme counter at Macy's in Vernon Hills, Illinois.  Plaintiff Davis was induced to purchase the High Resolution product based on Lancôme's false and misleading product efficacy statements.  The statements Plaintiff Davis read and received were material and influenced her decision to purchase High Resolution.  Indeed Lancôme's false and misleading promises of product efficacy were intended to mislead, confuse and deceive members of the public, including Plaintiff Davis and the Class members.

118.   Despite using the products consistently, Plaintiff Davis did not experience the results promised by Lancôme.

119.   Lancôme sells the High Resolution collection, along with many of the other collections at issue here, in retail stores like Sephora, Macy's, Nordstrom, Bloomingdales, and Neiman Marcus, to name a few.  Lancôme controls and approves the content, use, and dissemination of marketing materials to these and other retail stores.

120. For example, Lancôme states on sephora.com that High Resolution provides the following benefits:

- **What it does:** Lancôme High Résolution Night Refill-3x™ has triple antiwrinkle power that refills wrinkles within one hour. Skin reclaims a youthful elasticity and resiliency and is noticeably more supple and plump. Dermatologists are only able to inject collagen and hyaluronic acid, but Refill-3X complex has the added ability to boost the synthesis of elastin. This exclusive formula, enriched with patent-pending Anisic Extract, helps complete the nightly cellular renewal process. Fine lines, wrinkles, and imperfections are noticeably less visible by morning, and skin appears refreshed and hydrated.

121. Not surprisingly, Lancôme's magazine advertising repeats the charade: "Target 80% of collagen in just 48 hours":



122. Still other Lancôme-approved claims of High Resolution's effectiveness include the following from Macys.com:

    With age, collagen coils loosen, elastin fibers degrade and hyaluronic acid reserves become depleted. As a result, visible wrinkles set in. The solution comes in the form of Lancôme's most advanced weapon in the fight against wrinkles, a formula that helps boost the

synthesis of the three natural skin fillers: collagen, elastin and hyaluronic acid to help refill the impression of wrinkles.

123.  And, Lancôme goes on to promise on Nordstrom.com that High Resolution will:

> Fight wrinkles at the source. Target 80% of collagen in just 48 hours! Inspired by laser therapy, High Résolution Eye Collaser-5X™ contains a revolutionary new complex that targets five key types of collagen in the skin around the eye (in in-vitro tests). The synthesis of healthy new collagen begins in just 48 hours.[1] Fast, visible results (based on results from a 3-week and a 4-week consumer test):- Immediately: 100% feel the eye contour is more supple while 86% see a visible reduction in puffiness. - In 3 weeks: 64% see a visible reduction in wrinkles. 54% see a visible reduction in the appearance of dark circles. 0.5 oz.  [1]Fight wrinkles deep within the skin's surface layers. In-vitro testing on rice peptides and alfalfa extract shows production of new collagen within 48 hours.[9]

124.  On Neimanmarcus.com, Lancôme promises that wrinkles are refilled in one hour:



---

[9]     In addition to not supporting actual results in humans, this reference to "in vitro testing on rice peptides and alfalfa extracts" is nonsensical. In keeping with Lancôme's misleading and deceptive approach to marketing, it appears to an unsuspecting consumer that the product claims are scientific – and therefore more credible.

125.    Not surprisingly, the National Advertising Division of the Council of Better Business Bureaus ("NAD") recommended that L'Oreal USA modify certain advertising claims made for its High Resolution Refill-3X facial cream. Specifically, following its review of the evidence, which included clinical testing of skin hydration after the initial product application and consumer-usage data, NAD determined that the advertising claim "Refill Wrinkles in Just One Hour" conveys the message from Lancôme is that wrinkles will be substantially reduced, if not completely eliminated, in a very short period of time. The NAD noted that the evidence in the record addressed improvements in skin hydration, rather than the reduction or elimination of wrinkles.    Accordingly, NAD recommended the advertiser discontinue the claim.    Apparently, Lancôme has ignored the NAD's finding and recommendation because it continues to make such false and deceptive clamis.    The one-hour claim is not limited to Lancôme's advertisements on neimanmarcus.com; it remains a pervasive sales tactic.

126.    Despite Lancôme's claims to the contrary, upon information and belief, no ingredient in High Resolution can "refill wrinkles in one hour" or "help boost the synthesis of the three natural skin fillers: collagen, elastin and hyaluronic acid to help refill the impression of wrinkles."

127.    Indeed like the other Luxury Wrinkle Creams, the High Resolution line is nothing more than a mixture of widely used ingredients – none of which are unique and none of which provide the promised results.

## **RENERGIE**

128.    Upon information and belief, Lancôme launched its Renergie line in or about late 2010.  Renergie Lift Volumetry Night costs $110.00 for 2.6 oz; Renergie Lift Volumetry Neck costs $90.00 for 1.7 oz; Renergie Lift Volumetry Lifting and Reshaping Cream costs $90.00 for 1.7 oz; Renergie Lift Volumetry Eye costs $67.00 for 0.5 oz; Renergie Anti-Wrinkle and Firming Treatment Cream costs $82.00 for 1.7 oz; Renergie Eye Anti-Wrinkle and Firming Treatment Cream costs $62.00 for 0.5 oz; Renergie Night costs $98.00 for 2.5 oz; Renergie Oil Free Lotion costs $82.00 for 1.7 oz; and Renergie Microlift Eve R.A.R.E- Intense Repositioning Eye Lifter costs $72.00 for 0.5 oz.

