James E. Cecchi
Caroline F. Bartlett
Zachary S. Bower
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Attorneys for Plaintiffs and the*
*Proposed Classes*

[Additional Counsel Listed on
Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE:  L'OREAL WRINKLE CREAM MARKETING PRACTICES LITIGATION | MDL 2415 <br><br> Master Docket No:  2:12-cv-3571 (WJM)(MF) |
| This Document Relates To:  ALL CASES | **MASTER CONSOLIDATED COMPLAINT and DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................... 1

II.   THE PARTIES ............................................................................................ 11

III.  JURISDICTION AND VENUE .................................................................. 19

IV.   GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ......... 19

   A.  L'Oreal's Misleading Efficacy Claims ............................................ 19

   B.  L'Oreal's Misleading and Deceptive References to Purported Scientific
       Data ............................................................................................... 22

   C.  L'Oreal's Misleading Use of Footnotes and Asterisks .................. 24

   D.  L'Oreal Misleadingly Advertises that Its Products are Protected by
       Patents .......................................................................................... 25

   E.  L'Oreal's Pervasive and Misleading National Marketing Campaign ... 30

      1.  Internet and Television Marketing ......................................... 30

      2.  Print Media and Point of Sale Materials ................................ 32

      3.  In-Store Sales People ............................................................ 41

      4.  Use of Celebrity Spokespeople and Models ............................ 41

      5.  Misuse of Statistics and Disclaimers .................................... 44

   F.  L'Oreal's Claims Regarding Product Efficacy Are Not Mere Puffery ... 45

   G.  Other Challenges to L'Oreal's Misleading Advertising ................. 46

   H.  Product Cycles .............................................................................. 47

   I.  Comparison to Lower Cost Products .............................................. 49

V.   THE SPECIFIC LANCÔME LUXURY WRINKLE CREAM CLAIMS .......... 52

      A.  Visionnaire Collection ............................................................ 52

      B.  The Genifique Collection ........................................................ 63

      C.  The High Resolution Collection .............................................. 72

i

D.    The Renergie Collection .............................................................. 77

E.    The Absolue Collection ................................................................ 84

VI.    THE SPECIFIC CLAIMS MADE BY L'OREAL FOR YOUTH CODE ........... 91

VII.    THE RESULTS OF L'OREAL'S DECEPTIVE CONDUCT ........................... 94

VIII.    CLASS ACTION ALLEGATIONS ................................................................... 97

IX.    CAUSES OF ACTION ................................................................................. 104

A.    L'Oreal/Lancome ........................................................................ 104

COUNT I
(Breach of Express Warranty) ................................................... 104

COUNT II
(Unjust Enrichment) ................................................................... 105

COUNT III
(Violation of the New Jersey Consumer Fraud Act) .................. 107

COUNT IV
(Violation of California Business & Professions Code Section 17200 *et seq.* - Unfair Conduct) ............................................................ 109

COUNT V
(Violation of California Business & Professions Code Section 17200 *et seq.* - Fraudulent Conduct) ................................................... 112

COUNT VI
(Violation of California Business & Professions Code Section 17200 *et seq.* – Commission of Unlawful Acts) ................................. 114

COUNT VII
(Violation of California Civil Code §1750 *et seq.* – Damages Consumers Legal Remedies Act) ............................................... 116

COUNT VIII
(Violation of California Civil Code §1750 *et seq.* – Injunctive Relief Consumers Legal Remedies Act) ............................................... 118

COUNT IX
(Violation of California Business & Professions Code § 17500, *et seq.* California False Advertising Law) ........................................... 120

COUNT X
(Violation of Illinois Consumer Fraud and Deceptive Business Practices
Act – Deceptive Trade Practices) ................................................................ 122

COUNT XI
(Violation of Illinois Consumer Fraud and Deceptive Business Practices
Act – Unfair and Deceptive Practices)........................................................ 125

COUNT XII
(Violation of the Florida Deceptive and Unfair Trade Practices Act)....... 127

COUNT XIII
(Violation of the Consumer Fraud Laws of the Various States).............. 130

COUNT XIV
(For Breach of Express Warranty Laws of the Various States) .............. 134

B.    L'Oreal/Youth Code ................................................................. 138

COUNT XV
(For Breach of Express Warranty)............................................................. 138

COUNT XVI
(Unjust Enrichment)................................................................................... 139

COUNT XVII
(Violation of the New Jersey Consumer Fraud Act).................................. 141

COUNT XVIII
(Violation of Massachusetts General Laws, Chapter 93A, §§ 2 and 9) .... 142

COUNT XIX
(Violation of California Business & Professions Code Section 17200 *et seq.* -
Unfair Conduct) ........................................................................................ 145

COUNT XX
(Violation of California Business & Professions Code Section 17200 *et seq.* -
Fraudulent Conduct) ................................................................................ 148

COUNT XXI
(Violation of California Business & Professions Code Section 17200 *et seq.*
– Commission of Unlawful Acts)............................................................... 150

COUNT XXII
(Violation of California Civil Code §1750 *et seq*. – Damages Consumers
Legal Remedies).......................................................................................... 152

COUNT XXIII
(Violation of California Civil Code §1750 *et seq*. – Injunctive Relief
Consumers Legal Remedies Act)................................................................. 154

COUNT XXIV
(Violation of California Business & Professions Code § 17500, *et seq*.
California False Advertising Law)............................................................... 155

COUNT XXV
(Violation of the Consumer Fraud Laws of the Various States)............... 157

COUNT XXVI
(For Breach of Express Warranty)............................................................. 162

JURY DEMAND ........................................................................................ 170

Plaintiffs, by their attorneys, on behalf of themselves and all others similarly situated, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## I.   <u>NATURE OF THE ACTION</u>

1.      The search for the elusive waters of the "Fountain of Youth" has tempted those seeking to restore youth and beauty for ages.  Indeed, as the story goes, in 1513, the great explorer Juan Ponce De Leon searched high and low for the "Fountain of Youth" – only to find Florida instead.  In the 1800s, "snake oil" salesmen infamously ranged the West selling tonics that claimed to cure every ill, including signs of aging.  Today, the search for a youth potion continues and, like modern-day snake oil salesmen, L'Oreal USA, Inc. ("L'Oreal"), through its Luxury Division brands, Lancôme, Lancôme, Inc., and Lancôme Luxury Products, LLC ("L'Oreal/Lancôme") and through its Consumer Division brand L'Oreal Paris ("L'Oreal/Youth Code") (collectively "L'Oreal")[1] prey on consumers' fundamental fear of aging and their eternal hope that products exist that can eliminate the signs of aging and effectively turn back time.

---

[1]      As L'Oreal's corporate structure remains unclear at the time of this filing, Plaintiffs reserve the right to add additional defendants as discovery progresses.  In addition, because the Lancôme Luxury Wrinkle Cream products themselves reference Lancôme Luxury Products, LLC, while the advertisements and websites do not, the reference herein to one of the L'Oreal entities shall not be deemed to exclude any other.  L'Oreal has made it impossible for a consumer to determine which entity, in fact, produces, distributes, and/or sells the various Lancôme Luxury Wrinkle Creams and Youth Code Products.

2.     In fact, L'Oreal profits handsomely by its false, misleading, and/or deceptive claims that Lancôme's wrinkle cream products, including those from the Luxury Collections Visionnaire, Genifique, High Resolution, Renergie, and Absolue Precious Cells (collectively "Lancôme Luxury Wrinkle Creams") and L'Oreal Paris's Youth Code line of wrinkle creams, specifically Youth Code Serum Intense, Youth Code Eye Cream, and Youth Code Day/Night Cream (collectively "Youth Code" or "Youth Code Products") have age-negating effects on human skin.  Lancôme Luxury Wrinkle Creams and Youth Code Products are referred to collectively herein as the "Products."

3.     For example, among other things, L'Oreal/Lancôme has made and continues to make specific promises as to the Lancôme Luxury Wrinkle Creams including that:

- Visionnaire is the "1st skincare [product] capable of fundamentally re-creating more beautiful skin . . . it acts biologically on the 12 key targets of aging";

- Genifique Youth Activating Concentrate "boosts the activity of genes and stimulates the production of youth proteins";

- High Resolution "helps boost the synthesis of the three natural skin fillers – collagen, hyaluronic acid, and elastin"; High Resolution Night Refill 3X™ "has triple antiwrinkle power that refills wrinkles in one hour";

- Renergie's "[l]ifting and contouring properties combine to firm and reshape the face . . . Skin Truth: skin cells need to communicate with each other constantly.  This communication is key to maintaining the support structure that keeps skin looking youthful.  This cutting-edge formula features the unique GF-Volumetry™ complex, shown to help support cellular communication"; the product will "lift the eyes; erase wrinkles and fine lines"; and "[v]isibly lift, firm and reshape facial contours, see the facial angle visibly improved by 8 degrees."; and

- Absolue's Pro-Xylane™, "a patented scientific innovation – has been shown to improve the condition around the stem cells and stimulate cell regeneration to reconstruct skin to a denser quality."; "it's proven: within 6 days skin recovers the epidermis of a young skin."

4.     Likewise, L'Oreal/Youth Code has made and continues to make specific promises of age-negating benefits, among others, as to Youth Code Products:

- "Immediately wrinkle reduction begins";

- "Skin's natural regeneration powers are boosted";

- "Breakthrough GenActiv Technology helps stimulate recovery";

- "Boosts skin's natural powers of regeneration";

- "Youth Regenerating Skincare";

- "Skin regains the qualities of young skin";

- "Lines and wrinkles are visibly reduced"; and

- "Boosts cell turnover."

5.     L'Oreal/Youth Code has promised and continues to promise consumers that its Youth Code Products are able to provide such age-negating benefits because of its claimed unique scientific breakthroughs and discoveries:

- "After 10 years of research L'Oreal scientists unlock the code of skin's youth by discovering a specific set of genes[1] that are responsible for skin's natural powers of regeneration";
        [1]in-vivo study

- "An innovation derived from gene science";

- "10 Years of Gene Research";

- "L'Oreal's breakthrough GenActiv Technology™"; and

- "International Patent[2]";
        [2]Patented in Germany, Spain, France, UK, Italy, and Japan; US Pat. Pending

3

6.      Unfortunately for consumers, these efficacy claims (and others detailed below) are false, deceptive, and/or misleading.

7.      As explained more fully herein, L'Oreal has made, and continues to make, false, misleading, and/ or deceptive claims and promises to consumers about the efficacy of its Lancôme Luxury Wrinkle Creams and Youth Code Products in a pervasive, nation-wide marketing scheme that confuses and misleads consumers about the true nature and effectiveness of the Products.  In reality, the Lancôme Luxury Wrinkle Creams and Youth Code Products do not live up to the efficacy claims made by L'Oreal.

8.      L'Oreal knows this, yet designs its marketing, advertising, and sales campaigns for Lancôme Luxury Wrinkle Creams and Youth Code Products to include indicia of scientific research to bolster its efficacy claims for the sole purpose of further misleading or deceiving consumers.  As a result, L'Oreal's marketing pitch is the same as that of the quintessential snake-oil salesman – L'Oreal dupes consumers with false, misleading, and/or deceptive promises of results it knows it cannot deliver, and does so with one goal in mind – reaping enormous profits.

9.      A direct effect of L'Oreal's pervasive and deceptive marketing, advertising, and sales campaigns is that consumers across the country, including Plaintiffs and the other members of the proposed Lancôme and Youth Code Classes and Subclasses, relied upon L'Oreal's false, misleading, and/or deceptive misrepresentations and purchased high-priced skin-care products that do not, and cannot, provide the results promised.  Because the Lancôme Luxury Wrinkle

4

Creams and Youth Code Products do not provide the promised results, Plaintiffs and the other members of the proposed Classes and Subclasses did not receive what they paid for.

10.     L'Oreal/Lancôme's false, misleading, and/or deceptive statements about the efficacy of a particular product are equally applicable to each of the products within that specific collection.  For example, for each of the Genifique products (serum, cream serum, eye cream, and night cream) ("Genifique Products"), L'Oreal/Lancôme specifically promises that its unique formula will "boost the activity of genes and stimulate the production of youth proteins" resulting in "visibly younger skin in 7 days."  According to L'Oreal/Lancôme, these claims are based upon the purported discovery of a formula shown in "in-vitro tests on genes" to "boost genes' activity."  Because each of the Genifique Products contains essentially the same formula or purportedly "youth boosting" ingredient, and because L'Oreal/Lancôme repeats the same promises for each product, the misleading claims touting the supposed benefits are equally applicable to all of the Genifique Products.  The same holds true for the Renergie, High Resolution, and Absolue collections.  (The Visionnaire Collection currently has only one product.)

11.     Similarly, L'Oreal/Youth Code's false, misleading, and/or deceptive statements about the efficacy of the Youth Code Products are equally applicable to each of those products because the statements appear uniformly on all Youth Code Product advertisements and packaging.

12.     L'Oreal/Lancôme markets and sells certain Lancôme Luxury Wrinkle Creams together, falsely, misleadingly, and/or deceptively promising even greater results when the products are used in combination.  For example, L'Oreal/Lancôme markets Visionnaire and Genifique together as "super serums" because they are "perfect partners for younger looking skin":



13.     Similarly, on its Lancôme website L'Oreal/Lancôme has a section titled "Discover Your Perfect Skincare" in which it asks consumers a series of questions about certain specific skin problems they are looking to address, such as "fight wrinkles" or "lift and firm."

14.     After the consumer answers a series of questions, L'Oreal/Lancôme provides a page titled "Skin Profile & Recommendations" where it recommends products aimed at correcting the specific concerns identified by the consumer.  As is also the case at department stores, L'Oreal/Lancôme cross-sells the various

6

Lancôme products and recommends that consumers purchase more than one of the Lancôme Luxury Wrinkle Creams:



15.    L'Oreal/Lancôme's marketing campaign for each of the Lancôme Luxury Wrinkle Creams follows the same deceptive pattern and practice – L'Oreal/Lancôme makes specific efficacy promises based on purported scientific research and new discoveries that deceive and/or mislead consumers into believing that the Lancôme Luxury Wrinkle Creams they are purchasing will provide the promised results.

16.    More specifically, for each of the Luxury Wrinkle Cream Collections, L'Oreal/Lancôme develops a thematic marketing efficacy claim or message and then echoes that same thematic claim across all media.  That is, regardless of whether the advertising for one of the Collections appears in print (magazine or newspaper), on L'Oreal/Lancôme's website, on third-party retailer websites, on product

brochures, product displays, or product packaging at the point of sale, L'Oreal/Lancôme repeats substantially the same thematic marketing message. For example, no matter where the advertising appears for Genifique, L'Oreal/Lancôme represents that the product will boost the activity of genes, stimulate youth proteins, and result in younger looking skin in 7 days and that these purported results are the product of certain tests, studies, patents and other sham scientific breakthroughs.

17. Lancôme Luxury Wrinkle Creams, and those of L'Oreal/Lancôme's competitors, are sold mainly though counters at high-end department stores. Salespersons who are specifically trained by L'Oreal/Lancôme to sell its Lancôme Luxury Wrinkle Creams routinely occupy the Lancôme counters, where L'Oreal/Lancôme also provides consumers access to product displays and sales brochures. Accordingly, consumers decide to purchase the Lancôme Luxury Wrinkle Creams almost exclusively by virtue of L'Oreal/Lancôme's marketing campaigns that reach consumers before they enter the retail outlets (*i.e.*, print media advertisements, television commercials or internet marketing) or through point-of-sale marketing, advertising, and sales.

18. Regardless of where Plaintiffs and the other members of the Lancôme Class and Subclasses purchased the Lancôme Luxury Wrinkle Creams (*i.e.*, on-line directly from L'Oreal/Lancôme, in a department store at the Lancôme counter, or from other third-party retailers like Sephora), consumers were (and are) exposed to L'Oreal/Lancôme's pervasive false, misleading and/or deceptive advertising

messages and material omissions regarding the efficacy promises of the Lancôme Luxury Wrinkle Cream collections.   Indeed, no reasonable consumer would accidentally purchase a $100 jar of wrinkle cream without reliance on L'Oreal/Lancôme's efficacy claims.

19.   Unlike Lancôme Luxury Wrinkle Creams, L'Oreal/Youth Code sells its Youth Code Products in drug stores, supermarkets, and on-line. Despite the difference in sales channels, no reasonable consumer would purchase Youth Code Products for $25 instead of readily available, less expensive products without expecting the benefits of the promised results that appear prominently and uniformly on the products' packaging.

20.   Plaintiffs Lydia Fabend, Alyssa Schwartz, Sonia Kallen, Lynn Bauer, Aida Absi, Rosemarie Murphy, Kimberly Davis, Cheryl Simmons, and Constanza Nino seek relief in this action individually and as a class action on behalf of all purchasers in the United States of at least one of the Lancôme Luxury Wrinkle Creams ("the Lancôme Class") at any time from the date of product launch for each of the Lancôme Luxury Wrinkle Creams to the present (the "Lancôme Class Period") for breach of express warranty, unjust enrichment, violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 58:8-1, *et seq.*; violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*; and the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

9

violations of Florida Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.*; and for violations of the Consumer Fraud Laws and Express Warranty Laws of the various states.  Pending completion of discovery, Plaintiffs may seek leave to amend the Class definitions or refine the nationwide Lancôme Class and Lancôme Subclasses that Plaintiffs seek to certify.

21.     Plaintiffs Lydia Fabend, Alyssa Schwartz, Sonia Kallen, Lynn Bauer, and Aida Absi seek relief individually and on behalf of a subclass of residents of their home state of California for purchases of Lancôme Luxury Wrinkle Creams ("California Lancôme Subclass").

22.     Plaintiff Rosemary Murphy seeks relief individually and on behalf of a subclass of residents of her home state of New Jersey for purchases of Lancôme Luxury Wrinkle Creams ("New Jersey Lancôme Subclass").

23.     Plaintiffs Kimberly Davis and Cheryl Simmons seek relief individually and on behalf of a subclass of residents of their home state of Illinois for purchases of Lancôme Luxury Wrinkle Creams ("Illinois Lancôme Subclass").

24.     Plaintiff Constanza Nino seeks relief individually and on behalf of a subclass of residents of her home state of Florida for purchases of Lancôme Luxury Wrinkle Creams ("Florida Lancôme Subclass").

25.     Plaintiffs Margaret Goldrick, Justin Gordon, and Jessica Luu seek relief in this action individually and as a class action on behalf of all purchasers in the United States of at least one of the Youth Code Products ("the Youth Code Class") at any time from the date of product launch for each of the Youth Code

Products to the present (the "Youth Code Class Period") for breach of express warranty; unjust enrichment; violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 58:8-1, *et seq.*; violation of the Massachusetts General Laws Chapter 93A; violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*; and the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* and violation of the Consumer Fraud Laws and Express Warranty Laws of the various states. Pending completion of discovery, Plaintiffs may seek leave to amend the Class definitions or refine the nationwide Youth Code Class and Youth Code Subclasses that Plaintiffs seek to certify.

26.     Plaintiff Margaret Goldrick seeks relief individually and on behalf of a subclass of residents of her home state of New Jersey for purchases of Youth Code Products ("New Jersey Youth Code Subclass").

27.     Plaintiff Justin Gordon seeks relief individually and on behalf of a subclass of residents of his home state of Massachusetts for purchases of Youth Code Products ("Massachusetts Youth Code Subclass").

28.     Plaintiff Jessica Luu seeks relief individually and on behalf of a subclass of residents of her home state of California for purchases of Youth Code Products ("California Youth Code Subclass").

## II.     **THE PARTIES**

29.     Plaintiff Fabend is a citizen of the State of California, residing in Marin County. Plaintiff Fabend purchased Lancôme High Resolution Refill 3X Triple Action Anti-Wrinkle Cream with SPF 15 and Renergie Lift Volumetry Lifting

and Reshaping Cream at Macy's department store in Union Square, San Francisco, California, during the Class Period for personal use.  As set forth in greater detail below, in or about late 2010 or early 2011, Plaintiff Fabend saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase the Lancôme Luxury Wrinkle Creams.  Plaintiff Fabend would not have purchased Lancôme High Resolution and Renergie products had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

30.     Plaintiff Schwartz is a citizen of the State of California, residing in San Francisco County.   Plaintiff Schwartz purchased Lancôme Genifique Youth Activating Concentrate at a Macy's department store in San Francisco, California, during the Class Period for personal use.  As set forth in greater detail below, in or about July 2012, Plaintiff Schwartz saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiff Schwartz would not have purchased the Lancôme Genifique product had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

12

31.     Plaintiff Kallen is a citizen of the State of California, residing in Los Angeles County.  Plaintiff Kallen purchased Lancôme High Resolution Eye Refill 3X Anti-Wrinkle Cream at the Nordstrom department store and Renergie Lift Volumetry Multiple Action and Renergie Lift Volumetry Eye at the Macy's department store at the Westfield Mall, Canoga Park, California, during the Class Period for personal use.  As set forth in greater detail below, from September 2011 to April 2012, Plaintiff Kallen saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiff Kallen would not have purchased the Lancôme High Resolution and Renergie products had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

32.     Plaintiff Bauer is a citizen of the State of California, residing in San Francisco County.  Plaintiff Bauer purchased Lancôme Renergie Microlift Eye R.A.R.E. Intense Repositioning Eye Lifter and Genifique Youth Activating Concentrate at the Macy's department store at the Stonestown Galleria Mall in San Francisco, California, during the Class Period for personal use.  As set forth in greater detail below, between 2010 and 2012, Plaintiff Bauer saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive

product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiff Bauer would not have purchased the Lancôme Renergie and Genifique products had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

33.    Plaintiff Absi is a citizen of the State of California, residing in Los Angeles County.  Plaintiff Absi purchased Lancôme Renergie Microlift Eye R.A.R.E. Intense Repositioning Eye Lifter at the Macy's and Nordstrom's department stores in Woodland Hills and Northridge, California, during the Class Period for personal use.  As set forth in greater detail below, between late-2010 and mid-2012, Plaintiff Absi saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive  product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiff Absi would not have purchased the Lancôme Renergie products had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

34.    Plaintiff Murphy is a citizen of the State of New Jersey, residing in Bergen County. Plaintiff Murphy purchased Absolue Precious Cells Advanced Regenerating and Reconstructing Cream and Genifique Youth Activating Concentrate at a Bloomingdale's department store in Hackensack, New Jersey, during the Class Period for personal use.  As set forth in greater detail below, in or

14

about 2010, Plaintiff Murphy saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams. Plaintiff Murphy would not have purchased the Lancôme Absolue Precious Cells and Genifique products had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

35.     Plaintiff Davis is a citizen of the state of Illinois, residing in Lake County. Plaintiff Davis purchased High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream at a Macy's department store in Vernon Hills, Illinois during the Class Period for personal use. As set forth in greater detail below, in or about January 2012, Plaintiff Davis saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams. Plaintiff Davis would not have purchased the Lancôme High Resolution product had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

36.     Plaintiff Simmons is a citizen of the state of Illinois, residing in Cook County. During the Class Period, on or about February 24, 2012, Plaintiff Simmons

purchased Genifique Youth Activating Concentrate at a Macy's department store in Chicago, Illinois for personal use.  On or about June 24, 2012, Plaintiff Simmons purchased Genifique Youth Activating Duo from the Home Shopping Network ("HSN").  As set forth in greater detail below, Plaintiff Simmons saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiff Simmons would not have purchased the Lancôme Genifique product had L'Oreal/Lancôme not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

37.   Plaintiff Nino is a citizen of the State of Florida, residing in Miami-Dade County.  Plaintiff Nino purchased Lancôme Visionnaire, Genifique Youth Activating Cream Serum, and Genifique Youth Activating Concentrate at a Macy's department store in Aventura, Florida, during the Class Period for personal use.  As set forth in greater detail below, in 2010-2012, Plaintiff Nino saw, read, and received L'Oreal/Lancôme's material misrepresentations as described more fully herein, including L'Oreal/Lancôme's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiff Nino would not have purchased the Lancôme Visionnaire and Genifique products had L'Oreal/Lancôme

not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

38.     Plaintiff Goldrick is a citizen of the State of New Jersey, residing in Middlesex County.  Plaintiff Goldrick purchased Youth Code Eye Cream and Youth Code Day Lotion with SPF at a CVS pharmacy in and around Old Bridge, New Jersey during the Class period for personal use.  As set forth in greater detail below, in or about mid- to late-2011, Plaintiff Goldrick saw, read, and received L'Oreal/Youth Code's material misrepresentations as described more fully herein, including L'Oreal/Youth Code's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Youth Code Products.  Plaintiff Goldrick would not have purchased the Youth Code Products had L'Oreal/Youth Code not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

39.     Plaintiff Gordon is a citizen of the State of Massachusetts, residing in Suffolk County. Plaintiff Gordon purchased L'Oreal Paris's Youth Code Serum Intense from Walgreens, Rite-Aid, and/or CVS, in and around Boston, Massachusetts, during the Class Period for personal use.  As set forth in greater detail below, from approximately December 2011 to June 2012, Plaintiff Gordon saw, read, and received L'Oreal/Youth Code's material misrepresentations as described more fully herein, including L'Oreal/Youth Code's many false, misleading, and/or deceptive  product claims, and relied on those material mis-statements in making his decision to purchase Youth Code Products.  Plaintiff Gordon would not

17

have purchased the Youth Code Products had L'Oreal/Youth Code not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

40.     Plaintiff Luu is a citizen of the State of California, residing in San Francisco County.   Plaintiff Luu purchased L'Oreal Paris's Youth Code Serum Intense, Youth Code Eye Cream, Youth Code Day/Night Cream, and Youth Code SPF 30 Day Lotion from Walgreens in San Francisco, California, during the Class Period for personal use.  As set forth in greater detail below, in or about the Spring 2012, Plaintiff Luu saw, read, and received L'Oreal/Youth Code's material misrepresentations as described more fully herein, including L'Oreal/Youth Code's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase Youth Code Products. Plaintiff Luu would not have purchased the Youth Code Products had L'Oreal/Youth Code not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

41.     Defendant L'Oreal U.S.A., Inc., is a Delaware corporation with its principal place of business in Berkeley Heights, New Jersey.   L'Oreal has manufacturing facilities in Clark, New Jersey; Franklin, New Jersey; and Piscataway, New Jersey.   L'Oreal has distribution facilities in Cranbury, New Jersey; Dayton, New Jersey; and South Brunswick, New Jersey.  L'Oreal also has research facilities in Clark, New Jersey and a consumer evaluation center in Berkeley Heights, New Jersey.