129.    Plaintiff Fabend purchased Lancôme's Renergie Lift Volumetry Volumetric Lifting and Reshaping Cream for approximately $90.00 on or about late 2010 or early 2011 from the Lancôme counter at the Union Square Macy's department store in San Francisco, California.  Plaintiff Fabend was induced to purchase the Renergie product based upon Lancôme's false and misleading statements of product efficacy.  The statements received by Plaintiff Fabend in or about late 2010 and early 2011 at the Union Square San Francisco Macy's department store were material and influenced her decision to purchase Lancôme products.  Indeed, Lancôme's false and misleading promises of product efficacy were intended to mislead, confuse, and deceive members of the public.

130.    According to Lancôme, Renergie is a:

unique treatment that addresses both wrinkles and lost firmness: Rénergie. Experience a rediscovery of skin's looks of youthful strength

and resilience. A unique firming and anti-wrinkle effect helps fortify skin to make it visibly plumper and smoother. This Double Performance treatment has been shown to dramatically decrease the appearance of fine lines and wrinkles as it fortifies skins firmness.

131.    Similarly, Lancôme claims that Renergie Night is:

From the laboratories of Lancôme Research comes a unique treatment that addresses both wrinkles and lost firmness: Rénergie. Experience a rediscovery of skin's looks of youthful strength and resilience. A unique firming and anti-wrinkle effect helps fortify skin to make it visibly plumper and smoother. This Double Performance treatment has been shown to dramatically decrease the appearance of fine lines and wrinkles as it fortifies skin's firmness.

Results:
Overnight, surface cell renewal is accelerated so skin looks re-energized, and well-rested. Day after Day, fine lines and wrinkles appear less noticeable as if they were virtually "slept away". Over time, skin is visibly tighter, smoother, younger looking.

132.    According to Lancôme's advertisements, Renergie can also "re-organize the collagen network to create a firmer support structure" and "provide tautening of the skin's support structure to deliver a visible volumetric action."  Lancôme claims further that "the facial angle of youth between the chin and the neck is improved by 9.5 degrees" and that Renergie's results are comparable to those of cosmetic surgery:



133. Many of Lancôme products, including Renergie, are also sold on the Home Shopping Network ("HSN"). According to one sales segment for Renergie on HSN, among other benefits, Lancôme claims that the product actually "re-contours the skin," "re-firms" and the skin "bounces back into shape." That video can be accessed at: http://www.youtube.com/watch?v=5EZU41ql5bw.

134. And according to this Lancôme product insert, Renergie can actually "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," and "reshape the profile":



135.   Again, Lancôme has produced a promotional video touting the specific benefits of using Renergie:







136.    In reality, nothing in Renergie will "erase wrinkles," "re-organize the collagen network of the skin," "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," and "reshape the profile" in humans such that it would repair or reverse the signs of aging or provide results similar to those of a facelift  Lancôme's claims to the contrary are false, deceptive and misleading.

137.    Indeed, if Renergie did actually "erase wrinkles," "re-organize the collagen network of the skin," "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," and "reshape the profile" it would trigger regulation by the FDA.

**ABSOLUE**

138.    Upon information and belief, Lancôme's Absolue Precious Cells collection was launched in October of 2009.  The cost of the Absolue Night Precious Cells Advanced Regenerating and Reconstructing Night Cream is $165.00 for 1.7 oz; the Absolue Ultimate Bx Replenishing and Restructuring Serum is $155.00 for 1 oz; the Absolue Ultimate Night Bx Intense Night Recovery and Replenishing Serum is

$165.00 for 1 oz; the Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 Sunscreen  is $165.00 for 1.6 oz ; and the Absolue L'Extrait is $350.00 for 1.7 oz.

139.    Plaintiff Murphy purchased Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 Sunscreen 1.6 oz. for $165.00 at the Lancôme counter at the Bloomingdale's department store in Hackensack, New Jersey in or about 2010.  As stated herein, Plaintiff Murphy purchased Absolue Precious Cells based upon Lancôme's false and misleading product efficacy statements. The statements received by Plaintiff Murphy in or about 2010 were material and influenced her decision to purchase Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 Sunscreen.

140.    Despite using the product consistently, Plaintiff Murphy did not experience the results promised by Lancôme.

141.    The Absolue Collection is purportedly based on a "decisive breakthrough in stem cells" such that "within 7 days skin recovers the visible signs of younger skin":



142.   In keeping with its characteristic marketing program, Lancôme regurgitates the misleading efficacy promises across the full line of Absolue Products.  For example, Lancôme claims that Absolue Eye Precious Cells is:

A powerful combination of unique ingredients – Reconstruction Complex and Pro-Xylane™, a patented scientific innovation – has been shown to improve the condition around the stem cells and stimulate cell regeneration to reconstruct skin to a denser quality.[1]   Results: Immediately, the eye contour appears smoother and more radiant. Within 7 days, signs of fatigue are minimized and the appearance of puffiness is reduced. Within 4 weeks, density is improved, skin feels soft and looks healthier. The youthful look of the eye contour is restored.

[1]*In-vitro test.*

143.   Similarly, Absolue  Advanced Regenerating cream is:

A powerful combination of unique ingredients – Reconstruction Complex and Pro-Xylane™, a patented scientific innovation – has been shown to improve the condition around the stem cells and stimulate cell regeneration to reconstruct skin to a denser quality.[1] Results: Immediately, skin feels soft, hydrated. Within 7 days, it's proven, skin recovers the visible signs of younger skin.[2] Skin feels strengthened and looks healthier. Within 4 weeks, wrinkles appear reduced, skin feels refined and polished. See significant deep wrinkle reduction in UV damaged skin, clinically proven.[3] *[1]In-vitro test. [2]Based on results from a consumer test on women with UV damaged skin.[3] Reduction in crow's feet and laugh lines in a 4-week clinical evaluation on UV damaged skin.*

144.   Lancôme represents that Absolue Night Precious Cells:

Restores density – Reduces wrinkles –Regenerates radiance. Fundamental discovery on stem cells.