42.     Defendant Lancôme, Inc. is a Delaware corporation.

43.     Defendant Lancôme Luxury Products, LLC is a limited liability corporation.

## III.   JURISDICTION AND VENUE

44.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from a Defendant.

45.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  L'Oreal distributed, marketed, advertised and sold the Products, which are the subject of the present complaint, in this District.

## IV.   GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. L'Oreal's Misleading Efficacy Claims

46.     A central theme of L'Oreal's false, misleading, and/or deceptive marketing campaign, which permeates throughout its print, television, in-store and web-based advertisements, product displays, sales brochures, sales training materials, and product packaging, is that its products, and the results promised by L'Oreal, are supported by vigorous scientific research and resulting discoveries.  As described in more detail below, L'Oreal's marketing campaign highlights, among other things, the purported years of scientific research, the number of patents, "studies," lab research, and in-vitro testing that, according to L'Oreal, supports the promised results.

19

47.     In fact, while such science-based claims provide L'Oreal with an increased level of credibility among unsuspecting consumers, and therefore increased sales, the purported scientific research and discovery is simply part and parcel of L'Oreal's false, misleading, and/or advertising campaign.

48.     By way of example, L'Oreal/Lancôme misleads consumers by claiming that many of its promised results for Lancôme Luxury Wrinkle Creams are supported by "in-vitro testing," which L'Oreal/Lancôme knows sounds scientifically impressive to the average consumer.

49.     In fact, "in-vitro" is Latin for "in glass" and it means that the results are based on lab testing rather than "in vivo" testing on people.  In other words, "in-vitro" results are based on ingredient testing on cells in a test tube or petri dish, which means that the ingredients' ability to penetrate actual human skin cannot be assessed.  L'Oreal/Lancôme is well aware of this reality yet continues to convey to consumers that "in-vitro" results support its efficacy claims.

50.     One example of an ingredient with great "in-vitro" results that does not translate to skin benefits is the family of peptides.  In "in-vitro" tests on cells, peptides have been shown to boost collagen production, reverse skin damage, lighten discoloration, and much more.  While L'Oreal/Lancôme touts these "in-vitro" results in its marketing, it fails to disclose what it knows is the truth:  Most peptide molecules are too large to penetrate the skin, which means they cannot possibly deliver the in-lab results in real life.  And, even if the peptide is one that could possibly penetrate the skin, the degree of penetration and benefit to consumers is

significantly less in actual use by consumers than the "in-vitro" test results purport to provide.  L'Oreal/Lancôme is aware of this flaw in in-vitro testing, yet does not disclose it to consumers.  Accordingly, L'Oreal/Lancôme's use of "in-vitro" tests as a marketing ploy is misleading to consumers.

51.     Despite L'Oreal's admission in its Code of Business Ethics (2007) that "[o]verselling our products by making inflated or exaggerated claims for them is dishonest," L'Oreal ignores its own ethical standard for increased profits resulting from its deceptive and misleading efficacy claims.

52.     One of the reasons L'Oreal saturates its marketing campaigns with misleading scientific references is to create the perception that the Products have drug-like efficacy, when, in fact, they do not.  L'Oreal knows, or should know, that such a perception will increase sales.

53.     Indeed, L'Oreal/Lancôme's drug-like efficacy claims caught the attention of the FDA.  On September 7, 2012, the FDA issued a warning letter to L'Oreal's Lancôme division, stating that:

> [t]he claims on your web site indicate that [certain Lancôme products including Genifique Youth Activating Concentrate, Genifique Eye Youth Activating Eye Concentrate, Genifique Cream Serum Youth Activating Cream Serum, Genifique Repair Youth Activating Night Cream, Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 Sunscreen, Absolue Eye Precious Cells Advanced Regenerating and Reconstructing Eye Cream, Absolue Night Precious Cells Advanced Regenerating and Reconstructing Night Cream and Renergie Microlift R.A.R.E. Intense Repositioning Eye Lifter] are intended to affect the structure or any function of the human body, rendering them drugs under the Act.  The marketing of these products with these claims evidencing these intended uses violates the Act.

. . . .

Your products are not generally recognized among qualified experts as safe and effective for the above referenced uses, and therefore, the products are new drugs as defined in section 201(p) of the Act [21 U.S.C. § 321(p)]. . . .

This letter is not an all-inclusive statement of violations associated with your products or their labeling, and we have not attempted to list here all of the products that are promoted on your website for intended uses that cause them to be drugs. . . .

54.     In response to the FDA warning letter, L'Oreal/Lancôme has made some modifications to some of its advertising and marketing materials for the Lancôme Luxury Wrinkle Creams.  Despite these changes in the wake of the FDA's letter, L'Oreal's advertising and marketing materials continue to include false, misleading, and/or deceptive claims and therefore continue to cause harm to the members of the Lancôme and Youth Code Classes and Subclasses.

### B. L'Oreal's Misleading and Deceptive References to Purported Scientific Data

55.     L'Oreal's product marketing strategy also includes misleading references to "clinical" studies or trials and consumer "tests."  L'Oreal includes such references because it knows (because, according to its product brochures for the Lancôme Luxury Wrinkle Creams, it also conducts psychological research on consumers) that average consumers are swayed by such indicia of scientific credibility.  L'Oreal takes full advantage of this to further mislead and deceive consumers into purchasing its products.

56.     By way of example, L'Oreal/Lancôme has made and continues to make the following claims regarding "clinical studies" or tests, among others, in its respective Lancôme Luxury Wrinkle Cream product marketing materials:

- Genifique:

    o "Clinical study on skin proteins associated with young skin – France";

    o "Based on consumer evaluations in a clinical study, which also consists of expert evaluations."

- Renergie:

    o "Based on results from consumer test of 50 women aged from 45 to 65 years old – France."

- Absolue:

    o "Based on results from a consumer test on women with UV-damaged skin";

    o "Reduction in crow's feet and laugh lines in a 4-week clinical evaluation on UV-damaged skin."

- Visionnaire:

    o "Self-assessment of the total of all consumers tested at 4 and 6 weeks."

    o "Clinical study"

- High Resolution:

    o "In-vitro testing on rice peptides and alfalfa extract shows production of new collagen within 48 hours"

57.     Such references to scientific-sounding studies or "tests" are themselves misleading (regardless of whether the studies or tests were ever conducted).

58.     Upon information and belief, flaws in L'Oreal's studies and tests include, but are not limited to, (1) studies with too few participants to yield results that are scientifically or statistically significant such that L'Oreal could reasonably believe that the results would translate to consumers generally, and (2) tests where participants are cherry picked and/or where results are selectively determined such that L'Oreal is able to manipulate the results to support the purported benefits of the Lancôme Luxury Wrinkle Creams and Youth Code Products for use in its advertising and marketing materials.

59.     Regardless of whether the actual "clinical" studies or "tests" referenced by L'Oreal produced the claimed results, the references to such "clinical" studies or "tests" as being indicative of results for consumers generally in actual use of the Products is misleading and deceptive.  In other words, Plaintiffs' claims are not based on the inherent faults in L'Oreal's purported clinical data, studies, or surveys. Indeed, while this "data" is part and parcel of L'Oreal's false, misleading, and/or deceptive advertising, Plaintiffs intend to prove, through expert testimony and through information they believe will be revealed in discovery, that L'Oreal's advertising claims, as detailed herein, contain efficacy promises that the products simply cannot and do not deliver.

## C. L'Oreal's Misleading Use of Footnotes and Asterisks

60.     Another way that L'Oreal/Lancôme misleads consumers in the marketing of its Lancôme Luxury Wrinkle Creams is by its pervasive use of footnotes or asterisks throughout its marketing materials to deceptively disclaim the promised results of a particular product.

61.     For example, in its High Resolution product brochure L'Oreal/Lancôme states that High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream "Visibly refills wrinkles and crow's feet* and helps re-plump skin for renewed smoothness."  However, in microscopically small print at the bottom of the brochure, L'Oreal/Lancôme incoherently attempts to qualify the foregoing wrinkle claim stating, "*Visibly refill [sic] the appearance of wrinkles."  L'Oreal/Lancôme provides no explanation as to how High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream purports to refill *the appearance* of wrinkles, instead of the wrinkle itself, as is claimed in much larger, legible typeface.  In fact, while the use of the "appearance of wrinkle" language in the disclaimer is an attempt to remedy the deceptive nature of the primary marketing message, the attempt fails because the type is illegible and also because it conveys a conflicting and misleading message.  Consumers are therefore left with the false impression that High Resolution will actually refill their wrinkles and crow's feet.

### D.  L'Oreal Misleadingly Advertises that Its Products are Protected by Patents

62.     Another aspect of the false, misleading and/or deceptive advertising and marketing scheme employed by L'Oreal to sell its Lancôme Luxury Wrinkle Creams and Youth Code Products is its claims that some of the products are patented by L'Oreal.

63.     For example, in its brochure for Genifique, L'Oreal/Lancôme claims: "The Innovation - 10 Years of Research - 7 International Patents."

64.    The message conveyed to consumers is that L'Oreal/Lancôme's own extensive 10 years of research has led to the development of some new and unique ingredient that it has patented, and that this ingredient is what makes Genifique distinct; that is, what enables it to "boost the activity of genes."  However, it is impossible for the consumer to know exactly what is patented since there is no patent information or patent number(s) anywhere on the product or the product's packaging.  In fact, upon information and belief, no U.S. patents exist for Genifique that allow it to "boost the activity of genes and stimulate the production of youth proteins" resulting in "visibly younger skin in 7 days."

65.    Moreover, even L'Oreal/Lancôme is unsure of the number of "international patents" it possesses for Genifique.  In the May 2012 issue of Glamour magazine, a L'Oreal/Lancôme advertisement for Genifique claims that it is internationally patented.  An asterisk refers to very small print which states "patented in the EU, France, Japan, Russia, and Mexico. US patent pending." According to this advertisement, there are only 5, not 7, "international" patents for Genifique.

66.    L'Oreal/Lancôme convinces consumers that Genifique warrants its high price tag through misleading claims that its unique ingredient is protected by patents and therefore not available in any other product.  But, upon information and belief, none of the ingredients in Genifique are unique.  All of the ingredients in Genifique are present in other cosmetic products.

67.     L'Oreal/Lancôme makes similar unfounded statements with respect to Visionnaire [LR 2412 4%] Advanced Skin Corrector, claiming that "[LR 2412] is such a visionary molecule that it is now protected by 20 International Patents!" L'Oreal/Lancôme further claims in the Question and Answer section on its website:

Question:     "Why did it take so long to develop [LR 2412]?"

Answer:     These 12 years represent the sum of the time it took to create 20 compounds, all of which belong to the jasmonate family, and to carry out formulation trials to test their stability, safety and performance. The final result of this long development process is a single molecule that is now protected by 20 International patents.

68.     Contrary to these claims, the package insert for Visionnaire, which consumers receive only *after* purchasing the product, states only that a patent is "pending" and conveniently omits L'Oreal/Lancôme's claim of having "20 International Patents!"

69.     As shown below, L'Oreal/Youth Code also claims that the Youth Code Products are protected by an "INTERNATIONAL PATENT":



70.     This patent claim is found on the product boxes themselves and is printed directly below the claim "YOUTH REGENERATING DISCOVERY - Innovation derived from GENE Science."

71.     The proximity of the patent claim to the "YOUTH REGENERATING DISCOVERY" claim misleadingly conveys to consumers that the patent somehow involves the purported "10 years of research" leading to the "discover[y]" of a "specific set of genes."

72.     However, upon information and belief, none of the actual patents listed on any of the Youth Code Products relate to any such gene innovation or the discovery of a "specific set of genes that are responsible for the skin's natural powers of regeneration."

73.     Instead, upon information and belief, the patents identified on the Youth Code packaging relate to: "novel compounds having an improved power to moisturize skin and/or hair"; "a new family of thickening or gelling polymers making it possible to obtain stable thickened cosmetic and dermatological formulations"; "a novel family of thickening and/or gelling polymers which makes it possible to obtain a very large number of cosmetic and dermatological formulations which may contain supports of different nature"; and a "photostable cosmetic composition intended for protecting the skin against UV-radiation."

74.     Falsely touting that its research has led to a discovery of a specific set of genes that is protected by patents is part and parcel of L'Oreal/Youth Code's deceptive scheme to convince consumers that its Youth Code Products will provide

28

unique skin regeneration benefits based on the promised and patented "gene science" discovery and are therefore worth their price tag.

75.     Once again, L'Oreal's claims of patent protection are intended to deceive consumers and cause them to purchase what they believe are unique products providing unique results.

76.     The use of the word "patent" by L'Oreal in its advertising materials is not only deceptive and misleading to the consumer, but also constitutes false marketing under U.S. patent law.  According to 35 U.S.C. § 292(a):

> (a)     Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, or imported by the person into the United States, the name or any imitation of the name of the patentee, the patent number, or the words "patent," "patentee," or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; or **Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article the word "patent" or any word or number importing the same is patented, for the purpose of deceiving the public**; or Whoever marks upon, or affixes to, or uses in advertising in connection with any article the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public - Shall be fined not more than $500 for every such offense. (Emphasis added)

77.     In sum, touting that its research and scientific innovation has led to the patenting of its products is simply part and parcel of L'Oreal's false, misleading,

29

and/or scheme to convince consumers that the Lancôme Luxury Wrinkle Creams and Youth Code Products provide unique age-negating benefits and are therefore worth their price tag.

### E. L'Oreal's Pervasive and Misleading National Marketing Campaign

78.     L'Oreal's pervasive false, misleading, and/or deceptive national marketing campaign includes the dissemination of deceptive marketing and advertising through a variety of mediums including, but not limited to, Internet, television, print media, point-of-sale materials such as product displays, product brochures, and product packaging, as well as (in the case of L'Oreal/Lancôme) in-person product presentations and demonstrations by L'Oreal/Lancôme-trained Lancôme beauty consultants and sales people.

### 1.     Internet and Television Marketing

79.     L'Oreal/Lancôme's Internet marketing for its Lancôme Luxury Wrinkle Creams includes, among other things, video presentations, statistical data, and question and answer information on its own website, Lancôme-usa.com.   In addition, the Lancôme Luxury Wrinkle Creams are advertised on numerous third-party websites including, but not limited to, Sephora.com, Macys.com, Amazon.com, Neimanmarcus.com, Nordstrom.com, facebook.com, and hsn.com.   Many of L'Oreal/Lancôme's commercials and promotional videos are also readily accessible on youtube.com.  Each of these sources provides consumers access 24 hours a day, 7 days a week, to L'Oreal/Lancôme's deceptive advertising.

80.     For example, Plaintiff Simmons purchased Lancôme Genifique Youth Activating Duo on or about June 24, 2012, through Home Shopping Network at a cost of $125.00 (plus tax).  This purchase was made after seeing the product promoted on the HSN television program.  Plaintiff Simmons' reliance on the efficacy claims made by L'Oreal/Lancôme on HSN reinforced the in-store point-of-sale marketing materials, like those described herein at store displays at a Macy's department store in the Chicago metropolitan area, and also those that Plaintiff Simmons observed on the L'Oreal/Lancôme website, each of which regurgitated the same efficacy claims for Genifique.

81.     Efficacy claims made by L'Oreal/Lancôme on HSN, the Lancôme website, and at Macy's to Plaintiff Simmons, combined with representations as to the claimed results from using the Genifique Youth Activating Duo convinced Plaintiff Simmons to purchase the product.

82.     Plaintiff Murphy purchased Absolue Precious Cells Advanced Regenerating and Reconstructing Cream and Genifique Youth Activating Concentrate after viewing L'Oreal/Lancôme television commercials, which repeated the same misleading efficacy claims as appearing in L'Oreal/Lancôme's printed marketing materials.

83.     L'Oreal/Youth Code uses its website, www.lorealparisusa.com, to promote the Youth Code Products by repeating the same misleading efficacy claims as appear on the product packaging.

## 2.    <u>**Print Media and Point of Sale Materials**</u>

84.    L'Oreal also heavily markets its Lancôme Luxury Wrinkle Creams and Youth Code Products in print media, including the placing of advertisements in such nationally circulated magazines as Glamour, Cosmopolitan, Vogue, Elle, Marie Claire, and Allure, among others.

85.    The specific dates and places of each of L'Oreal's advertisements are in Defendants' possession.

86.    In or about late 2010 to early 2011, in reliance upon information provided by L'Oreal/Lancôme in magazine advertisements, including Glamour magazine, among others, Plaintiff Fabend purchased Lancôme High Resolution and Renergie products.

87.    In or about summer 2011 to spring 2012, in reliance upon information provided by L'Oreal/Lancôme in magazine advertisements, including Glamour and Allure magazines, among others, Plaintiff Kallen purchased Lancôme High Resolution and Renergie products.

88.    In or about 2010-2012, in reliance upon information provided by L'Oreal/Lancôme in magazine advertisements, including those in Vogue, Marie Claire, and Allure magazines, among others, Plaintiff Nino purchased Lancôme's Visionnaire and Genifique Products.

89.    In or about late 2010 to mid-2012, in reliance upon information provided by L'Oreal/Lancôme in magazine advertisements, including those in Glamour and Vogue magazines, among others, Plaintiff Absi purchased Lancôme Renergie products.

90.     In or about 2010 to early 2011, in reliance upon information provided by L'Oreal/Lancôme in magazine advertisements, including Glamour, among others, Plaintiff Bauer purchased Lancôme Genifique Youth Activating Concentrate.

91.     In or about mid- to late-2011, in reliance upon information provided by L'Oreal/Youth Code in magazine advertisements, including those in Cosmopolitan, among others, Plaintiff Goldrick purchased Youth Code products.

92.     In or about early 2012, in reliance upon information provided by L'Oreal/Youth Code in magazine advertisements, including those in Glamour, Cosmopolitan, and People, among others, Plaintiff Luu purchased Youth Code products.

93.     In addition, L'Oreal/Lancôme uses point-of-sale marketing materials such as product sales brochures and product displays for distribution and viewing at, among other places, malls and department stores, which provide much of the same information available online and which direct customers to visit Lancôme.com for more product information.[2]   The following are sample sales brochures, which were made available at, among other places, the Lancôme counter at the Nordstrom department store in Short Hills, New Jersey:

---

[2]     When consumers in the United States visit Lancôme.com, they are automatically re-directed to Lancôme-usa.com.













94.    Plaintiff Fabend saw, read, and relied on print and point-of-sale marketing materials containing false, misleading, and/or deceptive efficacy statements in making her decision to purchase the High Resolution and Renergie products in or about late 2010 and early 2011 at the Union Square San Francisco

Macy's department store.  The efficacy statements relied on by Plaintiff Fabend included, among other things, the purported, "scientific" benefits based upon discoveries, "clinical" data, and "in-vitro" tests.  In addition, Plaintiff Fabend viewed before and after photos of a woman's jaw and neckline purporting to have been "reshaped" and "visibly improved by 8 degrees" after using L'Oreal/Lancôme's Renergie Lift Volumetry product.

95. The foregoing false, misleading, and/or deceptive efficacy statements, among others, received by Plaintiff Fabend in or about late 2010 and early 2011 at the Union Square San Francisco Macy's department store were material and influenced her decision to purchase L'Oreal/Lancôme products.

96. Plaintiff Schwartz saw, read, and relied on print and point-of-sale marketing materials containing false, misleading, and/or deceptive efficacy statements in making her decision to purchase the Genifique product in or about July 2012 at the Macy's department store on O'Farrell Street in San Francisco, California.  The efficacy statements relied on by Plaintiff Schwartz included, among other things, the claim that the product provides "visibly younger skin in just 7 days" as well as other purported "scientific" benefits based upon discoveries, "clinical" data, and "in-vitro" tests.

97. The foregoing false, misleading, and/or deceptive efficacy statements, among others, received by Plaintiff Schwartz in or about July 2012 at the San Francisco Macy's department store were material and influenced her decision to purchase L'Oreal/Lancôme products.

98.     Similarly, Plaintiff Murphy saw, read, and relied upon the false, misleading, and/or deceptive efficacy statements contained in L'Oreal's point-of-sale marketing materials such as sales brochures and product displays for Lancôme Genifique and Absolue Precious Cells products at Bloomingdale's department store in Hackensack, New Jersey in or about 2010 (for Absolue Precious Cells) and 2011-2012 (for Genifique).

99.     Plaintiff Murphy was induced to purchase Absolue Precious Cells as a result of L'Oreal/Lancôme's materially false, misleading, and/or deceptive marketing materials.

100.     Likewise, Plaintiff Murphy was induced to purchase Genifique as a result of L'Oreal/Lancôme's materially false, misleading, and/or deceptive marketing materials.

101.     Plaintiff Davis saw, read, and relied upon the false, misleading, and/or deceptive efficacy statements contained in L'Oreal's point-of-sale materials such as sales brochures and product displays for Lancôme High Resolution at Macy's department store in Vernon Hills, Illinois.  Plaintiff Davis was induced to purchase High Resolution as a result of L'Oreal/Lancôme's materially false, misleading, and/or deceptive marketing materials.