Epidermis' most precious cells are the stem cells. Lancôme's research has made a decisive breakthrough by revealing the crucial role of stem cells' environment on their ability to restore density.

Exclusive innovation from Lancôme: A powerful combination of unique ingredients—Reconstruction Complex and Pro-Xylane™ – has been

shown to improve the condition around the stem cells, and stimulate cell regeneration to reconstruct skin to a denser quality.[1] This indulgently rich cream melts effortlessly into the skin and helps support skin's natural ability to repair itself at night.

Results: Upon waking, skin looks rested, soft and supple, and feels wrapped in a veil of comfort. Day 7, skin feels strengthened. Day 28, wrinkles appear reduced. Skin feels satiny smooth. [1]In-vitro test.

145.    According to Lancôme, Absolue L'Extrait has the following benefits:

Through a state-of-the-art biotechnological extraction process comes a line of Lancôme Rose native cells. Fermogenesis™, an exclusive process, preserves their capacities intact to perpetuate their integrity. Fermogenesis™ provides each cell with a gentle, unstressed growth environment, at its own rhythm, preserving its own metabolic rate and all of its regenerative potential.

Absolue L'Extrait was evaluated during a clinical study on several age-defining parameters**. At eleven weeks of use, a significant improvement in each of these major signs was noted***.
　　　**Forehead wrinkles, frown lines, crow's feet, under eye wrinkles, nasolabial fold, wrinkles around the mouth.
　　　***Based on a clinical study on 41 women.

146.    Lancôme further claims about Absolue L'Extrait:

An exceptional elixir exists. It contains up to 2 million Lancôme Rose native cells.

Experience Lancôme's revolutionary skincare innovation and our most powerful regenerating ingredient, Lancôme Rose Native Cells.

Extracted from the heart of the rare and resilient Lancôme Rose using an exclusive, state-of-the-art biotechnological process, these native cells are proven to extend their own exceptional properties to enhance skin's regenerative potential*.

Each jar of Absolue L'Extrait contains up to 2 million of these precious native cells. Absolue L'Extrait helps reveal firmer, more elastic, more adiant skin for fascinating beauty.

Absolue L'Extrait. A master piece of regeneration.

\*Based on in-vitro test results.

147.    Once again, Lancôme has produced promotion videos.  The video for

Absolue L'Extrait (available at http://www.youtube.com/watch?v= QhORyX6UeWI)

promises:









148.   Despite these promises of age-negating benefits such as skin recovering the epidermis of younger skin, reductions of over 30% of the signs of aging and stem cell rejuvenation, nothing in the Absolue products can provide the results promised by Lancôme.  Indeed, like the other Luxury Wrinkle Creams, and despite Lancôme's suggestion to the contrary, the Absolue Collection is nothing more than a mixture of widely used ingredients – none of which provide the promised unique results.

**The Results of Lancôme's Deceptive Conduct**

149.   Ignoring the inability of the Luxury Wrinkle Creams to provide the promised results, Lancôme's pervasive false and misleading marketing campaign leaves consumers with the impression that its products are uniquely able to provide certain age-negating effects on human skin.

150.   Lancôme compounds this deception by maintaining that all of the products and the promised results are unique and based on years of research and scientific study or data.

151.   Lancôme hammers this point home with its repeated references to patents, research, labs, scientific studies, stem cells, and claims of scientific breakthroughs, among other things, as a way to bolster the credibility of the products in the eyes of the consumer.  In fact, these claims are merely part and parcel of Defendants' false and misleading advertising program for its Luxury Wrinkle Creams.

152.    In addition to the material misrepresentations as described herein, Defendants' actions are likewise actionable based on their material omissions, which similarly induced Plaintiffs and the Class to purchase Luxury Wrinkle Creams.  For example, Defendants have failed to disclose the following:

- That the "in vitro" tests relied on by Defendants are not likely to translate to actual results in humans;

- That the referenced clinical studies or surveys were designed to be used in Lancôme's marketing efforts;

- That the purported patents, to the extent they exist, are not related to the efficacy promises or scientific "discoveries" made by Defendants;

- That none of the Luxury Wrinkle Creams provide unique benefits that cannot be found in other, less expensive products; and

- That any benefits actually provided by the use of the Luxury Wrinkle Creams are only temporary.

153.    Lancôme is in a position to actually know, or should know, that the promised results are not possible, *i.e.* its skin-care products cannot permanently recreate or re-contour the skin or provide the other promised age-negating results. Lancôme fails to disclose that its products do not perform as promised.

154.    Until such time as Lancôme ceases to continue to engage in deceptive and misleading advertising of the Luxury Wrinkle Creams, Plaintiffs and the Class will continue to be harmed.

155.   Lancôme's claims of efficacy based on "scientific" discovery are a material and important factor in its marketing campaign because Lancôme knows that consumers pay special attention to product claims that are science-oriented. Lancôme further knows that consumers can be duped into paying a higher price for products that purport to provide "hyperscientific" skin-correcting and age-negating benefits.

156.   Lancôme also is aware that, because of the aging population, consumers are increasingly susceptible to such deceptive marketing and advertising and that such marketing and advertising will continue to yield it ever-greater profits.

157.   Indeed, it is for these precise reasons – increase sales and profits – that Lancôme intentionally engages in its deceptive marketing and advertising campaign.