102.     Plaintiff Nino saw, read, and relied on print and point-of-sale marketing materials containing false, misleading, and/or deceptive efficacy statements in making her decision to purchase the Visionnaire and Genifique products in 2010-2012 at the Macy's department store in Aventura, Florida.

38

Furthermore, Plaintiff Nino relied on before and after photos of women's faces that purported to demonstrate the dramatic results that would be achieved from using the Lancôme products.

103.    The false, misleading, and/or deceptive statements, among others, received by Plaintiff Nino in or about 2010-2012 at the Macy's department store in Aventura, Florida were material and influenced her decision to purchase Lancôme products.

104.    Plaintiff Absi saw, read, and relied on print and point-of-sale marketing materials containing false, misleading, and/or deceptive efficacy statements in making her decision to purchase the Renergie products in or about late 2010 and continuing to mid-2012 at the Macy's and Nordstrom department stores in Woodland Hills and Northridge, California.

105.    Plaintiff Absi recalls reviewing statements that Renergie Microlift provided immediate "lifting, lasting repositioning" and was inspired by "eye-lifting surgical techniques" and that Renergie Microlift's "unique R.A.R.E. oligopeptide helps to re-bundle collagen."

106.    In deciding to purchase Renergie Microlift Eye R.A.R.E. Intense Repositioning Eye Lifter, Plaintiff Absi relied upon L'Oreal/Lancôme's claims that the Renergie product would "recreate a younger, lifted look" and would provide "lasting repositioning" to her eyes.

107.    Plaintiff Absi also relied on L'Oreal/Lancôme's claim that the Renergie products promise that "surface cell renewal is accelerated," that the products will

"re-organize the collagen network to create a firmer support structure," and that they will actually "re-firm" and "re-contour[] the skin," as well as "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," and "reshape the profile."

108.   The foregoing false, misleading, and/or deceptive statements, among others, received by Plaintiff Absi in or about late 2010 and mid-2012 at the Nordstrom and Macy's department stores were material and influenced her decision to purchase Lancôme products.

109.   Plaintiff Bauer saw, read, and relied on print and point-of-sale marketing materials containing false, misleading, and/or deceptive efficacy statements in making her decision to purchase the Lancôme Renergie and Genifique products in or about 2010 and 2011 at the Stonestown Galleria Mall's Macy's department store in San Francisco, California.   The efficacy statements relied on by Plaintiff Bauer included, among other things, the purported, "scientific" benefits based upon discoveries, "clinical" data, and "in-vitro" tests.   In addition, Plaintiff Bauer viewed before and after photos of a woman's jaw and neckline purporting to have been "reshaped" and "visibly improved by 8 degrees" after using L'Oreal/Lancôme's Renergie Microlift product.

110.   The foregoing false, misleading, and/or deceptive statements, among others, received by Plaintiff Bauer in or about 2010 and or 2011 at the Galleria Mall's Macy's department store in San Francisco, California were material and influenced her decision to purchase Lancôme products.

### 3.   <u>In-Store Sales People</u>

111.   Upon information and belief, L'Oreal/Lancôme also provides training programs and disseminates uniform information to its sales persons regarding the Lancôme Luxury Wrinkle Creams.   These sales persons are trained by L'Oreal/Lancôme to parrot and reinforce the same purported benefits of using the Lancôme Luxury Wrinkle Creams as well as the pseudo-scientific data supporting such promised results as contained in L'Oreal/Lancôme's other forms of advertising.

112.   Whether over the Internet, television, in print, or through contact with sales people, each of these forms of marketing and advertising perpetuates the same general deceptive scheme that L'Oreal/Lancôme's products have age-negating effects on human skin.

### 4.   <u>Use of Celebrity Spokespeople and Models</u>

113.   L'Oreal makes further use of print, television, and Internet advertising wherein L'Oreal touts the benefits of the Products using celebrity spokespersons and models.

114.   What L'Oreal fails to disclose is that the images of the celebrities it uses are airbrushed, digitized, embellished, "Photo-shopped," or otherwise altered and, therefore, contrary to the claims made by L'Oreal, cannot and do not illustrate the effectiveness of the Products.   In sum, contrary to the message conveyed by L'Oreal in its advertisements, the images used to sell its Lancôme Luxury Wrinkle Creams and Youth Code Products have nothing to do with the effectiveness of the products themselves.

115.    Most recently, the National Advertising Division of the Council of Better Business Bureaus ("NAD") in the United States has taken a stance against the use of Photoshop in cosmetics advertising, noting that "[a]dvertising self regulatory authorities recognize the need to avoid photoshopping in cosmetics advertisements where there is a clear exaggeration of potential product benefits."

116.    Despite this warning, and the increased scrutiny regarding the use of Photo-shopped images in the marketing of skin care products because of the deceptive message it conveys, upon information and belief, L'Oreal continues to use altered images in its advertising of the Lancôme Luxury Wrinkle Creams and Youth Code Products, including, for example, this highly embellished image of actress Kate Winslet as compared to her photo below.    (available at http://www.imdb.com/media/rm2159774208/nm0000701).





117.    Similarly, on the left is the advertisement for Youth Code and on the right is an un-retouched photograph of the model appearing in the advertisement:



118.    Such deceptive use of celebrity spokespersons only further illustrates the lengths to which L'Oreal will go to trick its consumers to make a profit.

43

### 5.    Misuse of Statistics and Disclaimers



119.    L'Oreal uses statistics to further mislead consumers into believing that the promised results are virtually guaranteed.  For example, in the above print advertisement, L'Oreal/Youth Code claims that "95% OF WOMEN SAW RESULTS.**" Any reasonable consumer would associate that claim with the immediately foregoing specific efficacy promises that "ONE DROP INSTANTLY IMPROVES SKIN QUALITY; ONE WEEK SKIN LOOKS VISIBLY YOUNGER; and ONE MONTH SKIN ACTS DRAMATICALLY YOUNGER.*"  However, in virtually unreadable, microscopically small print at the very bottom of the advertisement, L'Oreal/Youth Code attempts to clarify the results and promises.

120.    The single asterisk indicates that, after use of the product for one month, "*Skin is firmer and cell renewal increases."  Underneath that, with the double asterisk, L'Oreal/Youth Code attempts to further clarify that the results that "95% OF WOMEN SAW" were not for firmer skin, cell renewal, or visibly younger skin – but rather for "One or more of these benefits:  feels restored, rested, smoothness." This nonsensical (and nearly invisible) disclaimer has nothing to do with the claims that L'Oreal/Youth Code makes as to Youth Code's purported gene science, gene research, and skin regenerating powers as conveyed in the primary marketing message.   Thus, the attempted disclaimer does nothing to cure the misleading message conveyed by the statistical "95%" claim.

121.    L'Oreal/Youth Code's false, misleading, and/or deceptive use of statistical claims is a central part of its marketing campaign for Youth Code, therefore leading to increased sales and profits for L'Oreal/Youth Code that it otherwise would not have enjoyed without resorting to such deception.

### F. L'Oreal's Claims Regarding Product Efficacy Are Not Mere Puffery

122.    L'Oreal's specific claims of efficacy cannot be defended as mere puffery. Similarly, L'Oreal's claims of scientifically backed research and discoveries go beyond any mere sales puffery by claiming first that certain specific discoveries enable the Lancôme Luxury Wrinkle Creams and Youth Code Products to provide their unique benefits, and then by providing specific "proven results" affirmations and promises of those benefits.  Indeed, such specific scientific references are an integral part of its marketing campaign, as L'Oreal admits in its 2011 annual report

that: "close interaction between science and marketing . . .  is a key advantage to L'Oreal's innovation approach."

123.    L'Oreal relies on such a "close interaction" because it knows that consumers are more likely to purchase its products when the indicia of scientific discovery and study are present.  L'Oreal even has a term for the exaggerated use of science in its advertising and marketing campaign:  "hyperscience."

124.    Even if one or more of L'Oreal's claims is literally true, when viewed in their totality, the promises made by L'Oreal regarding the efficacy of the Lancôme Luxury Wrinkle Creams and Youth Code Products are nevertheless misleading to the average consumer and are therefore actionable regardless of their literal truthfulness.

### G. Other Challenges to L'Oreal's Misleading Advertising

125.    In December 2010, the Swedish Market Court found that L'Oreal's claims that the Lancôme High Resolution products (one of the products at issue here) could smooth out wrinkles by up to 70% were unsubstantiated and not supported by scientific evidence.  The court ruled that L'Oreal's advertisements were thus misleading.  The court imposed a conditional fine of 1 million krona, and also ordered L'Oreal to pay the ombudsman's legal fees.  L'Oreal was banned from making a number of claims about its creams, including that they "repair wrinkles from within," "reduce wrinkles up to 40 percent," or use "pictures that mislead customers about the effects of the product in future adverts."[3]

---

[3]    Available at:  http://www.cosmeticsdesign-europe.com/Market-Trends/Ads-branded-misleading-as-L-Oreal-s-lumbered-with-conditional-fine.

126.     Despite these admonitions by the Swedish court, L'Oreal continues to deceive and confuse consumers in the United States by repeating similar false, misleading, and deceptive claims domestically.[4]

127.     In addition, L'Oreal has recently had advertisements banned in the U.K. for containing deceptive images, which were found to have misled consumers regarding the efficacy of their products.  Specifically, an advertisement by L'Oreal for its Revitalift wrinkle cream was banned because it "misleadingly exaggerated the performance of the product in relation to the claims."  Also, an advertisement featuring Julia Roberts wearing Lancôme's Teint Miracle foundation was banned because her skin appeared "categorically flawless."

### H. Product Cycles

128.     To further perpetuate its deceptive and misleading scheme, L'Oreal has a short product cycle, releasing new products every few years based upon some new "research" or purported "scientific discovery."  L'Oreal does so in order to tout its new products via a re-imagined marketing campaign in order to keep driving sales and profits that otherwise would stagnate once consumers used the products and realized that they do not perform as promised.  This scheme is evidenced by the fact that L'Oreal discontinues sales and production of its older products once new products are introduced to the market, despite the fact that the claims made about the discontinued products are seemingly amazing scientific breakthroughs.

---

[4]     *See*   http://thelook.today.msnbc.msn.com/_news/2012/02/01/10288992-loreal-ad-banned-for-making-rachel-weisz-look-misleadingly-smooth?lite;http://www.styleite.com/beauty/julia-roberts-christy-turlington-ads-banned-photoshop/#0

129.    For example, L'Oreal/Lancôme discontinued its Lancôme Secret de Vie[5] product, for which it made the following promises:

- It started in the Lancôme Laboratories with the urge to achieve "skin rebirth." Then came an awesome discovery: Sucre Vital™, a magical nutrient that fuels life in a hostile undersea world. Recreated by Lancôme scientists, this fuel and five other life-sustaining ingredients form Extrait de Vie™, a powerful concentrate that provides the skin with virtually everything it needs to thrive.

- Enriched with Extrait Extréme, two phenomenal marine extracts from extreme environments the boiling California undersea and the glacial Arctic Ocean this rare complex prolongs the life of skin cells.

- A unique concentrate of six ingredients that delivers intense restorative action to six major cell types for instant, visible, exceptional results.

- Intense nighttime regenerating action your skin experiences the transformation of "cellular rebirth."

130.    L'Oreal/Lancôme took this purported "awesome discovery" that "prolongs the life of skin cells" off the market despite its promised efficacy.

131.    Upon information and belief, the Secret de Vie line of products was replaced by the Absolue Collection.

132.    Similarly, L'Oreal discontinued its L'Oreal Paris Wrinkle Defense product, for which it made the following promises:

- combats the emergence of new lines and surface wrinkles;

- reduce the appearance of fine lines and wrinkles; and

- skin-resiliency booster.

---

[5]    The French name "Secret de Vie" translates into "Secret of Life" in English.

48

133.     L'Oreal's removal of purportedly effective products, like Secret de Vie and Wrinkle Defense, from the market demonstrates that L'Oreal's promised benefits are illusory and nothing more than clever marketing.

### I.  Comparison to Lower Cost Products

134.     L'Oreal sets the retail prices for all of its products and sells several lines of products at different price points.   Some of these lower-priced products provide similar results to those of the Lancôme Luxury Wrinkle Creams; others are almost identical.  For example, Youth Code Serum Intense is substantially identical to Genifique Youth Activating Concentrate.   The following chart compares these products:

| Product | Genifique Youth Activating Concentrate | Youth Code Serum Intense |
|---|---|---|
| Ingredients | • Aqua/ Water/Eau<br>• Bifida Ferment Lysate<br>• Glycerin<br>• Alcohol Denat.<br>• Dimethicone<br>• Hydroxyethylpiperazine Ethane Sulfonic Acid<br>• Sodium Hyaluronate<br>• Phenoxyethanol<br>• Adenosine<br>• PEG-20 Methyl Glucose Sesquistearate<br>• PEG-60 Hydrogenated | • Aqua/Water<br>• Bifida Ferment Lysate<br>• Glycerin<br>• Alcohol Denat.<br>• Dimenthicone<br>• Hydroxyethylpiperazine Ethane Sulfonic Acid<br>• Peg-20 Methyl Glucose Sesquisterate<br>• Sodium Hyaluronate<br>• Salicyloyl Phytosphingosine<br>• Palmitoyl Oligopeptide |

| | | |
|---|---|---|
| | Castor Oil<br><br>• Salicyloyl Phytosphingosine<br><br>• Ammonium Polyacryldimethyltauramide/Ammonium Polyacryloyldimethyl Taurate<br><br>• Limonene<br><br>• Xanthan Gum<br><br>• Caprylyl Glycol<br><br>• Disodium EDTA<br><br>• Octyldodecanol<br><br>• Citric Acid<br><br>• Citronellol<br><br>• Parfum/Fragrance | • Palmitoyl Tetrapeptide-7<br><br>• Adenosine<br><br>• Ammonium Polyacryldimethyltauramide,<br><br>• Disodium Edta<br><br>• Caprylyl Glycol<br><br>• Citric Acid<br><br>• Xanthan Gum<br><br>• N-Hydroxysuccinimide<br><br>• Chrysin<br><br>• Octyldodecanol<br><br>• Sodium Benzoate<br><br>• Phenoxyethanol<br><br>• Limonene<br><br>• Parfum |
| Claims | • 10 years of research<br><br>• More than 4000 genes analyzed<br><br>• More than 1300 proteins studied<br><br>• Tonicity and elasticity significantly improved<br><br>• Boosts the activity of genes<br><br>• Stimulates the production of youth proteins<br><br>• A true skincare innovation with 7 worldwide patents | • 10 Years of Gene Research<br><br>• See smoother, youthfully luminous and rested skin emerge.<br><br>• L'Oreal scientists unlock the code of skin's youth by discovering a specific set of genes that are responsible for skin's natural power of regeneration.<br><br>• With L'Oreal's breakthrough GenActiv Technology TM, this 10x more concentrated daily activating serum has the power |

50

|  |  |  |
|--|--|--|
|  | pending,<br><br>• Visibly younger skin in just 7 days.<br><br>• Skin looks as if lit from within – breathtaking radiant.<br><br>• Its youthful quality returns: cushiony soft and velvety to the touch. Drop by drop, skin is vibrant with youth, its tone becomes astonishingly even, its texture dramatically refined. | to instantly hydrate and transform skin to be smoother, youthfully luminous and rested skin emerge.<br><br>• Dramatic Results:<br><br>o Immediately, skin is transformed to be silky smooth, deeply hydrated<br><br>o 1 Week, Facial features look rested and your face radiates from within<br><br>o 4 Weeks, Helps liberate your face from signs of fatigue. Skin is revived and appears visible younger. |
| Cost | $80.00 for 1 fluid ounce | $24.99 for 1 fluid ounce |

135.    Despite the different efficacy claims and the price disparity, the only ingredients in Genifique but not in the less expensive Youth Code are PEG-60 Hydrogenated Castor Oil and Citronellol, neither of which is new or unique such that they provide any special benefits.   PEG-60 Hydrogenated Castor Oil is a fragrance ingredient, cleansing agent, or solubilizing agent found in more than 60 cosmetic products.   Citronellol is a colorless oily liquid with a floral smell suggestive of rose commonly used in cosmetics and personal care products.

136.    Accordingly, none of the ingredients that are found in Genifique but not found in the less expensive Youth Code justifies the price discrepancy.

137.     Moreover, as demonstrated by the above comparison, the efficacy claims are driven by the target market and not by the actual results that the substantially identical products will provide.  That is, the claims for Youth Code Serum Intense, which, at $24.99 for 1 fluid ounce is a much lower-priced product, focus on liberating the skin from looking "fatigued," "reviving" the skin, and making it look more "rested."  Conversely, the claims for Genifique Youth Activating Concentrate, which, at $80.00 for 1 fluid ounce, is a high-priced product, focus on science (*i.e.*, genes analyzed, performance, patents) and promises of "youth" proteins and younger skin.

138.     The difference in price points and efficacy claims for virtually the same products illustrates how L'Oreal's entire marketing strategy is unilaterally focused on making whatever efficacy promises are necessary to sell more products and therefore enhance its profits, regardless of whether those efficacy promises bear any relationship to actual results.

## V.  THE SPECIFIC LANCÔME LUXURY WRINKLE CREAM CLAIMS

139.     L'Oreal/Lancôme makes specific promises regarding the efficacy of the Lancôme Luxury Wrinkle Creams as further detailed below.

### A. Visionnaire Collection

140.     Visionnaire [LR 2412 4%] Advanced Skin Corrector ("Visionnaire") was launched in September 2011.

141.     Visionnaire is sold for $84 for 1.0 fl. oz, and $105 for 1.7 fl oz.

142.     Plaintiff Nino purchased Visionnaire Advanced Skin Corrector 1.7 oz for the full retail price at the Lancôme counter at the Macy's department store in

Aventura, Florida in or about the summer of 2012.   Plaintiff Nino relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements as described herein, and was induced to purchase Visionnaire based upon those statements.   The statements received by Plaintiff Nino from L'Oreal/Lancôme in or about the summer of 2012 were material and influential to her decision to purchase Visionnaire Advanced Skin Corrector.   Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Nino and the other Lancôme Class and Subclass members.

143.   L'Oreal/Lancôme's misleading advertising campaign for Visionnaire is designed to highlight the purportedly dramatic results that can be achieved by using Visionnaire.

144.   The following efficacy claims about Visionnaire are false, misleading, and/or deceptive:

a.   LR 2412 is a molecule designed to propel through skin layers. On its path, it triggers a cascading series of *micro-transformations\* and acts biologically on the 12 key targets of aging\**. LR 2412 is a small molecule. It is also amphiphilic, which means it is able to merge naturally with both aqueous and lipid structures in the skin. As soon as it is applied, LR 2412 therefore merges with surface lipids without impairing skin's barrier function. It is such a visionary molecule that it is now protected by 20 International Patents!
*Based on in-vitro testing*

b.   Capable of fundamentally re-creating more beautiful skin.

c.   One out of two women tempted by a cosmetic procedure decided to postpone it. \*\*\*

        ***  After 4 weeks of consumer use. Consumer evaluation of women aged 35 to 49 years tempted by hyaluronic acid, laser or chemical peeling. Results not equal to a medical procedure.

d.     In 4 weeks, wrinkles*, pores*, and uneveness are visibly corrected.
         *clinical study

e.     Fine lines look reduced: 76%
Pores seem less visible: 84%
Skin seems smoothed out: 87%
Overall skin appearance is improved: 86%

f.     LR 2412 visibly rejuvenates your skin.

g.     Much more than a wrinkle-corrector, our 1st skincare capable of fundamentally re-creating more beautiful skin. The first skincare with LR 2412, a molecule designed to propel through skin layers.

h.     When plants are damaged, they produce a 'signal molecule.' This activates the healing of the damaged tissues and also serves to make them more resistant. Within plants, it is this 'signal molecule' that triggers the action of repair and defense mechanisms. The challenge of our Research was to mimic its ability in a compound that it's in affinity with human skin. Our Research created and studied around 20 derivatives of this substance. Out of these studies, the molecule LR 2412 was born.

145.    L'Oreal/Lancôme claims that Visionnaire has the ability to boost cell renewal and accelerate the ability of the skin to heal itself.

146.    L'Oreal/Lancôme deceives and misleads consumers by claiming that the promised results of Visionnaire are based on "clinical studies" and "in-vitro testing."  Such references to purported supporting data is part and parcel of L'Oreal/Lancôme's false, misleading, and/or deceptive  marketing campaign because L'Oreal/Lancôme presents the data in a misleading manner such that consumers are likely to give it more credibility than it deserves.  Further, L'Oreal/Lancôme

knows the promised results – as trumpeted to consumers via its purportedly science-based marketing scheme – cannot be attained.

147.    L'Oreal/Lancôme repeatedly claims specific results for Visionnaire that are based on what amounts to a mere survey of consumers who are incentivized to report positive results as part of the "study."

148.    In addition, L'Oreal/Lancôme's descriptions of the tests and/or studies are themselves deceptive and misleading.

149.    For example, while one of L'Oreal/Lancôme's tests for Visionnaire is described as being conducted on a "total of 800 women" (Lancôme-usa.com), none of the purported efficacy results are based on this test.  Rather, for the efficacy results, L'Oreal/Lancôme refers at one point to an undefined and un-described "clinical study" and at another point to a seemingly different and incoherent description of a "self-assessment of the total of all consumers tested at 4 and 6 weeks."  These tests appear to be different from the test on "800 women," yet deceivingly purport to reflect the results of "all women tested."

150.    L'Oreal/Lancôme's references on the "proven results" portion of its website are similarly deceptive and misleading.  Here, L'Oreal/Lancôme touts that consumers who used Visionnaire reported that "fine lines looked reduced 76%."  L'Oreal/Lancôme does not disclose whether "all the consumers tested" reported a 76% reduction in the look of fine lines or whether 76% of the consumers tested reported some reduction in the look of fine lines, regardless of how minimal the "look" of the reduction.  L'Oreal/Lancôme intentionally creates such confusion in

order to deceptively bolster the results of its consumer testing because the interpretations of this "result" can be dramatically different – a 76% reduction in the look of fine lines across all those who were tested vs. 76% of those who were tested saw a minimal reduction in the look of fine lines.

151.     Moreover, L'Oreal/Lancôme's patent claims for Visionnaire are not consistent from one advertisement to another.  For example, the Lancôme website claims that Visionnaire is the result of 12 years of research and 20 international patents.[6]  The package insert for Visionnaire, which consumers obtain only after purchasing the product, indicates, however, that patents are pending but makes no mention of having any patents, much less 20 international patents.   And, inexplicably, L'Oreal/Lancôme's 2011 financial report to investors[7] claims that Visionnaire is protected by 17, not 20, patents. ("With Visionnaire, Lancôme has stepped into the future of cosmetics.   As well as offering the performance and technological innovation of LR 2412, protected by 17 patents, Visionnaire stands out thanks to its innovative communication, with its five advertising visuals which

---

[6]     "These 12 years represent the sum of the time it took to create 20 compounds, all of which belong to the jasmonate family, and to carry out formulation trials to test their stability, safety and performance. The final result of this long development process is a single molecule that is now protected by 20 International patents."  "These 20 International Patents, as well as the presentation of LR2412 at the World Congress of Dermatology in Seoul, South Korea, this spring, aid in validating our scientific discovery." (available at http://www.lancome-usa.com/visionnaire-minisite-ask-a-beauty-advisor/visionnaire_ask-a-beauty-advisor,default,pg.html).

[7]     http://www.loreal-finance.com/_docs/us/2011-annual-report/LOREAL_Rapport-Activite-2011.pdf

focus on women of different ethnic origins.   The launch was backed up by a futuristic film that combines visions of hyperscience, hyperluxury and a very Lancôme kind of femininity.").