158.   Lancôme has succeeded in its deceit and has in fact enjoyed massive profits from its deceptive campaigns. Such enormous profits would not have occurred but for Lancôme's deceptive and misleading marketing and advertising campaign.

159.   Lancôme charges a high price premium for its products. Plaintiffs and the Class would not have paid premium Lancôme prices for the Luxury Wrinkle Creams had they known the truth regarding the deceptive marketing promises.

160.   Moreover, Plaintiffs and the Class believed they were purchasing Lancôme wrinkle cream products that would provide the promised age-negating

benefits as detailed herein.  In reality, although Plaintiffs and the Class paid for these unique Luxury Wrinkle Cream benefits, they did not get what they paid for. Instead, the products Plaintiffs and the Class purchased did not provide the promised age-negating results.

161.   As a result and because of Lancôme's deceptive marketing, Plaintiffs and the Class have been harmed in their purchases of the Luxury Wrinkle Creams.

162.   Without knowing the truth as to the efficacy of the Luxury Wrinkle Creams, Plaintiff and the Class paid exorbitant premiums for Lancôme skin-care products and/or received totally worthless products.

## CLASS ACTION ALLEGATIONS

163.   Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 (a), (b)(1), (b)(2), and (b)(3) on behalf of the following nationwide consumer class (the "Class"):

> All purchasers of at least one of the Luxury Wrinkle Creams in the United States from date of product launch to the present (the "Class Period").  Excluded from the Class are Defendant, its parent, subsidiaries and affiliates, their directors and officers and members of their immediate families; also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

164.   Plaintiffs also seek to represent subclasses defined as all members of the Class who purchased Luxury Wrinkle Creams in California ("the California Subclass"), all members of the Class who purchased Luxury Wrinkle Creams in New Jersey ("the New Jersey Subclass"), and all members of the Class who purchased Luxury Wrinkle Creams in Illinois ("the Illinois Subclass").

165.   Members of the Class and the California, New Jersey and Illinois Subclasses are so numerous that their individual joinder herein is impracticable. Members of each of these classes number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

166.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.   Common legal and factual questions include, but are not limited to:

(a)   whether Defendants were unjustly enriched by their conduct;

(b)   whether Defendants breached an express warranty made to Plaintiffs and the Class;

(c)   whether Defendants advertise or market the Luxury Wrinkle Creams  in a way that is false or misleading;

(d)   whether Defendants concealed from Plaintiffs and the Class that its Luxury Wrinkle Cream products do not provide the promised results;

(e)   whether, by the misconduct set forth in this Amended Complaint, Defendants have engaged in unfair, fraudulent or unlawful business practices with respect to the advertising, marketing and sales of its Luxury Wrinkle Creams;

(f)   whether Defendants violated the New Jersey Consumer Fraud Act;

(g)   whether Defendants violated the California Consumer Legal Remedies Act, California Unfair Competition Law and California False Advertising Law;

(h)    whether Defendants violated the Illinois Consumer Fraud and Deceptive Practices Act;

(i)    whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

167.   Plaintiff's' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiffs have no interests antagonistic to the interests of the other members of the Class.   Plaintiffs and all members of the Class have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

168.   Plaintiffs are adequate representatives of the Class because their interest does not conflict with the interests of the Class members they seeks to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.   The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

169.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.   Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### (Unjust Enrichment)

170.    Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

171.    Plaintiffs bring this claim individually and on behalf of the members of the nationwide Class against Defendants.

172.    Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences.  In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched.  At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.  The focus of the inquiry is the same in each state.  Since there is no material conflict relating to the elements of unjust enrichment between the different jurisdictions from which class members will be drawn, New Jersey law applies to those claims.

173.   Plaintiffs and Class members conferred a benefit on Defendants by purchasing one or more of the Luxury Wrinkle Creams.

174.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the Luxury Wrinkle Creams, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the efficacy of the Luxury Wrinkle Creams, which caused injuries to Plaintiffs and Class members because either they paid a price premium due to the deceptive advertising and false promises of efficacy or they purchased products that did not perform as promised and were therefore of no value to Plaintiffs and Class members.

175.   Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court.

## COUNT II
**(For Breach of Express Warranty)**

176.   Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

177.   Plaintiffs bring this claim individually and on behalf of the New Jersey, California, and Illinois Subclasses.

178.   Defendants, as the designers, manufacturers, marketers, distributors, or sellers expressly warranted that the Luxury Wrinkle Creams would provide certain actual age-negating effects, when in fact they do not.

179.   The age-negating effects as described in detail above were affirmations of fact and promises relating to the Luxury Wrinkle Creams which became part of the basis for the bargain that the Luxury Wrinkle Creams would conform to the affirmations of fact and promises.

180.   Likewise, the age-negating effects as described in detail above were descriptions of the Luxury Wrinkle Creams which became part of the basis of the bargain that the Luxury Wrinkle Creams would conform to the description.

181.   Defendants knew or should have known that the Luxury Wrinkle Creams could never provide the results promised.

182.   Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because they paid a price premium due to the deceptive advertising and false promises of Defendants.  Alternatively, Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because they paid for products that could never provide the promised results, rendering the products valueless to Plaintiffs and Class members.

## <u>COUNT III</u>
### (Violation of the New Jersey Consumer Fraud Act)

183.   Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

184.   Plaintiff Murphy brings this claim individually and on behalf of the nationwide Class and the New Jersey Subclass.

185.   Defendants misrepresented that the Luxury Wrinkle Creams would provide certain permanent age-negating effects.

186.    Defendants' claims that such age-negating effects were the result of unique scientific discoveries are further deceptive or misleading, as are their references to supporting scientific evidence.