152.   Finally, L'Oreal/Lancôme claims on yet other advertising material that Visionnaire is the result of 10 years of research and only 17 patents.



153.   The Lancôme website contains a video purporting to "explore the science of LR 2412."  This one-minute twenty-second video includes a dramatization of Visionnaire penetrating the skin and contains claims and promises that it will recreate more beautiful skin:





58





154.    A different video presentation, which makes similar efficacy promises,

includes the claim that Visionnaire can "create new skin matter":

59













155.   The almost invisible reference in this video (bottom right corner) to "19 women" is L'Oreal/Lancôme's unsuccessful attempt to disclaim the much more visible (and misleading) efficacy statement that the product is "**Active** on 100% of

women."  Indeed, "**Active** on 100% of women" is misleading because the use of the word "**Active**" suggests that the product contains active ingredients (like a drug) that would induce a therapeutic response, which it does not.  Moreover, "**Active** on 100% of women" is misleading because it hyper-inflates the efficacy, given that only a purported 19 women were "tested."

156.    Making specific efficacy promises based upon "scientific" data and discovery demonstrates that L'Oreal/Lancôme's claims are *not* mere puffery. Indeed, if Visionnaire actually "penetrated through skin layers," "act[ed] on all layers of the skin," "repair[ed]" fine lines and wrinkles, created "new skin matter," and "correct[ed] pores," it would trigger regulation by the FDA as a drug.

### B. The Genifique Collection

157.    The Genifique Collection ("Genifique") was launched in 2009.  The Youth Activating Concentrate costs $80 for 1 oz. and the Genifique Eye Youth Activating Eye Concentrate costs $60 for 0.5 oz.  The Genifique Eye Light-Pearl Eye Illuminating Youth Activating Concentrate costs $68.00 for 0.67 oz.  The Youth Activating Cream Serum costs $84. for 1 oz.  The Genifique Repair Youth Activating Night Cream costs $98 for 1.7 oz.

158.    Plaintiff Murphy purchased Genifique Youth Activating Concentrate 1 oz. for $80 at the Lancôme counter at the Bloomingdale's department store in Hackensack, New Jersey in May 2012.  Plaintiff Murphy was induced to purchase Genifique Youth Activating Concentrate based on L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements as described herein.  The statements received by Plaintiff Murphy in May 2012 were material and influenced

her decision to purchase Genifique Youth Activating Concentrate. These statements include, but are not limited to, L'Oreal/Lancôme's efficacy claim that Genifique Youth Activating Concentrate "boosts the activity of genes and stimulates the production of youth proteins" and can provide "visibly younger skin in just 7 days." Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Murphy and the other Lancôme Class and Subclass members.

159. Plaintiff Schwartz purchased a 1 oz. bottle of Lancôme Genifique Youth Activating Concentrate for approximately $80, at the Lancôme counter at the Macy's department store, located in San Francisco, California, in July 2012. Plaintiff Schwartz relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Genifique Youth Activating Concentrate based on L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements as described herein. The statements received by Plaintiff Schwartz in or about July 2012 were material and influenced her decision to purchase Genifique Youth Activating Concentrate. These statements include, but are not limited to, L'Oreal/Lancôme's efficacy claim that Genifique Youth Activating Concentrate "boosts the activity of genes and stimulates the production of youth proteins" and can provide "visibly younger skin in just 7 days." Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy

were intended to mislead, confuse, and deceive members of the public, including Plaintiff Schwartz and the other Lancôme Class and Subclass members.

160.   Plaintiff Bauer purchased Lancôme Genifique Youth Activating Concentrate for approximately $100 in or about late-2010 or early 2011 from the Lancôme counter at the Macy's department store at the Stonestown Galleria Mall in San Francisco, California.   Plaintiff Bauer relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Genifique Youth Activating Concentrate based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein. The statements received by Plaintiff Bauer in or about late-2010 or early 2011 at the Macy's department store were material and influenced her decision to purchase Genifique Youth Activating Concentrate.   These statements include, but are not limited to, L'Oreal/Lancôme's efficacy claim that Genifique Youth Activating Concentrate "boosts the activity of genes and stimulates the production of youth proteins" and can provide "visibly younger skin in just 7 days."   Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Bauer and the other Lancôme Class and Subclass members.

161.   Plaintiff Nino purchased Genifique Youth Activating Cream Serum 1 oz. in or about 2010 at full retail price from the Lancôme counter at the Macy's department store in Aventura, Florida.   She also purchased Genifique Youth Activating Concentrate 1 oz. at full retail price from the Lancôme counter at the

Macy's department store in Aventura, Florida in or about 2011. Plaintiff Nino relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements as described herein, and was induced to purchase Genifique Youth Activating Cream Serum and Genifique Youth Activating Concentrate based upon those statements. The statements received by Plaintiff Nino from L'Oreal/Lancôme in or about 2010-2011 were material and influential to her decision to purchase Genifique Youth Activating Cream Serum and Genifique Youth Activating Concentrate. These statements include, but are not limited to, L'Oreal/Lancôme's efficacy claim that its Genifique products "boost the activity of genes and stimulate the production of youth proteins" and can provide "visibly younger skin in just 7 days." Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Nino and the other Lancôme Class and Subclass members.

162.    Plaintiff Simmons purchased Genifique Youth Activating Concentrate in the 1 oz. size in or about February 2012 for $100.00 from the Lancôme counter at the Macy's department store in Chicago, Illinois. Plaintiff Simmons purchased Genifique Youth Activating Duo in or about June 2012 for $125.00 from HSN. Plaintiff Simmons relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements as described herein, and was induced to purchase Genifique Youth Activating Concentrate and Genifique Youth Activating Duo based upon those statements.    The statements received by Plaintiff Simmons from

L'Oreal/Lancôme in or about 2012 were material and influential to her decision to purchase Genifique Youth Activating Concentrate and Genifique Youth Activating Duo. These statements include, but are not limited to, L'Oreal/Lancôme's efficacy claim that its Genifique products "boost the activity of genes and stimulate the production of youth proteins" and can provide "visibly younger skin in just 7 days." Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Simmons and the other Lancôme Class and Subclass members.

163.    L'Oreal/Lancôme misleadingly claims that Genifique is:

a. Our first skincare that boosts the activity of genes[1] and stimulates the production of youth proteins[2]. A true skincare innovation with 7 worldwide patents pending. Génifique is the foundation of every woman's skincare at any age or for any skin concern.
    [1]*In-vitro test on genes.* [2]*Clinical study on skin proteins associated with young skin – France.*

b. Result: Visibly younger skin in just 7 days. Skin looks as if lit from within – breathtaking radiant. Its youthful quality returns: cushiony soft and velvety to the touch. Drop by drop, skin is vibrant with youth, its tone becomes astonishingly even, its texture dramatically refined.

164.    L'Oreal/Lancôme's advertisements further promise that using Genifique will provide visibly younger looking skin in just 7 days by reactivating and/or reviving youth (proteins) in the genes:

67





165.    In reality, L'Oreal/Lancôme knows or should know that using Genifique will not boost the activity of genes in humans, despite its reference to an "in-vitro test on genes."

166.    Moreover, the reference to the "clinical study on skin proteins associated with young skin – France" provides no information that would allow a consumer to assess the reliability of the purported clinical study.  Accordingly, the reference to this study does nothing to cure the false, misleading, and/or deceptive statements made by L'Oreal/Lancôme regarding Genifique's ability to "stimulate

the production of youth proteins," and instead contributes to the deception and consumer confusion by further bolstering the misleading efficacy claims.

167.    L'Oreal/Lancôme also created and distributed several marketing videos further disseminating its claim that Genifique reactivates youth proteins based on the "science of genomics."  The videos, one of which is entitled "The Science Behind Lancôme Genifique," were available on Lancôme-usa.com and are currently available                               on                               youtube.com (http://www.youtube.com/watch?v=puQkKTEcRr4&feature=related).    The videos are inundated with purported scientific data, discoveries, studies and statistics showing how Genifique allegedly boosts the activity of genes:















168.     In reality, such claims are misleading and deceptive because nothing in Genifique is the result of a scientific discovery that can increase youth proteins in human skin such that it would repair or reverse the signs of aging.   Instead, L'Oreal/Lancôme's reference to scientific-sounding information is part and parcel of its deceptive and misleading scheme to convince consumers that Genifique provides unique age-negating benefits that L'Oreal/Lancôme knows it does not, and cannot, provide.

169.     Indeed, if Genifique did actually activate "youth genes" or stimulate the production of "youth proteins" in the skin, it would trigger regulation by the FDA.

### C.  The High Resolution Collection

170.     The High Resolution Collection was launched by L'Oreal/Lancôme in 2009.  The cost of the High Resolution Refill-3X™ Triple Action Renewal Anti-Wrinkle Night Cream is $93.00 for 2.6 oz.  The High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream is $60 for 0.5 oz.   The High Resolution Refill-3X™ Triple Action Renewal Anti-Wrinkle Cream SPF 15 Sunscreen is $78 for 1.7 oz.  The High Resolution Collaser-5x (tm) Intense Collagen Anti-Wrinkle Serum sold for $72.00 for 1 oz, but is no longer available online.

171.     Plaintiff Fabend purchased High Resolution Refill 3X Triple Action Renewal Anti-Wrinkle Cream SPF 15 for approximately $80.00 in or about late 2010 or early 2011 from the Lancôme counter at the Union Square Macy's department store in San Francisco, California.   Plaintiff Fabend relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was

induced to purchase High Resolution Refill 3X Triple Action Renewal Anti-Wrinkle Cream SPF 15 based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein.   The statements received by Plaintiff Fabend in or about late 2010 and early 2011 were material and influenced her decision to purchase High Resolution Refill 3X Triple Action Renewal Anti-Wrinkle Cream SPF 15.   Indeed, L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Fabend and the other members of the Lancôme Class and Subclasses.

172.   Plaintiff Davis purchased High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream for approximately $60 in or about January 2012 from the Lancôme counter at Macy's in Vernon Hills, Illinois. Plaintiff Davis relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein.   The statements Plaintiff Davis read and received were material and influenced her decision to purchase High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream.   Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Davis and the other members of the Lancôme Class and Subclasses.

173.     Plaintiff Kallen purchased High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream for approximately $80.00 between September 2011 and April 2012 from the Lancôme counter at Nordstrom's department store in Canoga Park, California.   Plaintiff Kallen relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein.   The statements Plaintiff Kallen read and received were material and influenced her decision to purchase High Resolution Eye Refill-3X™ Triple Action Renewal Anti-Wrinkle Eye Cream.   Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Kallen and the other members of the Lancôme Class and Subclasses.

174.     L'Oreal/Lancôme sells the High Resolution collection, along with many of the other collections at issue here, in retail stores like Sephora, Macy's, Nordstrom, Bloomingdales, and Neiman Marcus, to name a few.   L'Oreal/Lancôme controls and approves the content, use, and dissemination of marketing materials to these and other retail outlets.

175.     For example, L'Oreal/Lancôme states on sephora.com that High Resolution provides the following benefits:

- **What it does:** Lancôme High Résolution Night Refill-3x™ has triple antiwrinkle power that refills wrinkles within one hour.

74

Skin reclaims a youthful elasticity and resiliency and is noticeably more supple and plump. Dermatologists are only able to inject collagen and hyaluronic acid, but Refill-3X complex has the added ability to boost the synthesis of elastin. This exclusive formula, enriched with patent-pending Anisic Extract, helps complete the nightly cellular renewal process. Fine lines, wrinkles, and imperfections are noticeably less visible by morning, and skin appears refreshed and hydrated.

176. Not surprisingly, L'Oreal/Lancôme's magazine advertising repeats the charade: "Target 80% of collagen in just 48 hours":



177. Still other L'Oreal/Lancôme-approved claims of High Resolution's effectiveness include the following from Macys.com:

With age, collagen coils loosen, elastin fibers degrade and hyaluronic acid reserves become depleted. As a result, visible wrinkles set in. The solution comes in the form of Lancôme's most advanced weapon in the fight against wrinkles, a formula that helps boost the synthesis of the three natural skin fillers: collagen, elastin and hyaluronic acid to help refill the impression of wrinkles.

178. And, L'Oreal/Lancôme goes on to promise on Nordstrom.com that High Resolution will:

Fight wrinkles at the source. Target 80% of collagen in just 48 hours! Inspired by laser therapy, High Résolution Eye Collaser-5X™ contains a revolutionary new complex that targets five key types of collagen in the skin around the eye (in in-vitro tests). The synthesis of healthy new collagen begins in just 48 hours.[1] Fast, visible results (based on results from a 3-week and a 4-week consumer test):- Immediately: 100% feel the eye contour is more supple while 86% see a visible reduction in puffiness. - In 3 weeks: 64% see a visible reduction in wrinkles. 54% see a visible reduction in the appearance of dark circles. 0.5 oz. *[1]Fight wrinkles deep within the skin's surface layers.* In-vitro testing on rice peptides and alfalfa extract shows production of new collagen within 48 hours.[8]

179. On Neimanmarcus.com, L'Oreal/Lancôme promises that wrinkles are refilled in one hour:



180. Not surprisingly, the NAD recommended that L'Oreal USA modify certain advertising claims made for its High Resolution Refill-3X facial cream. Specifically, following its review of the evidence, which included clinical testing of

---

[8]     In addition to not supporting actual results in humans, this reference to "in vitro testing on rice peptides and alfalfa extracts" is nonsensical. But, in keeping with L'Oreal's misleading and deceptive approach to marketing, it appears to an unsuspecting consumer that the product claims are "scientific" – and therefore more credible.

skin hydration after the initial product application and consumer-usage data, NAD determined that the advertising claim "Refill Wrinkles in Just One Hour" conveys the message from L'Oreal that wrinkles will be substantially reduced, if not completely eliminated, in a very short period of time.  The NAD noted that the evidence in the record addressed improvements in skin hydration, rather than the reduction or elimination of wrinkles.  Accordingly, NAD recommended that L'Oreal discontinue the claim.  Apparently, L'Oreal/Lancôme has ignored the NAD's finding and recommendation because it continues to make such false and deceptive claims.  The one-hour claim is not limited to L'Oreal/Lancôme's advertisements for High Resolution on neimanmarcus.com; it remains a pervasive sales and marketing tactic.

181.    Despite L'Oreal/Lancôme's claims to the contrary, upon information and belief, no ingredient in High Resolution can "refill wrinkles in one hour" or "help boost the synthesis of the three natural skin fillers:  collagen, elastin and hyaluronic acid to help refill the impression of wrinkles."

182.    Indeed like the other Lancôme Luxury Wrinkle Creams, the High Resolution line is nothing more than a mixture of widely used ingredients – none of which are unique and none of which provide the promised results.

### D.  The Renergie Collection

183.    Upon information and belief, L'Oreal/Lancôme launched its Renergie Collection in or about late 2010.  Renergie Lift Volumetry Night costs $110.00 for 2.6 oz; Renergie Lift Volumetry Neck costs $90.00 for 1.7 oz; Renergie Lift Volumetry Lifting and Reshaping Cream costs $90.00 for 1.7 oz; Renergie Lift

Volumetry Eye costs $67.00 for 0.5 oz; Renergie Anti-Wrinkle and Firming Treatment Cream costs $82.00 for 1.7 oz; Renergie Eye Anti-Wrinkle and Firming Treatment Cream costs $62.00 for 0.5 oz; Renergie Night costs $98.00 for 2.5 oz; Renergie Oil Free Lotion costs $82.00 for 1.7 oz; and Renergie Microlift Eye R.A.R.E- Intense Repositioning Eye Lifter costs $72.00 for 0.5 oz.

184.     Plaintiff Fabend purchased Renergie Lift Volumetry Volumetric Lifting and Reshaping Cream for approximately $90.00 on or about late 2010 or early 2011 from the Lancôme counter at the Union Square Macy's department store in San Francisco, California.  Plaintiff Fabend relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Renergie Lift Volumetry Volumetric Lifting and Reshaping Cream based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein.  The statements received by Plaintiff Fabend in or about late 2010 and early 2011 were material and influenced her decision to purchase Renergie Lift Volumetry Volumetric Lifting and Reshaping Cream.   Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Fabend and the other members of the Lancôme Class and Subclasses.

185.     Plaintiff Kallen purchased Renergie Lift Volumetry Multiple Action and Renergie Lift Volumetry Eye for approximately $80.00 each between September 2011 and April 2012 from the Lancôme counter at Nordstrom and Macy's department stores in California.    Plaintiff Kallen relied upon

L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Renergie Lift Volumetry Multiple Action and Renergie Lift Volumetry Eye based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein. The statements received by Plaintiff Kallen in or about summer 2011 through spring 2012 were material and influenced her decision to purchase Renergie Lift Volumetry Multiple Action and Renergie Lift Volumetry Eye. Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Kallen and the other members of the Lancôme Class and Subclasses.

186. Plaintiff Absi purchased Renergie Anti-Wrinkle and Firming Treatment Cream and Renergie Microlift Eye R.A.R.E- Intense Repositioning Eye Lifter in or about late 2010 through mid-2012 from the Lancôme counter at the Macy's and Nordstrom's department stores in Woodland Hills and Northridge, California. Plaintiff Absi relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Renergie Anti-Wrinkle and Firming Treatment Cream and Renergie Microlift Eye R.A.R.E- Intense Repositioning Eye Lifter based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein. The statements received by Plaintiff Absi in or about late 2010 through mid-2012 were material and influenced her decision to purchase Renergie Anti-Wrinkle and Firming Treatment Cream and Renergie Microlift Eye R.A.R.E- Intense Repositioning Eye Lifter.

Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Absi and the other members of the Lancôme Class and Subclasses.

187.   Plaintiff Bauer purchased Lancôme Renergie Microlift for approximately $100 either in 2010 or 2011 from the Lancôme counter at the Stonestown Galleria Mall's Macy's department store in San Francisco, California. Plaintiff Bauer relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Renergie Microlift based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy as described herein.  The statements received by Plaintiff Bauer in or about 2010 or early 2011 were material and influenced her decision to purchase Renergie Microlift.  Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Davis and the other members of the Lancôme Class and Subclasses.

188.   According to L'Oreal/Lancôme, Renergie is a:

> unique treatment that addresses both wrinkles and lost firmness: Rénergie. Experience a rediscovery of skin's looks of youthful strength and resilience. A unique firming and anti-wrinkle effect helps fortify skin to make it visibly plumper and smoother. This Double Performance treatment has been shown to dramatically decrease the appearance of fine lines and wrinkles as it fortifies skins firmness.

189.   Similarly, L'Oreal/Lancôme claims that Renergie Night is:

From the laboratories of Lancôme Research comes a unique treatment that addresses both wrinkles and lost firmness: Rénergie. Experience a rediscovery of skin's looks of youthful strength and resilience. A unique firming and anti-wrinkle effect helps fortify skin to make it visibly plumper and smoother. This Double Performance treatment has been shown to dramatically decrease the appearance of fine lines and wrinkles as it fortifies skin's firmness.

Results:
Overnight, surface cell renewal is accelerated so skin looks re-energized, and well-rested. Day after Day, fine lines and wrinkles appear less noticeable as if they were virtually "slept away". Over time, skin is visibly tighter, smoother, younger looking.

190.   According to L'Oreal/Lancôme's advertisements, Renergie can also "re-organize the collagen network to create a firmer support structure" and "provide tautening of the skin's support structure to deliver a visible volumetric action." L'Oreal/Lancôme claims further that "the facial angle of youth between the chin and the neck is improved by 9.5 degrees" and that Renergie's results are comparable to those of cosmetic surgery:



191.    Many of the Lancôme Luxury Wrinkle Creams, including Renergie, are also sold on the Home Shopping Network ("HSN").  According to one sales segment for Renergie on HSN, among other benefits, L'Oreal/Lancôme claims that the product actually "re-contours the skin," "re-firms" and the skin "bounces back into shape."            That        video        can        be        accessed        at: http://www.youtube.com/watch?v=5EZU41ql5bw.

192.    And according to this product insert, Renergie can actually "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," and "reshape the profile":



193.    Again, L'Oreal/Lancôme has produced a promotional video touting the specific benefits of using Renergie:







194.    In reality, nothing in Renergie will "erase wrinkles," "re-organize the collagen network of the skin," "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," or "reshape the profile" in humans such that it would repair or reverse the signs of aging or provide results similar to

83

those of a facelift.  L'Oreal/Lancôme's claims to the contrary are false, deceptive and misleading.

195.    Indeed, if Renergie did actually "erase wrinkles," "re-organize the collagen network of the skin," "slim the jawline by redefining the facial oval," "restore lost volumes and remodel the cheeks," or "reshape the profile," it would trigger regulation by the FDA.

### E. The Absolue Collection

196.    Upon information and belief, the Absolue Precious Cells Collection was launched in October of 2009.  The cost of the Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 Sunscreen is $165.00 for 1.6 oz; Absolue Night Precious Cells Advanced Regenerating and Reconstructing Night Cream is $165.00 for 1.7 oz; Absolue Eye Precious Cells Advanced Regenerating and Reconstructing Eye Cream is $110.00 for 0.5 oz; the Absolue Ultimate Bx Replenishing and Restructuring Serum is $155.00 for 1 oz; the Absolue Ultimate Night Bx Intense Night Recovery and Replenishing Serum is $165.00 for 1 oz; and the Absolue L'Extrait is $350.00 for 1.7 oz.

197.    Plaintiff Murphy purchased Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 1.6 oz. for $165.00 at the Lancôme counter at the Bloomingdale's department store in Hackensack, New Jersey in or about 2010.  Plaintiff Murphy relied upon L'Oreal/Lancôme's false, misleading, and/or deceptive efficacy statements, and was induced to purchase Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15 based upon L'Oreal/Lancôme's false, misleading, and/or deceptive statements of product efficacy

as described herein.  The statements received by Plaintiff Murphy in or about 2010 were material and influenced her decision to purchase Absolue Precious Cells Advanced Regenerating and Reconstructing Cream SPF 15.  Indeed L'Oreal/Lancôme's false, misleading, and/or deceptive promises of product efficacy were intended to mislead, confuse, and deceive members of the public, including Plaintiff Murphy and the other members of the Lancôme Class and Subclasses.

198.  The Absolue Collection is purportedly based on a "decisive breakthrough in stem cells" such that "within 7 days skin recovers the visible signs of younger skin":



199.  In keeping with its characteristic marketing program, L'Oreal/Lancôme regurgitates the misleading efficacy promises across the full line of Absolue Products.  For example, L'Oreal/Lancôme claims that Absolue Eye Precious Cells is:

> A powerful combination of unique ingredients – Reconstruction Complex and Pro-Xylane™, a patented scientific innovation – has been shown to improve the condition around the stem cells and stimulate cell regeneration to reconstruct skin to a denser quality.[1]  Results:

Immediately, the eye contour appears smoother and more radiant. Within 7 days, signs of fatigue are minimized and the appearance of puffiness is reduced. Within 4 weeks, density is improved, skin feels soft and looks healthier. The youthful look of the eye contour is restored.

> [1]*In-vitro test.*

200.     Similarly, Absolue Advanced Regenerating cream is:

A powerful combination of unique ingredients – Reconstruction Complex and Pro-Xylane™, a patented scientific innovation – has been shown to improve the condition around the stem cells and stimulate cell regeneration to reconstruct skin to a denser quality.[1] Results: Immediately, skin feels soft, hydrated. Within 7 days, it's proven, skin recovers the visible signs of younger skin.[2] Skin feels strengthened and looks healthier. Within 4 weeks, wrinkles appear reduced, skin feels refined and polished. See significant deep wrinkle reduction in UV damaged skin, clinically proven.[3]

> [1]*In-vitro test.* [2]*Based on results from a consumer test on women with UV damaged skin.* [3] *Reduction in crow's feet and laugh lines in a 4-week clinical evaluation on UV damaged skin.*

201.     L'Oreal/Lancôme represents that Absolue Night Precious Cells:

Restores density – Reduces wrinkles –Regenerates radiance. Fundamental discovery on stem cells.