187.    Defendants' affirmative misrepresentations constitute an unconscionable commercial practice, deception, fraud, false promise and/or misrepresentation as to the nature of the goods, in violation of the New Jersey Consumer Fraud Act.

188.    Moreover, Defendants intentionally failed to disclose the truth behind the purported scientific discoveries and supporting clinical data; that is, the "hyperscience" upon which Lancôme relies to justify the price premiums for the Luxury Wrinkle Creams is nothing more than a sham.    Indeed, any studies or clinical data was designed for use in Lancôme's marketing campaign and not to test whether the Luxury Wrinkle Creams actually performed as promised.

189.    Defendants' knowing and intentional omissions as described herein constitute a violation of the New Jersey Consumer Fraud Act.

190.    Plaintiffs and all Class members suffered an ascertainable loss caused by Defendants' misrepresentations and omissions because they were induced to purchase, or paid a price premium, due to the misleading and false advertising and deceptive promises of age-negating efficacy of the Luxury Wrinkle Creams, when, in fact, those qualities did not exist.    Simply put, Plaintiffs and Class members paid for the advertised benefits of the Luxury Wrinkle Creams and did not get what they paid for.

191.    Indeed, their purchases are of no value because the Luxury Wrinkle Creams do not provide the advertised age-negating benefits.

## COUNT IV
### (Violation of California Business & Professions Code
### Section 17200 *et seq.* - Unfair Conduct on behalf of California Class)

192.    Plaintiff Fabend realleges each and every allegation contained above as if fully set forth herein.

193.    Plaintiff Fabend brings this claim individually and on behalf of the California Subclass under California law.

194.    Under California Business & Professions Code §17200, any business act or practice that is unethical, oppressive, unscrupulous and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

195.    Defendants have engaged, and continue to engage, in conduct which is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiff Fabend and the California Subclass.  This conduct includes, but is not limited to advertising, marketing and labeling and deceptive promises of the age-negating efficacy of the Luxury Wrinkle Creams when, in fact, Defendants knew or should have known those qualities did not exist.  Defendants' scheme was and is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiff Fabend and the California Subclass.

196.    Defendants have engaged, and continue to engage, in conduct that violates the legislatively declared policies of: (1) 35 U.S.C. §292(a), against using the word "patent" in advertising in connection with any unpatented product; (2)

California Health & Safety Code §111770, which prohibits the misbranding of any cosmetic; (3) California Health & Safety Code §111765, which prohibits the manufacture and sale of any misbranded cosmetic, and (4) California Business & Professions Code §17508 against making false or misleading factual claims in advertising.    Defendants gain an unfair advantage over competitors, whose advertising for products must comply with 35 U.S.C. §292(a), Health & Safety Code §§ 111765 and 111770 and California Business & Professions Code §17500.

197.    Defendants' conduct is substantially injurious to consumers.    Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Luxury Wrinkle Creams at all, or would not have paid such a high price for the Luxury Wrinkle Creams, but for Defendants' false promotion of the Luxury Wrinkle Creams.    Consumers have thus overpaid for the Luxury Wrinkle Creams.    Such injury is not outweighed by: (i) any countervailing benefits to consumers or competition; or (ii) any utility to the Defendants.    Indeed, no benefit to consumers or competition or to Defendants results from Defendants' conduct.    Since consumers reasonably rely on Defendants' representations of the Luxury Wrinkle Creams and injury results from ordinary use of the Luxury Wrinkle Creams, consumers could not have reasonably avoided such injury.

198.    By committing the acts alleged above, Defendants have engaged in unfair business acts and practices which constitute unfair competition within the meaning of California Business & Professions Code §17200.

199.   Plaintiff Fabend and the California Subclass have all paid money for the Luxury Wrinkle Creams.   However, Plaintiff Fabend and the California Subclass did not obtain the full value of the advertised product due to Defendants' misrepresentations regarding the nature of said products.   Accordingly, Plaintiff Fabend and the California Subclass have suffered injury in fact and lost money or property as a result of Defendants' acts of false advertising.

200.   In accordance with California Business & Professions Code §17203, Plaintiff Fabend seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair and deceptive acts and practices and further seek an order requiring Defendants to conduct a corrective advertising campaign.

201.   As a result of Defendants' conduct, Plaintiff Fabend seeks injunctive and restitutionary relief under California Business & Professions Code §17203.

202.   Plaintiff Fabend has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendants' acts as set forth herein.

203.   California Subclass members have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein.

## **COUNT V**
**(Violation of California Business & Professions Code Section 17200 *et seq.* - Fraudulent Conduct on behalf of California Class)**

204.   Plaintiff Fabend realleges each and every allegation contained above as if fully set forth herein.

205.   Plaintiff Fabend brings this claim individually and on behalf of the California Subclass under California law.

206.   Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

207.   Defendants have engaged, and continue to engage, in conduct that is likely to deceive Plaintiffs and members of the Class, all of whom are members of the general public.   This conduct includes, but is not limited to advertising, marketing and labeling and deceptive promises of the purportedly age-negating efficacy of the Luxury Wrinkle Creams when, in fact, Defendants knew or should have known those qualities did not exist.

208.   The purportedly age-negating benefits of the Luxury Wrinkle Creams, which forms the basis of the misrepresentations of Defendants described herein, were especially important to the purchasers of the Luxury Wrinkle Creams, including Plaintiff Fabend and the California Subclass.   After reviewing the packaging, product displays, and sales brochures for the Luxury Wrinkle Creams and Defendants' other advertising, including oral representations made by Lancôme sales persons, Plaintiff Fabend purchased the Luxury Wrinkle Creams in reliance on Defendants' representations that the Luxury Wrinkle Creams promised age-negating benefits.   Plaintiff Fabend would not have purchased the product at all, or would not have paid such a high price for the product, but for Defendants' false and misleading promotion of the Luxury Wrinkle Creams.