Epidermis' most precious cells are the stem cells. Lancôme's research has made a decisive breakthrough by revealing the crucial role of stem cells' environment on their ability to restore density.

Exclusive innovation from Lancôme: A powerful combination of unique ingredients—Reconstruction Complex and Pro-Xylane™ – has been shown to improve the condition around the stem cells, and stimulate cell regeneration to reconstruct skin to a denser quality.[1] This indulgently rich cream melts effortlessly into the skin and helps support skin's natural ability to repair itself at night.

Results: Upon waking, skin looks rested, soft and supple, and feels wrapped in a veil of comfort. Day 7, skin feels strengthened. Day 28, wrinkles appear reduced. Skin feels satiny smooth.

> [1]*In-vitro test.*

202.    According to L'Oreal/Lancôme, Absolue L'Extrait has the following benefits:

> Through a state-of-the-art biotechnological extraction process comes a line of Lancôme Rose native cells. Fermogenesis™, an exclusive process, preserves their capacities intact to perpetuate their integrity. Fermogenesis™ provides each cell with a gentle, unstressed growth environment, at its own rhythm, preserving its own metabolic rate and all of its regenerative potential.

> Absolue L'Extrait was evaluated during a clinical study on several age-defining parameters**. At eleven weeks of use, a significant improvement in each of these major signs was noted***.
> **Forehead wrinkles, frown lines, crow's feet, under eye wrinkles, nasolabial fold, wrinkles around the mouth.*
> ***Based on a clinical study on 41 women.*

203.    L'Oreal/Lancôme further claims about Absolue L'Extrait:

> An exceptional elixir exists. It contains up to 2 million Lancôme Rose native cells.

> Experience Lancôme's revolutionary skincare innovation and our most powerful regenerating ingredient, Lancôme Rose Native Cells.

> Extracted from the heart of the rare and resilient Lancôme Rose using an exclusive, state-of-the-art biotechnological process, these native cells are proven to extend their own exceptional properties to enhance skin's regenerative potential*.

> Each jar of Absolue L'Extrait contains up to 2 million of these precious native cells. Absolue L'Extrait helps reveal firmer, more elastic, more radiant skin for fascinating beauty.

> Absolue L'Extrait. A master piece of regeneration.
> *Based on in-vitro test results.*

204.    Once again, L'Oreal/Lancôme has produced promotion videos. The video for Absolue L'Extrait (available at http://www.youtube.com/watch?v= QhORyX6UeWI) promises:







205.    Despite these promises of age-negating benefits such as skin recovering the epidermis of younger skin, reductions of over 30% of the signs of aging and stem cell rejuvenation, nothing in the Absolue Collection can provide the results promised by L'Oreal/Lancôme.   Indeed, like the other Lancôme Luxury Wrinkle Creams, and despite L'Oreal/Lancôme's suggestion to the contrary, the Absolue Collection is nothing more than a mixture of widely used ingredients – none of which provide the promised unique results.

## VI.   <u>THE SPECIFIC CLAIMS MADE BY L'OREAL FOR YOUTH CODE</u>

206.   The Youth Code product line was launched in 2010.  L'Oreal/Youth Code prices Youth Code Products uniformly at $24.99:  Youth Code Serum Intense is $24.99 for 1 oz; Youth Code Day/Night Cream is $24.99 for 1 oz; Youth Code Eye Cream is $24.99 for 0.5 oz; Youth Code Day Lotion SPF 30 is $24.99 for 1.7 oz.

207.   L'Oreal/Youth Code product packaging contains uniform, misleading statements and efficacy claims.

208.   The following advertising and marketing claims about Youth Code are false, misleading, and/or deceptive:

a.   "Potent serum boosts skin's natural powers of regeneration so it regains the qualities of young skin";

b.   "Helps increase skin's natural powers of regeneration, boosting skin's own capacity for recovery";

c.   "Instantly improves skin's quality";

d.   "Based on 10 years of gene research";

e.   "Breakthrough GenActiv Technology™ . . . boosts skin's natural power of regeneration so it regains the qualities of young skin";

f.   "Immediately . . . wrinkle reduction begins";

g.   "Immediately, skin is smoother, deeply hydrated";

h.   "1 month, lines and wrinkles are visibly reduced";

i.   "Youth Regenerating Skincare";

j.   "One week: skin looks visibly younger";

k.   "One month: skin acts dramatically younger";

l.   "Speeds up gene's recovery power. [1]Based on in-vivo study.";

m.   "After 10 years of research L'Oreal scientists, along with a team of medical researchers, unlock the code of skin's youth by discovering a specific set of genes[1] that are responsible for skin's natural powers of regeneration.";

> [1]*in-vivo study*

n.   "An innovation derived from gene science";

o.   "L'Oreal's breakthrough GenActiv Technology™"; and

p.   "International Patent."

209.   Plaintiff   Goldrick   saw   and   read   L'Oreal/Youth   Code's misrepresentations in print media and on product packaging as described more fully herein, including, but not limited to, the claims that Youth Code Eye Cream and Youth Code SPF 30 Day Lotion have the "power to instantly hydrate and transform skin to be visibly smoother" and that use of the Youth Code Products "can increase skin's power of regeneration so it regains the qualities of young skin." Plaintiff Goldrick also saw and read L'Oreal/Youth Code's misrepresentations that the Youth Code Eye Cream would visibly reduce crow's feet, under eye bags, and dark circles.   Plaintiff Goldrick relied on L'Oreal/Youth Code's material misrepresentations and would not have purchased Youth Code had L'Oreal/Youth Code not made such false and deceptive claims and instead disclosed the true nature of its products.

210.   Plaintiff   Gordon   saw   and   read   L'Oreal/Youth   Code's misrepresentations that appeared in print media and on product packaging as described more fully herein, including, but not limited to, the claims that Youth Code Serum Intense has the "power to instantly hydrate and transform skin to be

visibly smoother" and that use of Youth Code Serum Intense "can increase skin's power of regeneration so it regains the qualities of young skin."  Plaintiff Gordon relied on L'Oreal/Youth Code's material misrepresentations and would not have purchased Youth Code had L'Oreal/Youth Code not made such false and deceptive claims and instead disclosed the true nature of its products.

211.    Plaintiff Luu saw and read L'Oreal/Youth Code's misrepresentations in print media and on product packaging as described more fully herein, including, but not limited to, the claims that Youth Code Serum Intense, Youth Code Eye Cream, Youth Code Day/Night Cream, and Youth Code SPF 30 Day Lotion have the "power to instantly hydrate and transform skin to be visibly smoother" and that use of the Youth Code Products "can increase skin's power of regeneration so it regains the qualities of young skin."  Plaintiff Luu also saw and read L'Oreal/Youth Code's misrepresentations that the Youth Code Eye Cream would visibly reduce crow's feet, under eye bags, and dark circles.  Plaintiff Luu relied on L'Oreal/Youth Code's material misrepresentations and would not have purchased Youth Code had L'Oreal/Youth Code not made such false and deceptive claims and instead disclosed the true nature of its products.

212.    The Youth Code Products compete with other, lower cost moisturizers that are often sold on the same store shelves.  Accordingly, L'Oreal/Youth Code makes such specific efficacy claims and promises of amazing results in order to convince consumers that they should pay more for the Youth Code Products, when in reality other lower cost products provide substantially the same benefits.

## VII.     THE RESULTS OF L'OREAL'S DECEPTIVE CONDUCT

213.     Ignoring the inability of the Lancôme Luxury Wrinkle Creams and Youth Code Products to provide the promised results, L'Oreal's pervasive, national false, misleading, and/or deceptive marketing campaign leaves consumers with the impression that its products are uniquely able to provide certain age-negating effects on human skin.

214.     L'Oreal compounds this deception by maintaining that all of the products and the promised results are unique and based on years of research and scientific study or data.

215.     L'Oreal exacerbates its deception with repeated references to patents, research, labs, scientific studies, stem cells, and claims of scientific breakthroughs, among other things, as a way to bolster the credibility of the products in the eyes of the consumer.  In fact, these claims are merely part and parcel of L'Oreal's false, misleading, and/or deceptive advertising and marketing program for its Lancôme Luxury Wrinkle Creams and Youth Code Products.

216.     In addition to the material misrepresentations as described herein, L'Oreal's actions are likewise actionable based on their material omissions, which induced Plaintiffs and the other members of the Lancôme and Youth Code Classes and Subclasses to purchase Lancôme Luxury Wrinkle Creams and Youth Code Products.  For example, despite their knowledge to the contrary, Defendants have failed to disclose the following:

- That the "in vitro" tests relied on by Defendants cannot translate to real results in humans;

- That the referenced clinical studies or surveys were designed to be used in L'Oreal's marketing efforts;

- That the purported patents, to the extent they exist, are not related to the efficacy promises or scientific "discoveries" made by Defendants; and

- That none of the Lancôme Luxury Wrinkle Creams and Youth Code Products provide unique benefits that cannot be found in other, less expensive products.

217.    L'Oreal had exclusive and superior knowledge of and actively concealed the foregoing material facts, rendering their non-disclosure inherently unfair.

218.    L'Oreal is in a position to actually know, or should know, that the promised results are not possible, *i.e.* its skin-care products cannot provide the promised age-negating results.  L'Oreal fails to disclose that its products do not perform as promised.

219.    Until such time as L'Oreal ceases to continue to engage in false, misleading, and/or deceptive advertising and marketing of the Lancôme Luxury Wrinkle Creams and Youth Code Products, Plaintiffs and the other respective members of the Lancôme and Youth Code Classes and Subclasses will continue to be harmed.

220.    L'Oreal's claims of efficacy based on "scientific" discovery are a material and important factor in its marketing campaign because L'Oreal knows

that consumers pay special attention to product claims that are science-oriented. L'Oreal further knows that consumers can be duped into paying a higher price for products that purport to provide "hyperscientific" skin-correcting and age-negating benefits.

221.    L'Oreal also is aware that, because of the aging population, consumers are increasingly susceptible to such false, misleading, and/or deceptive marketing and advertising and that such marketing and advertising will continue to yield it ever-greater profits.

222.    Indeed, it is for these precise reasons – increased sales and profits – that L'Oreal intentionally engages in its false, misleading, and/or deceptive marketing and advertising campaigns.

223.    L'Oreal has succeeded in its deceit and has in fact enjoyed massive profits from its deceptive campaigns. Such enormous profits would not have occurred but for L'Oreal's false, misleading, and/or deceptive marketing and advertising campaigns.

224.    L'Oreal charges a price premium for its products.  Plaintiffs and the other members of the Lancôme and Youth Code Classes and Subclasses would not have paid premium prices for the Lancôme Luxury Wrinkle Creams and Youth Code Products had they known the truth regarding the deceptive marketing promises.

225.    Moreover, Plaintiffs and the other members of the Lancôme and Youth Code Classes and Subclasses believed they were purchasing wrinkle cream products

that would provide the promised age-negating benefits as detailed herein. In reality, although Plaintiffs and the respective Lancôme and Youth Code Classes and Subclasses paid for these unique Lancôme Luxury Wrinkle Creams and Youth Code Product benefits, they did not get what they paid for. Instead, the products Plaintiffs and the other members of the Lancôme and Youth Code Classes and Subclasses purchased did not provide the promised age-negating results.

226. As a result and because of L'Oreal's false, misleading, and/or deceptive advertising and marketing, Plaintiffs and the other members of the Lancôme and Youth Code Classes and Subclasses have been harmed in their purchases of the Lancôme Luxury Wrinkle Creams and Youth Code Products.

227. Without knowing the truth as to the efficacy of the Lancôme Luxury Wrinkle Creams and Youth Code Products, Plaintiffs and the other members of the Lancôme and Youth Code Classes and Subclasses paid premiums for L'Oreal's skin-care products and/or received totally worthless products.

## VIII.   CLASS ACTION ALLEGATIONS

228. Plaintiffs Fabend, Schwartz, Kallen, Bauer, Absi, Murphy, Davis, Simmons, and Nino bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) on behalf of the following nationwide consumer class (the "Lancôme Class"):

> All purchasers of at least one of the Lancôme Luxury Wrinkle Creams in the United States from date of product launch to the present (the "Class Period"). Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, their directors and officers and members of their immediate families; also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and the

members of their immediate family and judicial staff, and any juror assigned to this action.

229.    Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi seek to represent a subclass defined as all members of the Class who purchased Lancôme Luxury Wrinkle Creams in California (the "California Lancôme Subclass").

230.    Plaintiff Murphy seeks to represent a subclass defined as all members of the Class who purchased Lancôme Luxury Wrinkle Creams in New Jersey (the "New Jersey Lancôme Subclass").

231.    Plaintiffs Davis and Simmons seek to represent a subclass defined as all members of the Class who purchased Lancôme Luxury Wrinkle Creams in Illinois (the "Illinois Lancôme Subclass").

232.    Plaintiff Nino seeks to represent a subclass defined as all members of the Class who purchased Lancôme Luxury Wrinkle Creams in Florida ("the Florida Lancôme Subclass").

233.    Plaintiffs Goldrick, Gordon, and Luu bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) on behalf of the following nationwide consumer class (the "Youth Code Class"):

> All purchasers of at least one of the Youth Code Products in the United States from date of product launch to the present (the "Class Period"). Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, their directors and officers and members of their immediate families; also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

234.     Plaintiff Goldrick seeks to represent a subclass defined as all members of the Class who purchased Youth Code Products in New Jersey ("the New Jersey Youth Code Subclass").

235.     Plaintiff Gordon seeks to represent a subclass defined as all members of the Class who purchased Youth Code Products in Massachusetts ("the Massachusetts Youth Code Subclass").

236.     Plaintiff Luu seeks to represent a subclass defined as all members of the Class who purchased Youth Code Products in California ("the California Youth Code Subclass").

237.     Members of the Lancôme Class and the California, New Jersey, Illinois, and Florida Lancôme Subclasses are so numerous that their individual joinder herein is impracticable.  Members of each of these classes number in the tens of thousands.  The precise number of Lancôme Class and Subclass members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Lancôme Class and Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of L'Oreal/Lancôme and third party retailers and vendors.

238.     Common questions of law and fact exist as to all Lancôme Class and Subclass members and predominate over questions affecting only individuals.  Common legal and factual questions include, but are not limited to:

> (a)     whether L'Oreal/Lancôme breached an express warranty made to Plaintiffs and the other members of the Lancôme Class and Subclasses;

(b)     whether L'Oreal/Lancôme was unjustly enriched by its conduct;

(c)     whether L'Oreal/Lancôme advertised or marketed the Lancôme Luxury Wrinkle Creams in a way that is false, misleading, and/or deceptive ;

(d)     whether L'Oreal/Lancôme failed to disclose material facts regarding its Lancôme Luxury;

(e)     whether, by the misconduct set forth in this Master Consolidated Complaint, L'Oreal/Lancôme has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sales of its Lancôme Luxury Wrinkle Creams;

(f)     whether L'Oreal/Lancôme violated the New Jersey Consumer Fraud Act;

(g)     whether L'Oreal/Lancôme violated the California Consumers Legal Remedies Act, California Unfair Competition Law, and California False Advertising Law;

(h)     whether L'Oreal/Lancôme violated the Illinois Consumer Fraud and Deceptive Practices Act;

(i)     whether L'Oreal/Lancôme violated the Florida Deceptive and Unfair Trade Practices Act;

(j)     whether, as a result of L'Oreal/Lancôme's misconduct as alleged herein, Plaintiffs and the other members of the Lancôme Class and Subclasses are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

239.    Members of the Youth Code Class and the New Jersey, Massachusetts, and California Youth Code Subclasses are so numerous that their individual joinder herein is impracticable.  Members of each of these classes number in the thousands. The precise number of Youth Code Class and Youth Code Subclass members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Youth Code Class and Subclass members may be notified of the

pendency of this action by mail and/or publication through the distribution records

of L'Oreal/Youth Code and third party retailers and vendors.

240.     Common questions of law and fact exist as to all Youth Code Class and

Subclass members and predominate over questions affecting only individuals.

Common legal and factual questions include, but are not limited to:

(a)     whether L'Oreal/Youth Code advertised or marketed Youth Code in a way that is false, misleading, and/or deceptive ;

(b)     whether, by the misconduct set forth in this Master Consolidated Complaint, L'Oreal/Youth Code has engaged in unfair, fraudulent or unlawful business practices with respect to the advertising, marketing and sales of Youth Code Products;

(c)     whether L'Oreal/Youth Code failed to disclose material facts regarding its Youth Code Products;

(d)     whether L'Oreal/Youth Code violated the New Jersey Consumer Fraud Act;

(e)     whether L'Oreal/Youth Code violated Massachusetts General Laws Chapter 93A

(f)     whether L'Oreal/Youth Code violated the California Consumers Legal Remedies Act, California Unfair Competition Law and California False Advertising Law;

(g)     whether L'Oreal/Youth Code breached an express warranty made to Plaintiffs and the other members of the Youth Code Class and Subclasses;

(h)     whether L'Oreal/Youth Code was unjustly enriched by its conduct;

(i)     whether, as a result of L'Oreal/Youth Code's misconduct as alleged herein, Plaintiffs and the other members of the Youth Code Class and Subclasses are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

241.    Plaintiffs' claims are typical of the claims of the respective members of the Lancôme and Youth Code Classes and Subclasses as all members of the respective Lancôme and Youth Code Classes and Subclasses are similarly affected by L'Oreal's wrongful conduct.  Plaintiffs have no interests antagonistic to the interests of the other members of their respective Classes and Subclasses.

242.    Plaintiffs and all members of the Lancôme Class and Subclasses have sustained economic injury arising out of L'Oreal/Lancôme's violations of common and statutory law as alleged herein.

243.    Plaintiffs and all members of the Youth Code Class and Subclasses have sustained economic injury arising out of L'Oreal/Youth Code's violations of common and statutory law as alleged herein.

244.    Plaintiffs are adequate representatives of their respective Lancôme and Youth Code Classes and Subclasses because their interests do not conflict with the interests of the relevant class members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the respective Lancôme and Youth Code Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

245.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the respective Lancôme and Youth Code Class and Subclass members.  Each individual respective class member may lack the resources to undergo the burden and expense of individual prosecution

of the complex and extensive litigation necessary to establish L'Oreal's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of L'Oreal's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

246.     This suit may be maintained as a class action under Fed. R. Civ. Proc. 23(b)(2) because L'Oreal has acted, and/or refused to act, on grounds generally applicable to the Classes and Subclasses, thereby making appropriate final injunctive relief. Specifically, injunctive relief is necessary and appropriate to require L'Oreal to: (i) discontinue advertising, marketing, packaging and otherwise representing the Products as superior; (ii) undertake an immediate public information campaign to inform members of the proposed Classes and Subclasses as to their prior practices; and (iii) to correct any erroneous impression consumers may have derived concerning the nature, characteristics, or qualities of the Products, including without limitation, the placement of corrective advertising and providing written notice to the public.

## IX.   CAUSES OF ACTION

### A.  L'Oreal/Lancôme

**COUNT I**
**(Breach of Express Warranty)**

247.   Plaintiffs Fabend, Schwartz, Kallen, Bauer, Absi, Murphy, Davis, Simmons, and Nino repeat the allegations contained in the above paragraphs as if fully set forth herein.

248.   Plaintiffs bring this claim individually and on behalf of the other members of the New Jersey, California, Illinois, and Florida Lancôme Subclasses.

249.   L'Oreal/Lancôme, as the designer, manufacturer, marketer, distributor, or seller expressly warranted that the Lancôme Luxury Wrinkle Creams would provide certain actual age-negating effects, when in fact they do not.

250.   The age-negating effects as described in detail above were affirmations of fact and promises relating to the Lancôme Luxury Wrinkle Creams that became part of the basis for the bargain that the Lancôme Luxury Wrinkle Creams would conform to the affirmations of fact and promises.

251.   Likewise, the age-negating effects as described in detail above were descriptions of the Lancôme Luxury Wrinkle Creams that became part of the basis of the bargain that the Lancôme Luxury Wrinkle Creams would conform to the description.

252.   L'Oreal/Lancôme knew or should have known that the Lancôme Luxury Wrinkle Creams could not provide the results promised.

253.     Plaintiffs and the other Lancôme Subclass members were injured as a direct and proximate result of L'Oreal/Lancôme's breach because they paid a price premium due to the deceptive advertising and false, misleading, and/or deceptive promises of L'Oreal/Lancôme.   Alternatively, Plaintiffs and the other Lancôme Subclass members were injured as a direct and proximate result of L'Oreal/Lancôme's breach because they paid for products that could not provide the promised results, rendering the products valueless to Plaintiffs and the other Lancôme Subclass members.

254.     Plaintiffs and the members of the New Jersey, California, Illinois, and Florida Lancôme Subclasses demand judgment against L'Oreal/Lancôme for compensatory damages, plus interest, costs and such additional relief as the Court may deem appropriate or to which Plaintiffs and the New Jersey, California, Illinois, and Florida Lancôme Subclasses may be entitled.

## COUNT II
### (Unjust Enrichment)

255.     Plaintiffs Fabend, Schwartz, Kallen, Bauer, Absi, Murphy, Davis, Simmons, and Nino repeat the allegations contained in paragraphs 1-254 as if fully set forth herein, and, to the extent necessary, plead this cause of action in the alternative.

256.     Plaintiffs bring this claim individually, on behalf of the members of the nationwide Lancôme Class, and on behalf of the other members of the New Jersey, California, Illinois, and Florida Lancôme Subclasses against L'Oreal/Lancôme.

257.    While sometimes stated uniquely, the focus of the elements of an unjust enrichment cause of action and of the inquiry is the same in all states (*i.e.*, whether the defendant was *unjustly* enriched).   At the core of each state's law are two fundamental elements:  (1) the defendant received a benefit from the plaintiff and (2) it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.  Since the focus and the inquiry are the same and there is no material conflict relating to the elements of unjust enrichment among the states, New Jersey law applies to the nationwide unjust enrichment claim.

258.    Plaintiffs and each of the other Lancôme Class and Subclass members conferred a benefit on L'Oreal/Lancôme by purchasing one or more of the Lancôme Luxury Wrinkle Creams.

259.    L'Oreal/Lancôme has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the other Lancôme Class and Subclass members' purchases of the Lancôme Luxury Wrinkle Creams, which retention under these circumstances is unjust and inequitable because L'Oreal/Lancôme misrepresented the efficacy of the Lancôme Luxury Wrinkle Creams, which caused injuries to Plaintiffs and the other Lancôme Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of efficacy, or they purchased products that did not perform as promised and therefore had no value to Plaintiffs and the other Lancôme Class and Subclass members.

260.    Because L'Oreal/Lancôme's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the other Lancôme Class and Subclass members is

unjust and inequitable, L'Oreal/Lancôme must pay restitution to Plaintiffs and the other Lancôme Class and Subclass members for L'Oreal/Lancôme's unjust enrichment, as ordered by the Court.

<b>COUNT III</b><br>
<b>(Violation of the New Jersey Consumer Fraud Act)</b>

261. Plaintiffs repeat the allegations contained in paragraphs 1-260 as if fully set forth herein.

262. Plaintiff Murphy brings this claim individually, on behalf of the nationwide Lancôme Class, and alternatively, on behalf of the other members of the New Jersey Lancôme Subclass.

263. L'Oreal/Lancôme misrepresented that the Lancôme Luxury Wrinkle Creams would provide certain age-negating effects.

264. L'Oreal/Lancôme's claims that such age-negating effects were the result of unique scientific discoveries are false, misleading, and/or deceptive.