209.    Plaintiff Fabend and the California Subclass have all paid money for the Luxury Wrinkle Creams.   However, Plaintiff Fabend and the California Subclass did not obtain the full value of the advertised product due to Defendants' misrepresentations regarding the nature of said products.   Accordingly, Plaintiff Fabend and the California Subclass have suffered injury in fact and lost money or property as a direct result of Defendants' misrepresentations and material omissions.

210.    By committing the acts alleged above, Defendants have engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

211.    In accordance with California Business & Professions Code §17203, Plaintiff Fabend seeks an order enjoining Defendants from continuing to conduct business through its fraudulent conduct and further seeks an order requiring Defendants to conduct a corrective advertising campaign.

212.    As a result of Defendants' conduct, Plaintiff Fabend seeks injunctive and restitutionary relief under California Business & Professions Code §17203.

213.    Plaintiff Fabend has standing to pursue this claim as Plaintiff Fabend has suffered injury in fact and has lost money or property as a result of Defendants' acts as set forth above.

214.    California Subclass members have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above.

## COUNT VI

**(Violation of California Business & Professions Code Section 17200 *et seq.* – Commission of Unlawful Acts on behalf of California Class)**

215.    Plaintiff Fabend realleges each and every allegation contained above as if fully set forth herein.

216.    Plaintiff Fabend brings this claim individually and on behalf of the California Subclass under California law.

217.    The violation of any law constitutes an unlawful business practice under Business and Professions Code §17200.

218.    By advertising that certain Luxury Wrinkle Creams have patents, as alleged herein, where upon information and belief those patents do not exist, Defendants violate 35 U.S.C. §292(a), which prohibits using the word "patent" in advertising in connection with any unpatented product.

219.    By misrepresenting that the Luxury Wrinkle Creams provide age-negating benefits when, in fact, Defendants knew or should have known they do not, Defendants' labeling of the Luxury Wrinkle Creams is "false and misleading in any particular" in violation of Health & Safety Code §111730.  Thus, Defendants' conduct also violates California Health & Safety Code §111770, which prohibit the misbranding of any cosmetic, and California Health & Safety Code §111765, which prohibits the manufacture and sale of any misbranded cosmetic.

220.    By using false and misleading statements to promote the sale of the Luxury Wrinkle Creams when they knew or should have known that the statements were untrue and misleading, Defendants violate Business and Professions Code §17500.

221.    By violating 35 U.S.C. §292(a) and Health and Safety Code §§111730, 111765 and 111770, and Business and Professions Code §17500, Defendants have engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Business & Professions Code §17200.

222.    Plaintiff Fabend and the California Subclass have all paid money for the Luxury Wrinkle Creams.    However, Plaintiff Fabend and the California Subclass did not obtain the full value of the advertised product due to Defendants' misrepresentations regarding the nature of said products.    Accordingly, Plaintiff Fabend and the California Subclass have suffered injury in fact and lost money or property as a direct result of Defendants' misrepresentations and material omissions.

223.    In accordance with California Business & Professions Code §17203, Plaintiff Fabend seeks an order enjoining Defendants from continuing to conduct business through its fraudulent conduct and further seeks an order requiring Defendants to conduct a corrective advertising campaign.

224.    As a result of Defendants' conduct, Plaintiff Fabend seeks injunctive and restitutionary relief under California Business & Professions Code §17203.

225.    Plaintiff Fabend has standing to pursue this claim as Plaintiff Fabend has suffered injury in fact and has lost money or property as a result of Defendants' acts as set forth above.

226.    California Subclass members have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above.

## COUNT VII
### (Violation of California Civil Code §1750 *et seq.* – Damages Consumers Legal Remedies Act on behalf of California Class)

227.    Plaintiff Fabend realleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

228.    Plaintiff Fabend brings this claim individually and on behalf of the California Subclass under California law.

229.    Cal. Civ. Code §1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." Defendants violated this provision by representing that the Luxury Wrinkle Creams provide age-negating benefits, when they do not.

230.    Cal. Civ. Code §1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Defendant violated this provision by representing that the Luxury Wrinkle Creams provide age-negating benefits, when they do not.

231.    Cal. Civ. Code §1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  Defendant violated this provision by representing that the Luxury Wrinkle Creams provide age-negating benefits, when they do not.

232.   By committing the acts alleged above, Defendants have violated the CLRA.

233.   Plaintiff Fabend and California Subclass members suffered injuries caused by Defendants' misrepresentations because: (a) they were induced to purchase a product they would not have otherwise purchased if they had known that the promised wrinkle-erasing nature of the Luxury Wrinkle Creams was untrue; and/or (b) they paid a price premium due to the false and misleading advertising of the Luxury Wrinkle Creams.

234.   On June 8, 2012, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants which complies in all respects with California Civil Code §1782(a).   Plaintiff Fabend sent Defendants a letter via certified mail, advising Defendants that they are in violation of §1770. Defendants were further advised that in the event the relief requested has not been provided within thirty (30) days, Fabend would seek to amend this Complaint to include a claim for damages.   A true and correct copy of Plaintiff Fabend's' CLRA letter is attached hereto as Exhibit A.