265. L'Oreal/Lancôme's affirmative misrepresentations constitute an unconscionable commercial practice, deception, fraud, false promise, and/or misrepresentation as to the nature of the goods, in violation of the New Jersey Consumer Fraud Act.

266. Moreover, L'Oreal/Lancôme intentionally failed to disclose the truth behind the purported scientific discoveries and supporting clinical data; that is, the "hyperscience" upon which L'Oreal/Lancôme relies to justify the price premiums for the Lancôme Luxury Wrinkle Creams is nothing more than a sham. Indeed, any studies or clinical data was designed for use in L'Oreal/Lancôme's marketing

107

campaign and not to test whether the Lancôme Luxury Wrinkle Creams actually performed as promised.

267.    L'Oreal/Lancôme's knowing and intentional material omissions as described herein constitute a violation of the New Jersey Consumer Fraud Act.

268.    Plaintiff and all other Lancôme Class and New Jersey Lancôme Subclass members suffered an ascertainable loss caused by L'Oreal/Lancôme's misrepresentations and material omissions because they were induced to purchase, or paid a price premium, due to the misleading and false advertising and deceptive promises of age-negating efficacy of the Lancôme Luxury Wrinkle Creams, when, in fact, those qualities did not exist.  Simply put, Plaintiff and the other Lancôme Class and New Jersey Lancôme Subclass members paid for the advertised benefits of the Lancôme Luxury Wrinkle Creams and did not get what they paid for.

269.    Indeed, their purchases are of no value because the Lancôme Luxury Wrinkle Creams do not provide the advertised age-negating benefits.

270.    The Lancôme Luxury Wrinkle Creams advertised, marketed, and sold by L'Oreal/Lancôme are "merchandise" within the meaning of the New Jersey Consumer Fraud Act, and Plaintiff and the other members of the Lancôme Class and New Jersey Lancôme Subclass are "persons" and "consumers" within the meaning of the New Jersey Consumer Fraud Act, such that they demand judgment against L'Oreal/Lancôme for the statutory remedies made available under the New Jersey Consumer Fraud Act and such additional relief as the Court may deem

appropriate or to which Plaintiff and the Lancôme Class and New Jersey Lancôme Subclass may be entitled.

## **COUNT IV**
### **(Violation of California Business & Professions Code Section 17200 *et seq.* - Unfair Conduct)**

271.     Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi repeat the allegations contained in paragraphs 1-270 as if fully set forth herein.

272.     Plaintiffs bring this claim individually and on behalf of the other members of the California Lancôme Subclass under California law.

273.     Under California Business & Professions Code §17200, any business act or practice that is unethical, oppressive, unscrupulous and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

274.     L'Oreal/Lancôme has engaged, and continues to engage, in conduct that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs and the other members of the California Lancôme Subclass.  This conduct includes, but is not limited to labeling, advertising, marketing and selling based on deceptive promises of the age-negating efficacy of the Lancôme Luxury Wrinkle Creams when, in fact, L'Oreal/Lancôme knew or should have known those qualities did not exist.  L'Oreal/Lancôme's scheme was and is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs and the other members of the California Lancôme Subclass.

275.     L'Oreal/Lancôme has engaged, and continues to engage, in conduct that violates the legislatively declared policies of:   (1) 35 U.S.C. §292(a), against using the word "patent" in advertising in connection with any unpatented product; (2) California Health & Safety Code § 111730, which prohibits the labeling of any cosmetic that is "false and misleading in any particular"; (3) California Health & Safety Code §111770, which prohibits the misbranding of any cosmetic; (4) California Health & Safety Code §111765, which prohibits the manufacture and sale of any misbranded cosmetic, and (5) California Business & Professions Code §17508 against making false and/or misleading factual claims in advertising. L'Oreal/Lancôme gains an unfair advantage over competitors, whose advertising for products must comply with 35 U.S.C. §292(a), Health & Safety Code §§ 111765 and 111770 and California Business & Professions Code §17500.

276.     L'Oreal/Lancôme's conduct is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Lancôme Luxury Wrinkle Creams at all, or would not have paid such a high price for the Lancôme Luxury Wrinkle Creams, but for L'Oreal/Lancôme's false promotion of the Lancôme Luxury Wrinkle Creams.  Consumers have thus overpaid for the Lancôme Luxury Wrinkle Creams. Such injury is not outweighed by:  (i) any countervailing benefits to consumers or competition; or (ii) any utility to L'Oreal/Lancôme.  Indeed, no benefit to consumers or competition or to L'Oreal/Lancôme results from L'Oreal/Lancôme's conduct. Since consumers reasonably rely on L'Oreal/Lancôme's representations of the

Lancôme Luxury Wrinkle Creams and injury results from ordinary use of the Lancôme Luxury Wrinkle Creams, consumers could not have reasonably avoided such injury.

277.   By committing the acts alleged above, L'Oreal/Lancôme has engaged in unfair business acts and practices which constitute unfair competition within the meaning of California Business & Professions Code §17200.

278.   Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi and the other members of the California Lancôme Subclass have all paid money for the Lancôme Luxury Wrinkle Creams.   However, Plaintiffs and the other members of the California Lancôme Subclass did not obtain the full value of the advertised product due to L'Oreal/Lancôme's misrepresentations and omissions regarding the nature of said products.   Accordingly, Plaintiffs and the other members of the California Lancôme Subclass have suffered injury in fact and lost money or property as a result of Defendants' acts of false advertising.

279.   In accordance with California Business & Professions Code §17203, Plaintiffs seek an order enjoining L'Oreal/Lancôme from continuing to conduct business through unlawful, unfair and deceptive acts and practices and further seek an order requiring L'Oreal/Lancôme to conduct a corrective advertising campaign.

280.   As a result of L'Oreal/Lancôme's conduct, Plaintiffs seek injunctive and restitutionary relief under California Business & Professions Code §17203.

281.     Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of L'Oreal/Lancôme's acts as set forth herein.

282.     California Lancôme Subclass members have suffered injury in fact and have lost money or property as a result of L'Oreal/Lancôme's actions as set forth herein.

<u>**COUNT V**</u>
**(Violation of California Business & Professions Code Section 17200 *et seq.* - Fraudulent Conduct)**

283.     Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi repeat the allegations contained in paragraphs 1-282 as if fully set forth herein.

284.     Plaintiffs bring this claim individually and on behalf of the other members of the California Lancôme Subclass under California law.

285.     Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

286.     L'Oreal/Lancôme has engaged, and continues to engage, in conduct that is likely to deceive Plaintiffs and the other members of the California Lancôme Subclass, all of whom are members of the general public.  This conduct includes, but is not limited to labeling, advertising, marketing and sales based on deceptive promises of the purportedly age-negating efficacy of the Lancôme Luxury Wrinkle Creams when, in fact, those qualities did not exist.

287.     The purportedly age-negating benefits of the Lancôme Luxury Wrinkle Creams, which form the basis of the misrepresentations of L'Oreal/Lancôme

described herein, were especially important to the purchasers of the Lancôme Luxury Wrinkle Creams, including Plaintiffs and the other members of the California Lancôme Subclass.  After reviewing the packaging, product displays, and sales brochures for the Lancôme Luxury Wrinkle Creams and L'Oreal/Lancôme's other print, television and Internet-based advertising, Plaintiffs purchased the Lancôme Luxury Wrinkle Creams in reliance on L'Oreal/Lancôme's representations that the Lancôme Luxury Wrinkle Creams promised age-negating benefits. Plaintiffs would not have purchased the products at all, or would not have paid such a high price for the products, but for L'Oreal/Lancôme's false, misleading, and/or deceptive promotion of the Lancôme Luxury Wrinkle Creams.

288.    Plaintiffs and the other members of the California Lancôme Subclass have all paid money for the Lancôme Luxury Wrinkle Creams.  However, Plaintiffs and the other members of the California Lancôme Subclass did not obtain the full value of the advertised product due to L'Oreal/Lancôme's misrepresentations regarding the nature of said products.   Accordingly, Plaintiffs and the other members of the California Lancôme Subclass have suffered injury in fact and lost money or property as a direct result of L'Oreal/Lancôme's misrepresentations and material omissions.

289.    By committing the acts alleged above, L'Oreal/Lancôme has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

290.     In accordance with California Business & Professions Code §17203, Plaintiffs seek an order enjoining L'Oreal/Lancôme from continuing to conduct business through their fraudulent conduct and further seek an order requiring L'Oreal/Lancôme to conduct a corrective advertising campaign.

291.     As a result of L'Oreal/Lancôme's conduct, Plaintiffs seek injunctive and restitutionary relief under California Business & Professions Code §17203.

292.     Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of L'Oreal/Lancôme's acts as set forth above.

293.     California Lancôme Subclass members have suffered injury in fact and have lost money or property as a result of L'Oreal/Lancôme's actions as set forth above.

## COUNT VI
**(Violation of California Business & Professions Code Section 17200 *et seq.* – Commission of Unlawful Acts)**

294.     Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi repeat the allegations contained in paragraphs 1-293 as if fully set forth herein.

295.     Plaintiffs bring this claim individually and on behalf of the other members of the California Lancôme Subclass under California law.

296.     The violation of any law constitutes an unlawful business practice under Business and Professions Code §17200.

297.     By labeling, marketing, and advertising that certain Lancôme Luxury Wrinkle Creams have patents, as alleged herein, where upon information and belief those patents do not exist, L'Oreal/Lancôme violates 35 U.S.C. §292(a), which

prohibits using the word "patent" in advertising in connection with any unpatented product.

298.    By misrepresenting that the Lancôme Luxury Wrinkle Creams provide age-negating benefits when, in fact, they do not, L'Oreal/Lancôme's labeling of the Lancôme Luxury Wrinkle Creams is "false and/or misleading in any particular" in violation of Health & Safety Code §111730.  Thus, L'Oreal/Lancôme's conduct also violates California Health & Safety Code §111770, which prohibits the misbranding of any cosmetic, and California Health & Safety Code §111765, which prohibits the manufacture and sale of any misbranded cosmetic.

299.    By using false, misleading, and/or deceptive  statements to promote the sale of the Lancôme Luxury Wrinkle Creams when they knew or should have known that the statements were untrue and/or misleading, L'Oreal/Lancôme violates Business and Professions Code §17500.

300.    By violating 35 U.S.C. §292(a) and Health and Safety Code §§111730, 111765 and 111770, and Business and Professions Code §17500, L'Oreal/Lancôme has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Business & Professions Code §17200.

301.    Plaintiffs and the other members of the California Lancôme Subclass have all paid money for the Lancôme Luxury Wrinkle Creams.  However, Plaintiffs and the other members of the California Lancôme Subclass did not obtain the full value of the advertised product due to L'Oreal/Lancôme's misrepresentations regarding the nature of said products.   Accordingly, Plaintiffs and the other

members of the California Lancôme Subclass have suffered injury in fact and lost money or property as a direct result of L'Oreal/Lancôme's misrepresentations and material omissions.

302.   In accordance with California Business & Professions Code §17203, Plaintiffs seek an order enjoining L'Oreal/Lancôme from continuing to conduct business through its fraudulent conduct and further seek an order requiring L'Oreal/Lancôme to conduct a corrective advertising campaign.

303.   As a result of L'Oreal/Lancôme's conduct, Plaintiffs seek injunctive and restitutionary relief under California Business & Professions Code §17203.

304.   Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of L'Oreal/Lancôme's acts as set forth above.

305.   California Lancôme Subclass members have suffered injury in fact and have lost money or property as a result of L'Oreal/Lancôme's actions as set forth above.

**COUNT VII**
**(Violation of California Civil Code §1750 *et seq*. – Damages**
**Consumers Legal Remedies Act)**

306.   Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi repeat the allegations contained in paragraphs 1-305 as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

307.   Plaintiffs bring this claim individually and on behalf of the other members of the California Lancôme Subclass under California law.

308.     Cal. Civ. Code §1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  L'Oreal/Lancôme violated this provision by representing that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

309.     Cal. Civ. Code §1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  L'Oreal/Lancôme violated this provision by representing that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

310.     Cal. Civ. Code §1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  L'Oreal/Lancôme violated this provision by representing that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

311.     By committing the acts alleged above, L'Oreal/Lancôme has violated the Consumers Legal Remedies Act ("CLRA").

312.     Plaintiffs and the California Lancôme Subclass members suffered injuries caused by L'Oreal/Lancôme's misrepresentations because: (a) they were induced to purchase a product they would not have otherwise purchased if they had known that the promised age-negating nature of the Lancôme Luxury Wrinkle

Creams was untrue; and/or (b) they paid a price premium due to the false, misleading, and/or deceptive advertising of the Lancôme Luxury Wrinkle Creams.

313.     On June 8, 2012, a CLRA notice letter was served on L'Oreal/Lancôme which complies in all respects with California Civil Code §1782(a).  Plaintiff Fabend sent L'Oreal/Lancôme a letter via certified mail, advising L'Oreal/Lancôme that it is in violation of §1770.  L'Oreal/Lancôme was further advised that in the event the relief requested was not provided within thirty (30) days, Fabend would seek to amend the Complaint to include a claim for damages.

314.     L'Oreal/Lancôme failed to respond to Plaintiff Fabend's CLRA notice letter of June 8, 2012.

315.     Thus, Plaintiffs seek damages pursuant to California Civil Code §1781(a) on behalf of themselves and the other members of the California Lancôme Subclass resulting from L'Oreal/Lancôme's wrongful acts and practices.

316.     Plaintiffs also seek an order requiring L'Oreal/Lancôme to pay Plaintiffs' costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

## COUNT VIII
### (Violation of California Civil Code §1750 *et seq*. – Injunctive Relief Consumers Legal Remedies Act)

317.     Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi repeat the allegations contained in paragraphs 1-316 as if fully set forth herein.

318.     Plaintiffs bring this claim individually and on behalf of the other members of the California Lancôme Subclass under California law.

118

319.    Cal. Civ. Code §1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  L'Oreal/Lancôme violated this provision by representing that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

320.    Cal. Civ. Code §1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  L'Oreal/Lancôme violated this provision by representing that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

321.    Cal. Civ. Code §1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  L'Oreal/Lancôme violated this provision by representing that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

322.    By committing the acts alleged above, L'Oreal/Lancôme has violated the CLRA.

323.    Plaintiffs and the other members of the California Lancôme Subclass suffered injuries caused by L'Oreal/Lancôme's misrepresentations because: (a) they were induced to purchase a product they would not have otherwise purchased if they had known that the promised age-negating nature of the Lancôme Luxury

Wrinkle Creams was untrue; and/or (b) they paid a price premium due to the false, misleading, and/or deceptive advertising of the Luxury Wrinkle Creams.

324.    Plaintiffs and the other members of the California Lancôme Subclass are entitled to, pursuant to California Civil Code §1780(a)(2), an order enjoining L'Oreal/Lancôme's above-described wrongful acts and, and ordering the payment of costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

## COUNT IX
### (Violation of California Business & Professions Code § 17500, *et seq.*<br>California False Advertising Law)

325.    Plaintiffs Fabend, Schwartz, Kallen, Bauer, and Absi repeat the allegations contained in paragraphs 1-324 as if fully set forth herein.

326.    Plaintiffs bring this claim individually and on behalf of the other members of the California Lancôme Subclass under California law.

327.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

328.     Throughout the Class Period, L'Oreal/Lancôme committed acts of false advertising, as defined by Cal. Bus. & Prof. Code §17500, by using false, misleading, and/or deceptive statements to promote the sale of the Lancôme Luxury Wrinkle Creams as described herein.

329.     L'Oreal/Lancôme knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

330.     L'Oreal/Lancôme's actions in violation of Cal. Bus. & Prof. Code § 17500 were false, misleading, and/or deceptive such that the general public is and was likely to be deceived.

331.     Plaintiffs and the other California Lancôme Subclass members suffered lost money or property as a result of L'Oreal/Lancôme's FAL violations because: (a) Plaintiffs and the other California Lancôme Subclass members were induced to purchase a product they would not have otherwise purchased had they known its true characteristics; and (b) Plaintiffs and the other California Lancôme Subclass members were induced to pay substantially more for Lancôme Luxury Wrinkle Creams than they would have paid if the Lancôme Luxury Wrinkle Creams' true characteristics had not be concealed or misrepresented.

332.     Plaintiffs bring this action pursuant to Cal. Bus. & Prof. Code § 17535 for injunctive relief to enjoin the practices described herein and to require L'Oreal/Lancôme to issue corrective disclosures to consumers.

## COUNT X
**(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act – Deceptive Trade Practices)**

333.     Plaintiffs Davis and Simmons repeat the allegations contained in paragraphs 1-332 as if fully set forth herein.

334.     Plaintiffs assert this claim individually and on behalf of the other members of the Illinois Lancôme Subclass.

335.     Throughout the Class Period, Plaintiffs and the other members of the Illinois Lancôme Subclass and L'Oreal/Lancôme were "persons" within the meaning of 815 ILCS 505/1(c).

336.     Throughout the Class Period, L'Oreal/Lancôme conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, marketing, offering for sale, and sale of Lancôme Luxury Wrinkle Creams.

337.      Throughout the Class Period, Plaintiffs and the other members of the Illinois Lancôme Subclass were "consumers" within the meaning of 815 ILCS 505/1(e).

338.     Under the Illinois Consumer Fraud and Deceptive Practices Act, the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, in the conduct of any trade or commerce is unlawful whether any person has in fact been misled, deceived or damaged thereby.

339.     Under Section of the 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have." 815 ILCS 510/2(a)(5).  L'Oreal/Lancôme violated this provision by representing, during the course its trade and business practices, that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

340.    Under Section of the 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person "represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another." 815 ILCS 510/2(a)(7).  L'Oreal/Lancôme violated this provision by representing, during the course its trade and business practices, that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

341.    Under Section of the 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person "advertises goods or services with intent not to sell them as advertised." 815 ILCS 510/2(a)(9). L'Oreal/Lancôme violated this provision by representing, during the course its trade and business practices, that the Lancôme Luxury Wrinkle Creams provide age-negating benefits as described herein, when they do not.

342.    L'Oreal/Lancôme's deceptive acts and practices, alleged herein, including but not limited to, L'Oreal/Lancôme's sale of Lancôme Luxury Wrinkle

Creams labeled, packaged, marketed, advertised, and sold as having certain age-negating benefits and L'Oreal/Lancôme's failure to disclose that Lancôme Luxury Wrinkle Creams do not have such age-negating efficacy violate the Illinois Consumer Fraud and Deceptive Business Practices Act.

343.    L'Oreal/Lancôme intended for Plaintiffs and the other Illinois Lancôme Subclass members to rely on its aforementioned deceptive acts and practices.

344.    Plaintiffs and the other Illinois Lancôme Subclass members relied on such misrepresentations, and were deceived.

345.    L'Oreal/Lancôme's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiffs and the other Illinois Lancôme Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages, because they were induced to purchase or paid a price premium due to the false, misleading, and/or deceptive advertising and marketing of Lancôme Luxury Wrinkle Creams and L'Oreal/Lancôme's failure to disclose the true nature of said products.

346.    815 ILCS 505/10a permits the Court to enter injunctive relief to require L'Oreal/Lancôme to stop the unlawful, unfair and deceptive conduct alleged herein, and award Plaintiffs Davis and Simmons and the other members of the Illinois Lancôme Subclass their costs and reasonable attorneys' fees.

347.    As a result of L'Oreal/Lancôme's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Plaintiffs and the other members of the Illinois Lancôme Subclass demand judgment against L'Oreal/Lancôme for the

statutory remedies made available under the Illinois Consumer Fraud and Deceptive Business Practices Act and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Illinois Lancôme Subclass may be entitled.

**COUNT XI**
**(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act – Unfair and Deceptive Practices)**

348.    Plaintiffs Davis and Simmons repeat the allegations contained in paragraphs 1-347 as if fully set forth herein.

349.    Plaintiffs assert this claim individually and on behalf of the other members of the Illinois Lancôme Subclass.

350.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, prohibits unfair methods of competition and unfair and deceptive acts or practices, including among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been misled, deceived or damaged thereby."

351.    Throughout the Class Period, L'Oreal/Lancôme conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, offering for sale, and sale of Lancôme Luxury Wrinkle Creams.

352.    815 ILCS 505/1(b) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "merchandise" to include Lancôme Luxury Wrinkle Creams.

125

353.    815 ILCS 505/1(c) of the Illinois Consumer Fraud and Deceptive Practices defines the term "person" to include L'Oreal/Lancôme.

354.    815 ILCS 505/1(e) of the Illinois Consumer Fraud and Deceptive Practices Act defines the term "consumer" to include Plaintiffs and the other Illinois Lancôme Subclass members.

355.    L'Oreal/Lancôme's acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices, in the course of trade and commerce, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, including but not limited to, L'Oreal/Lancôme's sale of Lancôme Luxury Wrinkle Creams labeled, packaged, advertised, marketed, and sold as having certain age-negating benefits and L'Oreal/Lancôme's failure to disclose the true nature of said products.

356.    L'Oreal/Lancôme intended for Plaintiffs and the other Illinois Lancôme Subclass members to rely on its aforementioned deceptive acts and practices.

357.    Plaintiffs and the other Illinois Lancôme Subclass members relied on such misrepresentations, and were deceived.

358.    L'Oreal/Lancôme's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiffs and the other Illinois Lancôme Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false, misleading, and/or deceptive labeling, packaging,

advertising, marketing and sale of Lancôme Luxury Wrinkle Creams and L'Oreal/Lancôme's failure to disclose the true nature of said products.

359.    815 ILCS 505/10a permits the Court to enter injunctive relief to require L'Oreal/Lancôme to stop the unlawful, unfair and deceptive conduct alleged herein, and award Plaintiffs Davis and Simmons and the other members of the Illinois Lancôme Subclass their costs and reasonable attorneys' fees.

360.    As a result of L'Oreal/Lancôme's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Plaintiffs and the other members of the Illinois Lancôme Subclass demand judgment against L'Oreal/Lancôme for the statutory remedies made available under the Illinois Consumer Fraud and Deceptive Business Practices Act and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Illinois Lancôme Subclass may be entitled.

## COUNT XII
### (Violation of the Florida Deceptive and Unfair Trade Practices Act)

361.    Plaintiff Nino repeats the allegations contained in paragraphs 1-360 as if fully set forth herein.

362.    Plaintiff Nino asserts this claim individually and on behalf of the other members of the Florida Lancôme Subclass.

363.    This is a claim for relief under Florida Statutes § 501.201, *et seq.*, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

364.    The purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or

unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

365.    Florida Statutes § 501.204(1) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

366.    Florida Statutes § 501.203(8) states that "trade or commerce means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."

367.    Throughout the Class Period, L'Oreal/Lancôme conducted trade or commerce within the meaning of § 501.203(8) and FDUTPA by its advertising, offering for sale, and sale of Lancôme Luxury Wrinkle Creams.

368.    Lancôme Luxury Wrinkle Creams are "goods" within the meaning of FDUTPA.

369.    Plaintiff Nino and the other Florida Lancôme Subclass members are "consumers" as defined by Florida Statutes § 501.203(7).

370.    L'Oreal/Lancôme's acts and practices, as alleged herein, constitute unfair, deceptive, and/or unconscionable acts and practices in violation of FDUTPA, including but not limited to, L'Oreal/Lancôme's sale of Lancôme Luxury Wrinkle Creams labeled, packaged, advertised, marketed, and sold as having certain age-negating benefits and L'Oreal/Lancôme's failure to disclose the true nature of said products.

371.     L'Oreal/Lancôme's business practices and conduct, as described herein further violate Florida Statutes § 501.204(1) in that the practices offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers, causing actual damages to consumers, including Plaintiff and the other Florida Lancôme Subclass members who purchased Lancôme Luxury Wrinkle Creams because of L'Oreal/Lancôme's representations and conduct.