235.   Defendants have failed to respond to Plaintiff Fabend's CLRA notice letter of June 8, 2012.

236.   Thus, Plaintiff Fabend seeks damages pursuant to California Civil Code §1781(a) on behalf of Plaintiff Fabend and the California Subclass resulting from the above-described wrongful acts and practices of Defendants.

237.    Further ordering the payment of costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

## COUNT VIII
### (Violation of California Civil Code §1750 *et seq.* – Injunctive Relief Consumers Legal Remedies Act on behalf of California Class)

238.    Plaintiff Fabend realleges each and every allegation contained above as if fully set forth herein.

239.    Plaintiff Fabend brings this claim individually and on behalf of the California Subclass under California law.

240.    Cal. Civ. Code §1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." Defendants violated this provision by representing that the Luxury Wrinkle Creams provide age-negating benefits, when they do not.

241.    Cal. Civ. Code §1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Defendant violated this provision by representing that the Luxury Wrinkle Creams provide age-negating benefits, when they do not.

242.    Cal. Civ. Code §1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Defendant violated this provision by

representing that the Luxury Wrinkle Creams provide age-negating benefits, when they do not.

243.    By committing the acts alleged above, Defendants have violated the CLRA.

244.    Plaintiff Fabend and California Subclass members suffered injuries caused by Defendants' misrepresentations because: (a) they were induced to purchase a product they would not have otherwise purchased if they had known that the promised wrinkle-erasing nature of the Luxury Wrinkle Creams was untrue; and/or (b) they paid a price premium due to the false and misleading advertising of the Luxury Wrinkle Creams.

245.    Plaintiff Fabend and members of the California Subclass are entitled to, pursuant to California Civil Code §1780(a)(2), an order enjoining the above-described wrongful acts and practices of Defendant, and ordering the payment of costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

246.    Wherefore, Plaintiff prays for judgment against Defendants, as set forth hereafter.


## COUNT IX
### (Violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*)

247.    Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

248.    Plaintiff Fabend brings this claim on behalf of the California Subclass under California law.

249.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

250.    Throughout the Class Period, Defendants committed acts of false advertising, as defined by Cal. Bus. & Prof. Code §17500, by using false and misleading statements to promote the sale of the Luxury Wrinkle Creams as described herein.

251.    Defendants knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

252.    Defendants' actions in violation of Cal. Bus. & Prof. Code § 17500 were false and misleading such that the general public is and was likely to be deceived.

253.    Plaintiff Fabend and California Subclass members suffered lost money or property as a result of Defendants' FAL violations because: (a) Plaintiff Fabend and the Class were induced to purchase a product they would not have otherwise purchased had they known its true composition; and (b) Plaintiff Fabend and the

Class were induced to pay substantially more for Lancôme's Luxury Wrinkle Creams than they would have paid if their true characteristics had not be concealed or misrepresented.

254.    Plaintiff Fabend brings this action pursuant to Cal. Bus. & Prof. Code § 17535 for injunctive relief to enjoin the practices described herein and to require Defendants to issue corrective disclosures to consumers.

**COUNT X**
**(Violation of Illinois Consumer Fraud and Deceptive Practices Act)**

255.    Plaintiff Davis repeats the allegations contained in the above paragraphs as if fully set forth herein.

256.    Plaintiff Davis asserts this claim individually and on behalf of the Illinois Subclass.

257.    Throughout the Class period, Plaintiff Davis and the other members of the Illinois Subclass and Defendants were "persons" within the meaning of 815 ILCS 505/1(c).

258.    Throughout the Class period, Defendants conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, offering for sale, and sale of Luxury Wrinkle Creams.

259.    Throughout the Class period, Plaintiff Davis and the other members of the Illinois Subclass were "consumers" within the meaning of 815 ILCS 505/1(e).

260.    Under the Illinois Consumer Fraud and Deceptive Practices Act, the use or employment of any practice described in Section 2 of the Uniform Deceptive

Trade Practices Act, 815 ILCS 510/2, in the conduct of any trade or commerce is unlawful whether any person has in fact been misled, deceived or damaged thereby.

261.    Under Section of the 2 of the Uniform Deceptive Trade Practices Act ("UTPA"), 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.  815 ILCS 510(2)(a)(5).

262.    Defendants' deceptive acts and practices, alleged herein, including but not limited to, Defendants' sale of Luxury Wrinkle Creams labeled, packaged, marketed, and advertised as having certain age-negating benefits and Defendants' failure to disclose that Luxury Wrinkle Creams do not have such age-negating efficacy violate the Illinois Consumer Fraud and Deceptive Business Practices Act.

263.    Defendants intended for Plaintiff Davis and the other Illinois Subclass members to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

264.    Plaintiff Davis and the other Illinois Subclass members relied on such misrepresentations and were deceived.

265.    Defendants' violation of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiff Davis and the other Illinois Subclass

members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Luxury Wrinkle Creams and Defendants' failure to disclose the true nature of said products.

266.   815 ILCS 505/10 permits the Court to enter injunctive relief to require Defendants to stop the unlawful, unfair and deceptive conduct alleged herein and award Plaintiff Davis and the other members of the Illinois Subclass their costs and reasonable attorneys' fees.

## COUNT XI
### (Violation of the Illinois Consumer Fraud and Deceptive Practices Act Unfair and Deceptive Practices)

267.   Plaintiff Davis repeats the allegations contained in the above paragraphs as is fully set forth herein.

268.   Plaintiff Davis asserts this claim individually and on behalf of the Illinois Subclass.

269.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., prohibits unfair methods of competition and unfair and deceptive acts or practices, including among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been misled, deceived or damaged thereby."

270.   Throughout the Class period, Defendants conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, offering for sale, and sale of Luxury Wrinkle Creams.