372.     L'Oreal/Lancôme's unconscionable, unfair, and deceptive acts and practices set forth herein were likely and reasonably foreseeable to mislead — and did mislead — Plaintiff and the other members of the Florida Lancôme Subclass, who acted reasonably in the circumstances in their reliance on L'Oreal/Lancôme's acts and practices, and to their detriment and were deceived.

373.     L'Oreal/Lancôme's misrepresentations or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and the other Florida Lancôme Subclass members regarding L'Oreal/Lancôme's products.

374.     L'Oreal/Lancôme's violations of FDUTPA directly and proximately caused Plaintiff and the other Florida Lancôme Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false, misleading, and/or deceptive advertising and marketing of Lancôme Luxury

Wrinkle Creams and L'Oreal/Lancôme's failure to disclose the true nature of said products.

375.    Plaintiff and Florida Lancôme Subclass members are entitled to relief for their damages because of L'Oreal/Lancôme's practices, including but not limited to, actual damages, costs, attorneys' fees, and injunctive relief, pursuant to Florida law, including Fla. Stat. § 501.2105 and § 501.211.

**COUNT XIII**
**(Violation of the Consumer Fraud Laws of the Various States)**

376.    Plaintiffs Fabend, Schwartz, Kallen, Bauer, Absi, Murphy, Davis, Simmons, and Nino repeat the allegations contained in paragraphs 1-375 as if fully set forth herein.

377.    Forty States and the District of Columbia have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising and that allow consumers to bring private and/or class actions.  By mislabeling and making false and deceptive efficacy claims regarding the Lancôme Luxury Wrinkle Creams, L'Oreal/Lancôme has engaged, and continues to engage, in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer statutes listed below.

    a.    Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et seq.*;

    b.    Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;

    c.    Arkansas Deceptive Trade Practices Act, Ark. Code §4-88-101, *et seq.*;

d.    California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;

e.    Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

f.    Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

g.    Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

h.    District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28 3901, *et seq.*;

i.    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

j.    Georgia Fair Business Practices Act, §10-1-390 *et seq.*;

k.    Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes §481A-1, *et seq.*;

l.    Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

m.    Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

n.    Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.*;

o.    Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat Ann §§ 365.020, *et seq.*;

p.    Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

q.    Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*,

r.    Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

s.    Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

t.    Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

u.    Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.*;

v.      Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

w.      Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;

x.      Nebraska Consumer Protection Act, Neb. Rev. Stat. §59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §87-301, *et seq.*;

y.      Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

z.      New Hampshire Consumer Protection Act,  N.H. Rev. Stat. § 358-A:1, *et seq.*;

aa.     New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§  56:8 1, *et seq.*;

bb.     New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 1, *et seq.*;

cc.     New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

dd.     North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.*;

ee.     Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109:4-3-02, 109:4-3-03, and 109:4-3-10;

ff.     Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

gg.     Oregon Unfair Trade Practices Act, Ore. Rev. Stat § 646.608(e) & (g);

hh.     Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

ii.     South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

jj.     South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et seq.*;

kk.     Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*;

ll.     Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

mm.     Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;

nn.     West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

oo.   Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et seq*.

378.   The acts, practices, misrepresentations and omissions by L'Oreal/Lancôme described above, and L'Oreal/Lancôme's dissemination of deceptive and misleading labeling, advertising, marketing, and sales materials concerning the Lancôme Luxury Wrinkle Creams, constitutes unfair competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes, because each of these statutes generally prohibits deceptive conduct in consumer transactions

379.   L'Oreal/Lancôme violated each of these statutes by making certain false, misleading, and/or deceptive efficacy promises regarding the Lancôme Luxury Wrinkle Creams.

380.   Plaintiffs and the other Lancôme Class Members were injured as a direct and proximate result of L'Oreal/Lancôme's unfair, deceptive and/or unconscionable acts and practices, because:  (a) Plaintiffs and the other Lancôme Class members were induced to purchase a product they would not have otherwise purchased had they known its true composition; and (b) Plaintiffs and the other Lancôme Class members were induced to pay substantially more for the Lancôme Luxury Wrinkle Creams than they would have paid if their true characteristics had not been concealed or misrepresented.

381.   As a result of L'Oreal/Lancôme's violations of the foregoing state consumer protection statutes, Plaintiffs and the other members of the Lancôme Class demand judgment against L'Oreal/ Lancôme for compensatory damages,

double damages, treble damages, statutory damages, punitive or exemplary damages, restitution, and/or injunction relief and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Lancôme Class may be entitled.

## COUNT XIV
**(For Breach of Express Warranty Laws of the Various States)**

382.    Plaintiffs Fabend, Schwartz, Kallen, Bauer, Absi, Murphy, Davis, Simmons, and Nino repeat the allegations contained in paragraphs 1-381 as if fully set forth herein.

383.    Each of the Plaintiffs brings this Count on her own behalf under the law of the state in which she purchased Lancôme Luxury Wrinkle Creams on behalf of:  (a) all other persons who purchased Lancôme Luxury Wrinkle Creams in the same State; and (b) all other persons who purchased Lancôme Luxury Wrinkle Creams in States having similar laws regarding express warranty.

384.    L'Oreal/Lancôme, as the designer, manufacturer, advertiser, marketer, distributor, or seller expressly warranted that the Lancôme Luxury Wrinkle Creams would provide certain actual age-negating effects, as described herein, when in fact they do not.

385.    L'Oreal/Lancôme's representations that the Lancôme Luxury Wrinkle Creams would provide certain age-negating effects as described herein are affirmations that the Lancôme Luxury Wrinkle Creams would deliver the age-negating benefits promised.

386.   L'Oreal/Lancôme's representations regarding Lancôme Luxury Wrinkle Creams as described in detail herein were descriptions of the goods and became part of the basis of the bargain that the Lancôme Wrinkle Creams would conform to the description.

387.   In addition or in the alternative, L'Oreal/Lancôme's representations are made to induce Plaintiffs and members of the Lancôme Class to rely on such representations, and Plaintiffs and members of the Lancôme Class did so rely on said representations as a material factor in their decision to purchase Lancôme Luxury Wrinkle Creams.  Plaintiffs and the other members of the Lancôme Class would not have purchased Lancôme Luxury Wrinkle Creams but for these representations and warranties.

388.   The Lancôme Luxury Wrinkle Creams did not, in fact, meet the descriptions L'Oreal/Lancôme made about the products.

389.   L'Oreal/Lancôme knew or should have known that the Lancôme Luxury Wrinkle Creams could not provide the results promised.

390.   At all times relevant to this action, L'Oreal/Lancôme falsely represented that its Lancôme Luxury Wrinkle Creams would provide certain age-negating effects as described herein when they do not, in breach of these express warranties.

391.   At all times relevant to this action, L'Oreal/Lancôme made false representations in breach of its express warranties and in violation of state express warranty laws, including:

a.      Ak. St. § 4-2-313.

b.      Ariz. Rev. Stat. Ann. § 47-2313.

c.      Ark. Code Ann. § 4-2-313.

d.      California Commercial Code § 2313.

e.      Fla. Stat. § 672.313

f.      Colo. Rev. St. § 4-2-313.

g.      Conn. Gen. Stat. Ann. § 42a-2-313.

h.      D.C. Stat. § 28:2-313.

i.      Haw. Rev. Stat. § 490:2-313.

j.      810 ILCS 5/2-313.

k.      Ind. Code § 26-1-2-313.

l.      Kansas Stat. Ann. § 84-2-313.

m.      La. Civ. Code. Ann. Art. 2520

n.      11 Maine Rev. Stat. Ann. § 2-313.

o.      Mass. Gen. Laws Ann. 106 § 2-313.

p.      Minn. Stat. Ann. § 336.2-313.

q.      Miss. Code Ann. § 75-2-313.

r.      Missouri Rev. Stat. § 400.2-313.

s.      Mont. Code Ann. 30-2-313.

t.      Neb. Rev. Stat. § 2-313.

u.      Nev. Rev. Stat. §104.2313.

v.      N.H. Rev. Stat. § 382-A:2-313.

w.      N.J. Stat. Ann. 12A:2-313.

x.      N.M. Stat. Ann. § 55-2-313.

y.      N.Y. U.C.C. Law § 2-313.

z.      N.C. Gen. Stat. Ann. § 25-2-313.

aa.     Okla. Stat. Ann. Tit. 12A, § 2-313.

bb.     Or. Rev. Stat. § 72.3130.

cc.     Pa. Stat. Ann. Tit. 13, § 2313.

dd.    R.I. Stat. § 6A-2-313.

ee.    S.C. § 36-2-313.

ff.    S.D. Cod. Laws. § 57A-2-313.

gg.    Tenn. Code Ann. § 47-2-313.

hh.    Tex. Bus. & Com. Code Ann. § 2.313.

ii.    Ut. Code Ann. § 70A-2-313.

jj.    Vt. Stat. Ann. § 2-313.

kk.    Wa. Ann. 62A.2-313.

ll.    W. Va. Code § 46-2-313.

mm.    Wyo. Stat. 34.1-2-313.

392.    The above statutes do not require privity of contract in order to recover for breach of express warranty.

393.    As a result of L'Oreal/Lancôme's conduct, Plaintiffs and the other members of the Lancôme Class were damaged.

394.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and the other members of the Lancôme Class, placed L'Oreal/Lancôme on notice thereof.

395.    Plaintiffs and the members of the Lancôme Class demand judgment against L'Oreal/Lancôme for compensatory damages, plus interest, costs and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Lancôme Class may be entitled.

## B. L'Oreal/Youth Code

### COUNT XV
### (For Breach of Express Warranty)

396.    Plaintiffs Goldrick, Gordon, and Luu repeat the allegations contained in paragraphs 1-395 as if fully set forth herein.

397.    Plaintiffs Goldrick, Gordon, and Luu bring this claim individually and on behalf of the other members of the New Jersey, Massachusetts, and California Youth Code Subclasses.

398.    L'Oreal/Youth Code, as the designer, manufacturer, advertiser, marketer, distributor, or seller expressly warranted that the Youth Code Products would provide certain actual age-negating effects, when in fact they do not.

399.    The age-negating effects as described in detail above were affirmations of fact and promises relating to the Youth Code Products which became part of the basis for the bargain that the Youth Code Products would conform to the affirmations of fact and promises.

400.    Likewise, the age-negating effects as described in detail above were descriptions of the Youth Code Products which became part of the basis of the bargain that the Youth Code Products would conform to the description.

401.    L'Oreal/Youth Code knew or should have known that the Youth Code Products could not provide the results promised.

402.    Plaintiffs and the other Youth Code Subclass members were injured as a direct and proximate result of L'Oreal/Youth Code's breach because they paid a price premium due to L'Oreal/Youth Code's deceptive advertising and false

promises.  Alternatively, Plaintiffs and the other Youth Code Subclass members were injured as a direct and proximate result of L'Oreal/Youth Code's breach because they paid for products that could never provide the promised results, rendering the products valueless to Plaintiffs and the other Youth Code Subclass members.

403.    Plaintiffs and the members of the New Jersey, Massachusetts, and California Youth Code Subclasses demand judgment against L'Oreal/Youth Code for compensatory damages, plus interest, costs and such additional relief as the Court may deem appropriate or to which Plaintiffs and the New Jersey, Massachusetts, and California Youth Code Subclasses may be entitled.

## COUNT XVI
### (Unjust Enrichment)

404.    Plaintiffs Goldrick, Gordon, and Luu repeat the allegations contained in paragraphs 1-403 as if fully set forth herein.

405.    Plaintiffs Goldrick, Gordon, and Luu bring this claim individually and on behalf of the other members of the nationwide Youth Code Class and the other members of the New Jersey, Massachusetts, and California Youth Code Subclasses against L'Oreal/Youth Code.

406.    While sometimes stated uniquely, the focus of the elements of an unjust enrichment cause of action and of the inquiry is the same in all states (*i.e.*, whether the defendant was *unjustly* enriched).  At the core of each state's law are two fundamental elements:  (1) the defendant received a benefit from the plaintiff and (2) it would be inequitable for the defendant to retain that benefit without

compensating the plaintiff. Since the focus is the same and there is no material conflict relating to the elements of unjust enrichment among the states, New Jersey law applies to the nationwide unjust enrichment claim.

407. Plaintiffs and the other Youth Code Class and Subclass members conferred a benefit on L'Oreal/Youth Code by purchasing one or more of the Youth Code Products.

408. L'Oreal/Youth Code has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the other Youth Code Class and Subclass members' purchases of the Youth Code Products, which retention under these circumstances is unjust and inequitable because L'Oreal/Youth Code misrepresented the efficacy of the Youth Code Products, which caused injuries to Plaintiffs and the other Youth Code Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of efficacy or they purchased products that did not perform as promised and were therefore of no value to Plaintiffs and the other Youth Code Class and Subclass members.

409. Because L'Oreal/Youth Code's retention of the non-gratuitous benefit conferred on them by Plaintiffs and the other Youth Code Class and Subclass members is unjust and inequitable, L'Oreal/Youth Code must pay restitution to Plaintiffs and the other Youth Code Class and Subclass members for its unjust enrichment, as ordered by the Court.

## COUNT XVII
### (Violation of the New Jersey Consumer Fraud Act)

410.    Plaintiff Goldrick repeats the allegations contained in paragraphs 1-409 as if fully set forth herein.

411.    Plaintiff Goldrick brings this claim individually and on behalf of the other members of the nationwide Youth Code Class and the other members of the New Jersey Youth Code Subclass.

412.    L'Oreal/Youth Code misrepresented that Youth Code would immediately begin to reduce wrinkles, boost the skin's natural powers of regeneration, help to stimulate recovery through its GenActiv Technology, and have certain other age-negating effects as described herein.

413.    L'Oreal/Youth Code also failed to disclose material facts regarding its purported supporting scientific data as described herein.

414.    L'Oreal/Youth Code's misrepresentations and omissions constitute an unconscionable commercial practice, deception, fraud, false promise and/or misrepresentation as to the nature of the goods, in violation of the New Jersey Consumer Fraud Act.

415.    Plaintiff and all Youth Code Class and New Jersey Youth Code Subclass members suffered an ascertainable loss caused by L'Oreal/Youth Code's misrepresentations because they were induced to purchase or paid a price premium due to the misleading labeling, advertising, marketing, packaging, and other promotion for Youth Code and because of L'Oreal/Youth Code's failure to disclose that the results it promised were not obtainable.  Because of L'Oreal/Youth Code's

misrepresentations and omissions, Plaintiff and the other members of the nationwide Youth Code Class and New Jersey Youth Code Subclass did not receive the products they thought they were paying for.

416.    The Youth Code Products advertised, marketed, and sold by L'Oreal/Youth Code are "merchandise" within the meaning of the New Jersey Consumer Fraud Act, and Plaintiff and the other members of the Youth Code Class and New Jersey Youth Code Subclass are "persons" and "consumers" within the meaning of the New Jersey Consumer Fraud Act, such that they demand judgment against L'Oreal/Youth Code for the statutory remedies made available under the New Jersey Consumer Fraud Act and such additional relief as the Court may deem appropriate or to which Plaintiff and the Youth Code Class and New Jersey Youth Code Subclass may be entitled.

## <u>COUNT XVIII</u>
### (Violation of Massachusetts General Laws, Chapter 93A, §§ 2 and 9)

417.    Plaintiff Gordon repeats the allegations contained in paragraphs 1-416 as if fully set forth herein.

418.    Plaintiff Gordon brings this claim individually and on behalf of the other members of the Massachusetts Youth Code Subclass.

419.    M.G.L. c. 93A, § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  M.G.L. c. 93A, § 9 permits any consumer injured by a violation of M.G.L. c. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

420.    Plaintiff Gordon alleges that L'Oreal/Youth Code engaged in unfair and deceptive business acts and/or practices in violation of M.G.L. c. 93A, §§ 2 and 9.

421.    L'Oreal/Youth Code's unfair and deceptive scheme to mislead consumers was comprised of countless unfair and deceptive acts or practices, including, but not limited to, uniformly misrepresenting to Plaintiff Gordon and the other members of the Massachusetts Youth Code Subclass, by means of its advertising, marketing and other promotional materials, and on the packaging and labeling of Youth Code, that Youth Code would immediately begin to reduce wrinkles, boost the skin's natural powers of regeneration, help to stimulate recovery through its GenActiv Technology, and have certain other age-negating effects as described herein.   These unfair and deceptive acts and practices have a capacity, tendency, and/or likelihood to deceive or confuse reasonable consumers.

422.    L'Oreal/Youth Code's acts and practices also violate 940 C.M.R. 3.05, M.G.L. c. 94, § 187, M.G.L. c. 106, § 2-313, and M.G.L. c. 106 § 2-314 and, as such, are unfair and deceptive in violation of M.G.L. c. 93A, § 2.

423.    Pursuant to M.G.L. c. 93A, § 9, Plaintiff Gordon, on behalf of himself and the other members of the Massachusetts Youth Code Subclass, seeks an order of this Court:

a.    Enjoining L'Oreal/Youth Code from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to its promoting, marketing, advertising, packaging and

labeling of Youth Code in the manner set forth in detail above; and

b.    Disgorging and restoring all monies that may have been acquired by L'Oreal/Youth Code as a result of such unfair and/or deceptive acts or practices.

424.    Plaintiff Gordon and the other members of the Massachusetts Youth Code Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

425.    The unfair and deceptive acts and practices of L'Oreal/Youth Code, as described above, present a serious threat to Plaintiff Gordon and the other members of the Massachusetts Youth Code Subclass.

426.    Plaintiff Gordon made a demand for relief, in writing, to L'Oreal/Youth Code at least thirty (30) days prior to filing this complaint, as required by M.G.L. c. 93A § 9.

427.    Based on the foregoing, Plaintiff Gordon and the other members of the Massachusetts Youth Code Subclass are entitled to all remedies available pursuant to M.G.L. c. 93A including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

428.    Pursuant to M. G. L. c. 231, § 6B, Plaintiff Gordon and other members of the Massachusetts Youth Code Subclass are further entitled to pre-judgment interest as a direct and proximate result of L'Oreal/Youth Code's wrongful conduct.

The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiff Gordon and the other Massachusetts Youth Code Subclass members are entitled to interest in an amount according to proof.

## COUNT XIX
### (Violation of California Business & Professions Code Section 17200 *et seq.* - Unfair Conduct)

429.    Plaintiff Luu repeats the allegations contained in paragraphs 1-428 as if fully set forth herein.

430.    Plaintiff brings this claim individually and on behalf of the other members of the California Youth Code Subclass under California law.

431.    Under California Business & Professions Code §17200, any business act or practice that is unethical, oppressive, unscrupulous and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

432.    L'Oreal/Youth Code has engaged, and continues to engage, in conduct that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiff and the other members of the California Youth Code Subclass.  This conduct includes, but is not limited to labeling, advertising, marketing and sales based on deceptive promises of the age-negating efficacy of the Youth Code Products when, in fact, L'Oreal/Youth Code knew or should have known those qualities did not exist.  L'Oreal/Youth Code's scheme was and is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiff and the other members of the California Youth Code Subclass.

433.     L'Oreal/Youth Code has engaged, and continues to engage, in conduct that violates the legislatively declared policies of:   (1) 35 U.S.C. §292(a), against using the word "patent" in advertising in connection with any unpatented product; (2) California Health & Safety Code § 111730, which prohibits the labeling of any cosmetic that is "false and misleading in any particular"; (3) California Health & Safety Code §111770, which prohibits the misbranding of any cosmetic; (4) California Health & Safety Code §111765, which prohibits the manufacture and sale of any misbranded cosmetic, and (5) California Business & Professions Code §17508 against making false and/or misleading factual claims in advertising. L'Oreal/Youth Code gains an unfair advantage over competitors, whose advertising for products must comply with 35 U.S.C. §292(a), Health & Safety Code §§ 111765 and 111770 and California Business & Professions Code §17500.

434.     L'Oreal/Youth Code's conduct is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Youth Code Products at all, or would not have paid such a high price for the Youth Code Products, but for L'Oreal/Youth Code's false promotion of the Youth Code Products.  Consumers have thus overpaid for the Youth Code Products.  Such injury is not outweighed by: (i) any countervailing benefits to consumers or competition; or (ii) any utility to L'Oreal/Youth Code.   Indeed, no benefit to consumers or competition or to L'Oreal/Youth Code results from L'Oreal/Youth Code's conduct.  Since consumers reasonably rely on L'Oreal/Youth Code's representations of the Youth Code

Products and injury results from ordinary use of the Youth Code Products, consumers could not have reasonably avoided such injury.

435. By committing the acts alleged above, L'Oreal/Youth Code has engaged in unfair business acts and practices which constitute unfair competition within the meaning of California Business & Professions Code §17200.

436. Plaintiff Luu and the other members of the California Youth Code Subclass have all paid money for the Youth Code Products. However, Plaintiff and the other members of the California Youth Code Subclass did not obtain the full value of the advertised product due to L'Oreal/Youth Code's misrepresentations and omissions regarding the nature of said products. Accordingly, Plaintiff and the other members of the California Youth Code Subclass have suffered injury in fact and lost money or property as a result of Defendants' acts of false advertising.

437. In accordance with California Business & Professions Code §17203, Plaintiff seeks an order enjoining L'Oreal/Youth Code from continuing to conduct business through unlawful, unfair and deceptive acts and practices and further seek an order requiring L'Oreal/Youth Code to conduct a corrective advertising campaign.

438. As a result of L'Oreal/Youth Code's conduct, Plaintiff seeks injunctive and restitutionary relief under California Business & Professions Code §17203.

439. Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of L'Oreal/Youth Code's acts as set forth herein.

440.     California Youth Code Subclass members have suffered injury in fact and have lost money or property as a result of L'Oreal/Youth Code's actions as set forth herein.

**COUNT XX**
**(Violation of California Business & Professions Code Section 17200 *et seq*. - Fraudulent Conduct)**

441.     Plaintiff Luu repeats the allegations contained in paragraphs 1-440 as if fully set forth herein.

442.     Plaintiff Luu brings this claim individually and on behalf of the other members of the California Youth Code Subclass under California law.

443.     Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

444.     L'Oreal/Youth Code has engaged, and continues to engage, in conduct that is likely to deceive Plaintiff and the other members of the California Youth Code Subclass, all of whom are members of the general public.   This conduct includes, but is not limited to labeling, advertising, marketing and sales based on deceptive promises of the purportedly age-negating efficacy of the Youth Code Products when, in fact, those qualities did not exist.

445.     The purportedly age-negating benefits of the Youth Code Products, which form the basis of the misrepresentations of L'Oreal/Youth Code described herein, were especially important to the purchasers of the Youth Code Products, including Plaintiff and the other members of the California Youth Code Subclass. After reviewing the packaging, product displays, and sales brochures for the Youth

Code Products and L'Oreal/Youth Code's other print, television and Internet-based advertising, Plaintiff purchased the Youth Code Products in reliance on L'Oreal/Youth Code's representations that the Youth Code Products promised age-negating benefits.  Plaintiff would not have purchased the products at all, or would not have paid such a high price for the products, but for L'Oreal/Youth Code's false and/or misleading promotion of the Youth Code Products.

446.    Plaintiff and the other members of the California Youth Code Subclass have all paid money for the Youth Code Products.  However, Plaintiff and the other members of the California Youth Code Subclass did not obtain the full value of the advertised product due to L'Oreal/Youth Code's misrepresentations regarding the nature of said products.  Accordingly, Plaintiff and the other members of the California Youth Code Subclass have suffered injury in fact and lost money or property as a direct result of L'Oreal/Youth Code's misrepresentations and material omissions.