271.   815 ILCS. 505/1(b) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "merchandise" to include Luxury Wrinkle Creams.

272.   815 ILCS. 505/1(c) of the Illinois Consumer Fraud and Deceptive Practices defines the term "person" to include Defendants.

273.   815 Ill. ILCS 505/1(e) of the Illinois Consumer Fraud and Deceptive Practices Act defines the term "consumer" to include Plaintiff Davis and the other Illinois Subclass members.

274.   Defendants' acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, including but not limited to, Defendants' sale of Luxury Wrinkle Creams labeled, packaged, advertised and marketed as having certain age-negating benefits and Defendants' failure to disclose the true nature of said products.

275.   Defendants intended for Plaintiff Davis and the other Illinois Subclass members to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

276.    Plaintiff Davis and the other Illinois Subclass members relied on such misrepresentations and were deceived.

277.    Defendants' violation of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiff Davis and the other Illinois Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Luxury Wrinkle Creams and Defendants' failure to disclose the true nature of said products.

## COUNT XII
### (Violation of the Consumer Fraud Laws of the Various States)

278.    Plaintiffs repeat the allegations contained in the above paragraphs as if fully set forth herein.

279.    By mislabeling and making false and deceptive efficacy claims regarding the Luxury Wrinkle Creams, Defendants have engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer statutes listed below.

280.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8.19-1, et seq.

281.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE § 45.50.471, et seq.

282.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, et seq.

283.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, et seq.

284.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of CAL. COMPETITION LAW, BUS. & PROF. CODE § 17200, et seq.

285.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, et seq.

286.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, et seq.

287.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, et seq.

288.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, et seq.

289.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, et seq.

290.    Defendants have engaged in unfair competition or unfair or deceptive acts r practices in violation of GA. CODE ANN. §10-1-392, et seq.

291.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, et seq.

292.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, et seq.

293.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, et seq.

294.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE §714.16, et seq.

295.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT. § 50-623, et seq.

296.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, et seq.

297.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1404, et seq.

298.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, et seq.

299.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, et seq.

300.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, et seq.

301.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, et seq.

302.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, et seq.

303.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, et seq.

304.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, et seq.

305.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, et seq.

306.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, et seq.

307.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, et seq.

308.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, et seq.

309.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, et seq.

310.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, et seq.

311.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, et seq.

312.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, et seq.

313.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, et seq.

314.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, et seq.

315.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, et seq.

316.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, et seq.

317.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE § 39-5-10, et seq.

318.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, et seq.

319.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, et seq.

320.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, et seq.

321.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, et seq.

322.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, et seq.

323.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, et seq.

324.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, et seq.

325.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, et seq.

326.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, et seq.

327.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, et seq.

328.    The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials concerning the Luxury Wrinkle Creams, constitutes unfair competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes, because each of these statutes generally prohibits deceptive conduct in consumer transactions

329.    Defendants violated each of these statutes by making certain false or misleading efficacy promises regarding the Luxury Wrinkle Creams.

330.    Plaintiff and Class Members were injured as a direct and proximate result of Defendants' unfair, deceptive and/or unconscionable acts and practices, because: (a) Plaintiff and the Class were induced to purchase a product they would not have otherwise purchased had they known its true composition; and (b) Plaintiff

and the Class were induced to pay substantially more for the Luxury Wrinkle Creams than they would have paid if their true characteristics had not be concealed or misrepresented.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.      For an order certifying the nationwide Class and the California, New Jersey, and Illinois Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class members;

B.      For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.      For an order finding in favor of the Plaintiffs, the nationwide Class, and the California, New Jersey and Illinois Subclasses on all counts asserted herein;

D.      For an order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and

H.    For an order awarding Plaintiffs, the nationwide Class and the California, New Jersey and Illinois Subclasses their reasonable attorneys' fees and expenses and costs of suit.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff


By:____/s/ James E. Cecchi_____
      JAMES E. CECCHI

Dated:  September 12, 2012

Of Counsel:

Paul M. Weiss                          Stephen A. Weiss
Julie D. Miller                        Jonathan Shub
COMPLEX LITIGATION GROUP, LLC          Scott A. George
513 Central Avenue, Suite 300          SEEGER WEISS LLP
Highland Park, Illinois 60035          77 Water Street
(847) 433-4500                         New York, New York 10005
                                       (212) 584-0700

Joseph P. Guglielmo
SCOTT + SCOTT LLP                      Joe R. Whatley, Jr.
500 5th Avenue, 40th Floor             Patrick J. Sheehan
New York, NY  10110                    WHATLEY KALLAS
(212) 223-6444                         380 Madison Avenue, 23rd Floor
                                       New York, New York 10017

*Attorneys for Plaintiff*

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all claims so triable.

> CARELLA, BYRNE, CECCHI,
> OLSTEIN, BRODY & AGNELLO
> Attorneys for Plaintiff


> By:   /s/ James E. Cecchi
> JAMES E. CECCHI


Dated:  September 12, 2012

Of Counsel:

Paul M. Weiss
Julie D. Miller
COMPLEX LITIGATION GROUP, LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
(847) 433-4500

Joseph P. Guglielmo
SCOTT + SCOTT LLP
500 5th Avenue, 40th Floor
New York, NY  10110
(212) 223-6444

Stephen A. Weiss
Jonathan Shub
Scott A. George
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
(212) 584-0700

Joe R. Whatley, Jr.
Patrick J. Sheehan
WHATLEY KALLAS
380 Madison Avenue, 23rd Floor
New York, New York 10017

*Attorneys for Plaintiff*