447.    By committing the acts alleged above, L'Oreal/Youth Code has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

448.    In accordance with California Business & Professions Code §17203, Plaintiff seeks an order enjoining L'Oreal/Youth Code from continuing to conduct business through its fraudulent conduct and further seeks an order requiring L'Oreal/Youth Code to conduct a corrective advertising campaign.

449.     As a result of L'Oreal/Youth Code's conduct, Plaintiff seeks injunctive and restitutionary relief under California Business & Professions Code §17203.

450.     Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of L'Oreal/Youth Code's acts as set forth above.

451.     California Youth Code Subclass members have suffered injury in fact and have lost money or property as a result of L'Oreal/Youth Code's actions as set forth above.

<b><u>COUNT XXI</u></b>

<b>(Violation of California Business & Professions Code Section 17200 <i>et seq</i>. –<br>Commission of Unlawful Acts)</b>

452.     Plaintiff Luu repeats the allegations contained in paragraphs 1-451 as if fully set forth herein.

453.     Plaintiff Luu brings this claim individually and on behalf of the other members of the California Youth Code Subclass under California law.

454.     The violation of any law constitutes an unlawful business practice under Business and Professions Code §17200.

455.     By labeling, marketing, and advertising that certain Youth Code Products have patents, as alleged herein, where upon information and belief those patents do not exist, L'Oreal/Youth Code violates 35 U.S.C. §292(a), which prohibits using the word "patent" in advertising in connection with any unpatented product.

456.     By misrepresenting that the Youth Code Products provide age-negating benefits when, in fact, they do not, L'Oreal/Youth Code's labeling of the Youth Code Products is "false and/or misleading in any particular" in violation of

150

Health & Safety Code §111730.  Thus, L'Oreal/Youth Code's conduct also violates California Health & Safety Code §111770, which prohibits the misbranding of any cosmetic, and California Health & Safety Code §111765, which prohibits the manufacture and sale of any misbranded cosmetic.

457.     By using false and/or misleading statements to promote the sale of the Youth Code Products when they knew or should have known that the statements were untrue and misleading, L'Oreal/Youth Code violates Business and Professions Code §17500.

458.     By violating 35 U.S.C. §292(a) and Health and Safety Code §§111730, 111765 and 111770, and Business and Professions Code §17500, L'Oreal/Youth Code has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Business & Professions Code §17200.

459.     Plaintiff and the other members of the California Youth Code Subclass have all paid money for the Youth Code Products.  However, Plaintiff and the other members of the California Youth Code Subclass did not obtain the full value of the advertised product due to L'Oreal/Youth Code's misrepresentations regarding the nature of said products.   Accordingly, Plaintiff and the other members of the California Youth Code Subclass have suffered injury in fact and lost money or property as a direct result of L'Oreal/Youth Code's misrepresentations and material omissions.

460.     In accordance with California Business & Professions Code §17203, Plaintiff seeks an order enjoining L'Oreal/Youth Code from continuing to conduct

business through its fraudulent conduct and further seeks an order requiring L'Oreal/Youth Code to conduct a corrective advertising campaign.

461.   As a result of L'Oreal/Youth Code's conduct, Plaintiff seeks injunctive and restitutionary relief under California Business & Professions Code §17203.

462.   Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of L'Oreal/Youth Code's acts as set forth above.

463.   California Youth Code Subclass members have suffered injury in fact and have lost money or property as a result of L'Oreal/Youth Code's actions as set forth above.

## COUNT XXII
### (Violation of California Civil Code §1750 *et seq*. – Damages Consumers Legal Remedies)

464.   Plaintiff Luu repeats the allegations contained in paragraphs 1-463 as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

465.   Plaintiff Luu brings this claim individually and on behalf of the other members of the California Youth Code Subclass under California law.

466.   Cal. Civ. Code §1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  L'Oreal/Youth Code violated this provision by representing that the Youth Code Products provide age-negating benefits as described herein, when they do not.

152

467.     Cal. Civ. Code §1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  L'Oreal/Youth Code violated this provision by representing that the Youth Code Products provide age-negating benefits as described herein, when they do not.

468.     Cal. Civ. Code §1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  L'Oreal/Youth Code violated this provision by representing that the Youth Code Products provide age-negating benefits as described herein, when they do not.

469.     By committing the acts alleged above, L'Oreal/Youth Code has violated the CLRA.

470.     Plaintiff and the California Youth Code Subclass members suffered injuries caused by L'Oreal/Youth Code's misrepresentations because:  (a) they were induced to purchase a product they would not have otherwise purchased if they had known that the promised age-negating nature of the Youth Code Products was untrue; and/or (b) they paid a price premium due to the false and/or misleading advertising of the Youth Code Products.

471.     On November 6, 2012, a CLRA notice letter was served on L'Oreal/Youth Code which complies in all respects with California Civil Code §1782(a).  Plaintiff Luu sent L'Oreal/Youth Code a letter via certified mail, advising L'Oreal/Youth Code that it is in violation of §1770 and provided L'Oreal/Youth Code with thirty (30) days to provide the relief requested.

472.     L'Oreal/Youth Code failed to respond to Plaintiff Luu's CLRA notice letter of November 6, 2012.

473.     Thus, Plaintiff seeks damages pursuant to California Civil Code §1781(a) on behalf of herself and the other members of the California Youth Code Subclass resulting from L'Oreal/Youth Code's wrongful acts and practices.

474.     Plaintiff also seeks an order requiring L'Oreal/Youth Code to pay Plaintiff's costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

**COUNT XXIII**
**(Violation of California Civil Code §1750 *et seq*. – Injunctive Relief**
**Consumers Legal Remedies Act)**

475.     Plaintiff Luu repeats the allegations contained in paragraphs 1-474 as if fully set forth herein.

476.     Plaintiff Luu brings this claim individually and on behalf of the other members of the California Youth Code Subclass under California law.

477.     Cal. Civ. Code §1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  L'Oreal/Youth Code violated this provision by representing that the Youth Code Products provide age-negating benefits as described herein, when they do not.

478.     Cal. Civ. Code §1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  L'Oreal/Youth Code violated this

provision by representing that the Youth Code Products provide age-negating benefits as described herein, when they do not.

479.    Cal. Civ. Code §1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."   L'Oreal/Youth Code violated this provision by representing that the Youth Code Products provide age-negating benefits as described herein, when they do not.

480.    By committing the acts alleged above, L'Oreal/Youth Code has violated the CLRA.

481.    Plaintiff and the other members of the California Youth Code Subclass suffered injuries caused by L'Oreal/Youth Code's misrepresentations because:  (a) they were induced to purchase a product they would not have otherwise purchased if they had known that the promised age-negating nature of the Youth Code Products was untrue; and/or (b) they paid a price premium due to the false and/or misleading advertising of the Youth Code Products.

482.    Plaintiff and the other members of the California Youth Code Subclass are entitled to, pursuant to California Civil Code §1780(a)(2), an order enjoining L'Oreal/Youth Code's above-described wrongful acts and, and ordering the payment of costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

## COUNT XXIV
### (Violation of California Business & Professions Code § 17500, *et seq*. California False Advertising Law)

483.    Plaintiff Luu repeats the allegations contained in paragraphs 1-482 as if fully set forth herein.

484.    Plaintiff Luu brings this claim individually and on behalf of the other members of the California Youth Code Subclass under California law.

485.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

486.    Throughout the Class Period, L'Oreal/Youth Code committed acts of false advertising, as defined by Cal. Bus. & Prof. Code §17500, by using false, misleading, and/or deceptive statements to promote the sale of the Youth Code Products as described herein.

487.    L'Oreal/Youth Code knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

488.    L'Oreal/Youth Code's actions in violation of Cal. Bus. & Prof. Code § 17500 were false, misleading, and/or deceptive such that the general public is and was likely to be deceived.

489.    Plaintiff and the other California Youth Code Subclass members lost money or property as a result of L'Oreal/Youth Code's FAL violations because: (a) Plaintiff and the other California Youth Code Subclass members were induced to

purchase a product they would not have otherwise purchased had they known its true characteristics; and (b) Plaintiff and the other California Youth Code Subclass members were induced to pay substantially more for Youth Code Products than they would have paid if the Youth Code Products' true characteristics had not be concealed or misrepresented.

490.    Plaintiff brings this action pursuant to Cal. Bus. & Prof. Code § 17535 for injunctive relief to enjoin the practices described herein and to require L'Oreal/Youth Code to issue corrective disclosures to consumers.

## COUNT XXV
## (Violation of the Consumer Fraud Laws of the Various States)

491.    Plaintiffs Goldrick, Gordon, and Luu repeat the allegations contained in paragraphs 1-490 as if fully set forth herein.

492.    In addition to and/or in the alternative to the foregoing causes of action, Plaintiffs Goldrick, Gordon, and Luu bring this cause of action on his or her own behalf under the law of the State in which he or she purchased Youth Code Products and on behalf of:   (a) all other persons who purchased Youth Code Products produced by L'Oreal/Youth Code in the States where Plaintiffs purchased Youth Code Products; and (b) all other persons who purchased Youth Code Products in States with similar consumer protection laws.

493.    Plaintiffs Goldrick, Gordon, and Luu and the other members of the Youth Code Class are consumers, purchasers or other persons entitled to the protection of the consumer protection laws of the State in which he or she purchased the Youth Code Products produced by L'Oreal/Youth Code.

494.    The consumer protection laws of the State in which Plaintiffs Goldrick, Gordon, and Luu and the other members of the Youth Code Class purchased the Youth Code Products declare that unfair or deceptive acts or practices in the conduct of trade or commerce are unlawful.

495.    Forty States and the District of Columbia have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising and that allow consumers to bring private and/or class actions.  These statutes are found at:

a.    Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et seq.*;

b.    Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;

c.    Arkansas Deceptive Trade Practices Act, Ark. Code §4-88-101, *et seq.*;

d.    California Consumers LegalRemedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;

e.    Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

f.    Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

g.    Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

h.    District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28 3901, *et seq.*;

i.    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

j.    Georgia Fair Business Practices Act, §10-1-390 *et seq.*;

k.    Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes §481A-1, *et seq.*;

l.    Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

m. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

n. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.*;

o. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

p. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

q. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*,

r. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

s. Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

t. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

u. Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.*;

v. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

w. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;

x. Nebraska Consumer Protection Act, Neb. Rev. Stat. §59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §87-301, *et seq.*;

y. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

z. New Hampshire Consumer Protection Act,  N.H. Rev. Stat. § 358-A:1, *et seq.*;

aa. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§  56:8 1, *et seq.*;

bb. New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 1, *et seq.*;

cc. New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

dd. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.*;

ee.    Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109:4-3-02, 109:4-3-03, and 109:4-3-10;

ff.    Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

gg.    Oregon Unfair Trade Practices Act, Ore. Rev. Stat § 646.608(e) & (g);

hh.    Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

ii.    South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

jj.    South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et seq.*;

kk.    Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*;

ll.    Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

mm.    Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;

nn.    West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

oo.    Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et seq.*

496.    The Youth Code Products produced by L'Oreal/Youth Code constitute products to which these consumer protection laws apply.

497.    In the conduct of trade or commerce regarding their production, labeling, advertising, marketing and sale of the Youth Code Products, L'Oreal/Youth Code engaged in one or more unfair or deceptive acts or practices, including, but not limited to, uniformly representing to Plaintiffs Goldrick, Gordon, and Luu and each member of the Youth Code Class by means of its advertising, marketing and other promotional materials, and on the packaging and labeling of the Youth Code Products, that the Youth Code would immediately begin to reduce

wrinkles, boost the skin's natural powers of regeneration, help to stimulate recovery through its GenActiv Technology, and have certain other age-negating effects as described herein.

498.    L'Oreal/Youth Code's representations and omissions were false, untrue, misleading, deceptive and/or likely to deceive.

499.    L'Oreal/Youth Code knew or should have known that their representations and omissions were false, untrue, misleading, deceptive and/or likely to deceive.

500.    L'Oreal/Youth Code used or employed such deceptive and unlawful acts or practices with the intent that Plaintiffs Goldrick, Gordon, and Luu and the other members of the Youth Code Class rely thereon.

501.    Plaintiffs Goldrick, Gordon, and Luu and the other members of the Youth Code Class did so rely.

502.    Plaintiffs Goldrick, Gordon, and Luu and the other members of the Youth Code Class purchased Youth Code Products produced by L'Oreal/Youth Code which misrepresented the characteristics and nature of Youth Code.  Plaintiffs Goldrick, Gordon, and Luu, and the other members of the Youth Code Class would not have purchased Youth Code but for the deceptive and unlawful acts of L'Oreal/Youth Code.

503.     As a result of L'Oreal/Youth Code's conduct, Plaintiffs Goldrick, Gordon, and Luu, and the other members of the Class were damaged.

504.     L'Oreal/Youth Code's conduct showed complete indifference to or conscious disregard for the rights and safety of others such that an award of punitive and/or statutory damages is appropriate.

505.     As a result of L'Oreal/Youth Code's violations of the foregoing state consumer protection statutes, Plaintiffs and the other members of the Youth Code Class demand judgment against L'Oreal/Youth Code for compensatory damages, double damages, treble damages, statutory damages, punitive or exemplary damages, restitution, and/or injunction relief and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Youth Code Class may be entitled.

## COUNT XXVI
### (For Breach of Express Warranty)

506.     Plaintiffs Goldrick, Gordon, and Luu repeat the allegations contained in paragraphs 1-505 as if fully set forth herein.

507.     Plaintiffs Goldrick, Gordon, and Luu bring this Count on his/her own behalf under the law of the state in which he/she purchased Youth Code on behalf of:  (a) all other persons who purchased Youth Code Products in the same State; and (b) all other persons who purchased Youth Code Products in States having similar laws regarding express warranty.

508.     L'Oreal/Youth Code's representations that the Youth Code Products would immediately begin to reduce wrinkles, boost the skin's natural powers of regeneration, help to stimulate recovery through its GenActiv Technology, and have certain other age-negating effects as described herein are affirmations by

L'Oreal/Youth Code that the Youth Code Products would deliver the age-negating benefits promised.

509.    L'Oreal/Youth Code's representations regarding the Youth Code Products are made to Plaintiffs and members of the Youth Code Class at the point of purchase, are part of the description of the goods and the bargain upon which they are offered for sale and purchased by Plaintiffs and the other members of the Youth Code Class.

510.    In addition or in the alternative, L'Oreal/Youth Code's representations are made to induce Plaintiffs and the other members of the Youth Code Class to rely on such representations, and Plaintiffs and the other members of the Youth Code Class did so rely on said representations as a material factor in his/her decision to purchase the Youth Code Products.  Plaintiffs and the other members of the Youth Code Class would not have purchased the Youth Code Products but for these representations and warranties.

511.    The Youth Code Products did not, in fact, meet the descriptions L'Oreal/Youth Code made about the Youth Code Products.

512.    At all times relevant to this action, L'Oreal/Youth Code falsely represented that its Youth Code Products immediately begin to reduce wrinkles, boost the skin's natural powers of regeneration, help to stimulate recovery through its GenActiv Technology and have certain other age-negating effects as described herein when they do not, in breach of these express warranties.

513.     At all times relevant to this action, L'Oreal/Youth Code made false representations in breach of its express warranties and in violation of state express warranty laws, including:

    a.      Ak. St. § 4-2-313.

    b.      Ariz. Rev. Stat. Ann. § 47-2313.

    c.      Ark. Code Ann. § 4-2-313.

    d.      California Commercial Code § 2313.

    e.      Colo. Rev. St. § 4-2-313.

    f.      Conn. Gen. Stat. Ann. § 42a-2-313.

    g.      D.C. Stat. § 28:2-313.

    h.      Fla. Stat. § 672.313

    i.      Haw. Rev. Stat. § 490:2-313.

    j.      810 ILCS 5/2-313.

    k.      Ind. Code § 26-1-2-313.

    l.      Kansas Stat. Ann. § 84-2-313.

    m.      La. Civ. Code. Ann. Art. 2520

    n.      11 Maine Rev. Stat. Ann. § 2-313.

    o.      Mass. Gen. Laws Ann. 106 § 2-313.

    p.      Minn. Stat. Ann. § 336.2-313.

    q.      Miss. Code Ann. § 75-2-313.

    r.      Missouri Rev. Stat. §400.2-313.

    s.      Mont. Code Ann. 30-2-313.

    t.      Neb. Rev. Stat. § 2-313.

    u.      Nev. Rev. Stat. §104.2313.

    v.      N.H. Rev. Stat. § 382-A:2-313.

    w.      N.J. Stat. Ann. 12A:2-313.

    x.      N.M. Stat. Ann. § 55-2-313.

    y.      N.Y. U.C.C. Law § 2-313.

z. N.C. Gen. Stat. Ann. § 25-2-313.

aa. Okla. Stat. Ann. Tit. 12A, § 2-313.

bb. Or. Rev. Stat. § 72.3130.

cc. Pa. Stat. Ann. Tit. 13, § 2313.

dd. R.I. Stat. § 6A-2-313.

ee. S.C. § 36-2-313.

ff. S.D. Cod. Laws. § 57A-2-313.

gg. Tenn. Code Ann. § 47-2-313.

hh. Tex. Bus. & Com. Code Ann. § 2.313.

ii. Ut. Code Ann. § 70A-2-313.

jj. Vt. Stat. Ann. § 2-313.

kk. Wa. Ann. 62A.2-313.

ll. W. Va. Code § 46-2-313.

mm. Wyo. Stat. 34.1-2-313.

514. The above statutes do not require privity of contract in order to recover for breach of express warranty.

515. As a result of L'Oreal/Youth Code's conduct, Plaintiffs and the other members of the Youth Code Class were damaged.

516. Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Youth Code Class, placed L'Oreal/Youth Code on notice thereof.

517. Plaintiffs and the members of the Youth Code Class demand judgment against L'Oreal/Youth Code for compensatory damages, plus interest, costs and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Youth Code Class may be entitled.

**WHEREFORE,** Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against L'Oreal, as follows:

A.      For an order certifying the nationwide Lancôme Class and the California, New Jersey, Illinois and Florida Lancôme Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs Fabend, Schwartz, Kallen, Bauer, Absi, Murphy, Davis, Simmons, and Nino as Class Representatives and their attorneys as Class Counsel to represent the Class members;

B.      For an order certifying the nationwide Youth Code Class and the New Jersey, Massachusetts, and California Youth Code Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs Goldrick, Gordon, and Luu as Class Representatives and their attorneys as Class Counsel to represent the Class members;

C.      For an order declaring that L'Oreal's conduct violates the statutes referenced herein;

D.      For an order finding in favor of the Plaintiffs, the nationwide Lancôme Class, and the California, New Jersey, Illinois and Florida Lancôme Subclasses on all counts asserted herein;

E.      For an order finding in favor of the Plaintiffs, the nationwide Youth Code Class, and New Jersey, Massachusetts, and California Youth Code Subclasses on all counts asserted herein;

F.      For an order awarding statutory, compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

G.     For both pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

H.     For injunctive relief as pleaded including: enjoining L'Oreal from continuing the practices set forth above; directing L'Oreal to cease its deceptive and misleading marketing campaigns; and directing L'Oreal to disgorge all monies L'Oreal acquired by any act or practice declared by this Court to be wrongful; or as the Court may deem proper;

I.     For an order of restitution and all other forms of equitable monetary relief;

J.     For injunctive relief, including but not limited to corrective advertising, as pleaded or as the Court may deem proper; and

K.     For an order awarding Plaintiffs, the nationwide Lancôme Class and the California, New Jersey, Illinois and Florida Lancôme Subclasses their reasonable attorneys' fees and expenses and costs of suit.

L.      For an order awarding Plaintiffs, the nationwide Youth Code Class and the New Jersey, Massachusetts, and California Youth Code Subclasses their reasonable attorneys' fees and expenses and costs of suit.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff

Dated:  March 11, 2013                   By:___/s/ James E. Cecchi_____
                                              JAMES E. CECCHI
                                              Caroline F. Bartlett
                                              Zachary S. Bower
                                              5 Becker Farm Road
                                              Roseland, New Jersey 07068
                                              (973) 994-1700

Of Counsel:

Paul M. Weiss                             Stephen A. Weiss
Richard J. Burke                          Jonathan Shub
COMPLEX LITIGATION GROUP, LLC             Scott A. George
513 Central Avenue, Suite 300             SEEGER WEISS LLP
Highland Park, Illinois 60035             77 Water Street
(847) 433-4500                            New York, New York 10005
                                          (212) 584-0700

Joseph P. Guglielmo                       Joe R. Whatley, Jr.
Judy Scolnick                             Patrick J. Sheehan
SCOTT + SCOTT,                            WHATLEY KALLAS
ATTORNEYS AT LAW, LLP                     380 Madison Avenue, 23rd Floor
The Chrysler Building                     New York, New York 10017
405 Lexington Avenue, 40th Floor          (212) 447-7077
New York, NY 10174
(212) 223-6444                            Mark Gardy
                                          Jennifer Sarnelli
Jay W. Eisenhofer                         Meagan Farmer
Robert G. Eisler                          GARDY & NOTIS, LLP
GRANT & EISENHOFER P.A.                   560 Sylvan Avenue, Suite 3085
123 Justison Street                       Englewood Cliffs, New Jersey 07632
Wilmington, Delaware 19801                (201) 567-7377
(302) 622-7000

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
(312) 214-0000

Benedict P. Morelli
Jeremy W. Alters
Matthew T. Moore
MORELLI ALTERS RATNER
Miami Design District
4141 Northeast 2nd Avenue
Suite 201
Miami, Florida 33137
(305) 571-8550

Daniel A. Edelman
Thomas E. Soule
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603
(312) 739-4200

Reginald Von Terrell
THE TERRELL LAW GROUP
PO Box 13315
Oakland, California 94661
(510) 237-9700

*Attorneys for Plaintiffs and the Proposed
Classes*

Roland K. Tellis
Mark P. Pifko
BARON AND BUDD, P.C.
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333

Benjamin M. Lopatin
THE LAW OFFICES OF HOWARD
W. RUBENSTEIN, P.A.
One Embarcadero Center
Suite 500
San Francisco, California 94111
(888) 436-6437

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff

Dated:  March 11, 2013

By:___/s/ James E. Cecchi_____
JAMES E. CECCHI
Caroline F. Bartlett
Zachary S. Bower
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Of Counsel:

Paul M. Weiss
Richard J. Burke
COMPLEX LITIGATION GROUP, LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
(847) 433-4500

Joseph P. Guglielmo
Judy Scolnick
SCOTT + SCOTT,
ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
(212) 223-6444

Jay W. Eisenhofer
Robert G. Eisler
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

Stephen A. Weiss
Jonathan Shub
Scott A. George
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
(212) 584-0700

Joe R. Whatley, Jr.
Patrick J. Sheehan
WHATLEY KALLAS
380 Madison Avenue, 23rd Floor
New York, New York 10017
(212) 447-7077

Mark Gardy
Jennifer Sarnelli
Meagan Farmer
GARDY & NOTIS, LLP
560 Sylvan Avenue, Suite 3085
Englewood Cliffs, New Jersey 07632
(201) 567-7377

170

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
(312) 214-0000

Benedict P. Morelli
Jeremy W. Alters
Matthew T. Moore
MORELLI ALTERS RATNER
Miami Design District
4141 Northeast 2nd Avenue
Suite 201
Miami, Florida 33137
(305) 571-8550

Daniel A. Edelman
Thomas E. Soule
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603
(312) 739-4200

Reginald Von Terrell
THE TERRELL LAW GROUP
PO Box 13315
Oakland, California 94661
(510) 237-9700

*Attorneys for Plaintiffs and the Proposed
Classes*

Roland K. Tellis
Mark P. Pifko
BARON AND BUDD, P.C.
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333

Benjamin M. Lopatin
THE LAW OFFICES OF HOWARD
W. RUBENSTEIN, P.A.
One Embarcadero Center
Suite 500
San Francisco, California 94111
(888) 436-6437